## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| **TAYLOR CADLE,** | |
| **Plaintiff,** | **Case No.: 8:25-cv-02790-KKM-SPF** |
| **-v-** | |
| **GRADY JUDD (in his individual capacity and official capacity), MELISSA TURNAGE (in her individual capacity), WILLIAM RUSHING (in his individual capacity), and HENRY CADLE** | |
| **Defendants.** | |

### FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES the Plaintiff, Taylor Cadle, by and through her undersigned counsel, and files this Amended Complaint against Defendants Grady Judd, individually and in his official capacity, Melissa Turnage, individually, and William Rushing, individually, and in complaining of the Defendants, pleads and alleges as follows:

1

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331, 1343; 42 U.S.C. §§ 1983, 1988; and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

2.     Venue is proper in this Court under 28 U.S.C. § 1391(a) because all Defendants reside in the State of Florida and at least one Defendant resides in the Middle District of Florida.

3.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because all incidents, events, and occurrences giving rise to this action occurred in Polk County, Florida, which is in the Middle District of Florida.

## JURY DEMAND

4.     Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by a twelve-person jury on all issues so triable.

## PARTIES

5.     Plaintiff Taylor Cadle (hereinafter, "Plaintiff"), is a United States citizen, and now an adult female. At all times relevant to this action, she was a resident of Polk County, Florida, and a minor child.

6.     At all times relevant to this action, Defendant Sheriff Grady Judd (hereinafter, "Sheriff Judd") was and is the Sheriff employed by and serving as the

2

director of the Polk County Sheriff's Office (hereinafter "PCSO"). Sheriff Judd is sued in his official and individual capacities.

7.     The Polk County Sheriff is an elected position.

8.     At all times relevant to this action, Defendant Sheriff Judd was Polk County's final policymaker and decisionmaker regarding the PCSO's policing policies and practices.

9.     At all times relevant to this action, Defendant Sheriff Judd, was a duly appointed agent of the PCSO.

10.     At all times relevant to this action, Defendant, Detective Melissa Turnage (hereinafter, "Detective Turnage"), was a duly appointed detective of the PCSO. Defendant Turnage is sued in her individual capacity.

11.     During the events described in this complaint, Defendant Turnage was acting within the scope of her employment with PCSO.

12.     At all times relevant to the events described in this Complaint, the acts and omissions of the Defendant Turnage described in this Complaint were committed under the color of law and within the scope of her employment as a duly appointed PCSO employee.

13.     Defendant Detective William Rushing (hereinafter, "Detective Rushing"), was a duly appointed detective of the PCSO. Defendant Rushing is sued in his individual capacity.

3

14. During the events described in this complaint, Defendant Detective Rushing was acting within the scope of his employment with PCSO.

15. At all times relevant to the events described in this Complaint, the acts and omissions of the Defendant Detective Rushing described in this Complaint were committed under the color of law and within the scope of his employment as a duly appointed PCSO employee.

16. Defendant Henry Cadle (hereinafter, "Cadle"), is the adoptive father and paternal great uncle of Plaintiff. Defendant Cadle was convicted of custodial sexual battery of a minor 12-17 years of age, and sentenced to 17 years of incarceration, for sexually abusing Plaintiff as a child.

17. All incidents complained of in this Complaint took place in and impacted or affected the Plaintiff in Polk County, Florida.

## FACTUAL ALLEGATIONS

18. Plaintiff was born on October 11, 2003.

19. When she was approximately seven (7) years of age, Plaintiff was removed from her mother's care and placed in the custody of the Florida Department of Children and Families, where she spent a year and a half in multiple foster homes.

20. On October 9, 2012, Plaintiff was formally adopted by her paternal great uncle, Defendant, Henry Cadle, and great aunt, Lisa Cadle, and moved with them into their home in Polk County, Florida.

21.    When Plaintiff was approximately nine (9) years old, Defendant Cadle began inappropriately touching her, with the abuse escalating to rape on countless occasions over the course of three years. Plaintiff was sexually abused by Defendant Cadle from the ages of 9-13 from approximately 2013 to 2017.

22.    The sexual abuse and rape often transpired when Defendant Cadle took Plaintiff on rides with him in his truck, where he would pull off and park on hidden roads to sexually abuse her.

23.    Plaintiff kept the abuse a secret for years, due to her overwhelming fear of being returned to foster care if she reported the rapes.

24.    On July 31, 2016, when Plaintiff was 12 years old, she disclosed to her church minister's wife that her adoptive father, and paternal great uncle, Defendant Cadle, had been sexually abusing her for years. The minister called the police. Upon arrival, Plaintiff told the initial Polk County Sheriff's Office deputies to arrive on the scene that Defendant Cadle, had been having her undress for him, and that the night prior, July 30, 2016, when she was in his vehicle he attempted to penetrate her vagina with his penis and ejaculated on her. Plaintiff also disclosed that the sexual abuse occurred on the side of the road in Defendant Cadle's vehicle, where he would pull over and make her climb in the front seat and have sex with her, and that if a vehicle was coming she had to hide on the floorboard and he would act like he was peeing. Plaintiff stated that Defendant Cadle would always force her to go with him in his

car when she did not want to, that she had lost count of how many times it had occurred, and the sexual abuse started when she was approximately nine (9) years old.

25.    Defendant Detective Turnage was assigned to investigate the case on behalf of the Polk County Sheriff's Office.

26.    On July 30, 2016, Defendant Turnage conducted a screening wherein the Plaintiff, at this time a twelve (12) year old child, advised that Defendant Cadle touched her in places she should not be touched, and touched her private parts with his private parts. Plaintiff told Defendant Detective Turnage that Defendant Cadle put a condom on his private parts when he touches her private part. The Plaintiff, too ashamed to state what the Defendant Cadle would say to her when he raped, her, wrote on a piece of paper for Defendant Detective Turnage, that Defendant Cadle he would tell her to, "cum on my dick baby." The Plaintiff also gave Defendant Detective Turnage a statement consistent with the statement she made to the initial deputy to arrive on scene describing how the rapes happened on the side of the road in Defendant Cadle's vehicle, and about Defendant Cadle's pretending to urinate and making her hide on the floorboard when a car passed by the vehicle.

27.    Defendant Turnage subsequently interviewed Defendant Cadle. Despite the evidence provided to her by Plaintiff, Detective Turnage stated, "Basically, Taylor [Plaintiff], I guess, has made up these allegations, okay? That you

6

have been sexually abusing her." Thus, the assigned law enforcement officer to investigate a contemporaneous report of child sexual abuse, made clear that she already did not believe Plaintiff upon the initiation of her investigation, a position that colored every subsequent dereliction of her duties throughout her work on the case; for reasons that can only be explained by the PCSO's failures to appropriately train, supervise, and discipline officers.

28.    When Defendant Detective Turnage asked Defendant Cadle if he would be willing to take a polygraph test, Defendant Cadle, said no, specifically responding, "I've had sex with a lot of people in the shower with my eyes closed, if you know what I mean. I'm a man." Defendant Detective Turnage did not question or investigate what Defendant Cadle meant by his suggestive and strange commentary.

29.    On August 3, 2016, during a recorded forensic interview, Plaintiff gave a third consistent statement about Defendant Cadle's sexual abuse.

30.    Defendant Detective Turnage contemporaneously observed Plaintiff's recorded forensic interview, writing a summary of Plaintiff's exceedingly detailed recitation of Defendant Cadle's sexual abuse, in her police report. The summary stated as follows:

> Taylor stated her dad touched her private area with his private. Taylor advised they were in the car, and were coming back from the hospital and pulled over to the side of the road. He [Cadle] then told her to get

in the front seat and put something on his thing and he put it in her. Taylor stated they were coming from Trinity Hospital and he stopped at a store, they did not have what he wanted to buy and was upset.

Taylor says they stopped at a Handy Store Gas Station, and he [Cadle] bought condoms. Taylor stated she knows where the Handy Store is located, because it is across the street from where his sister lives. Taylor advised when he [Cadle] came out of the store, his pocket was bulky, and he was playing with the keys in his hand. When he got in the car, he [Cadle] pulled out a box of condoms, which had 3 located inside, Taylor stated he put them in the driver's door pocket. The condoms were grayish in color and said lifestyles. Taylor advised he opened a wrapper and threw it behind him and put it on his thingy.

Taylor advised when he [Cadle] got back in the truck, then said car, the interior light was on, and the keys were left in the car with the vehicle running the A/C. Taylor says when they were on the way home, he pulled off the side of the road, where there are no houses or traffic. Taylor advised they went passed a driveway and pulled over just passed it and there were four tires on Rockridge Road. Taylor advised he then got out of the truck and opened the back door and the front door, and threw the box, and put the rest in the car door. Taylor advised he then told her "to pull her pants down" and she said "no", and he then said "I told you to do it and do it now."

Taylor stated he [Cadle] kept his pants on. Taylor advised when he was doing the act, she saw his thingy with brownish color hair, she saw veins popping up and he said "come on my dick baby." Taylor stated he was shaking and panting and his legs were shaking and white gooey stuff came out and it got on his fingers. Taylor advised when he was done, he threw it in the grass. Taylor then climbed over the console, to the back seat and he walked to the front of the car and got in and turned on the AC.

Taylor stated the first time happened when she was sick, and she was in the bed and her mom does not like to sleep with her because she sleeps like an octopus and gives off heat. Taylor advised when she was asleep, he [Cadle] came in and she felt the bed move and saw the light turn on and then turned off. Taylor stated he put his hand on her and it freaked her out and he put his hand over her mouth. Taylor advised during this

incident, he [Cadle] was touching the top part of it, and nothing went inside of her thing. Taylor stated he was using his finger and rubbing it back and forth. Taylor advised this happened when she was 9, and everyone was in the house; mom, dad [Cadle], her, and her brother.

Taylor advised another incident was when she told him [Cadle], "she would never touch his thing, and he could not force her to do it." Taylor stated they were driving down the road and she was in the back seat, and he told her to get into the front seat. Taylor advised he told her "you need to do more, you are almost 12 year old, don't play dumb." Taylor stated "no i don't", and he then replied "yes, you do." Taylor stated he then un-zipped his pants and pulled his thing through his pants and told her to "touch it." Taylor advised he said "do it", "touch it" and he called her "a little whore." Taylor stated he has never called her names before.

Taylor stated on another incident, he [Cadle] touched her on the outside of her shirt and was told "one day, he would have him lick her boobs and her thing." Taylor advised he was in his room one day and he touched her boobs, while he was sitting there making himself get hard. Taylor stated he would hold his thing and move his hand back and forth. Taylor advised he would put baby oil on his thingy and her thingy since it would make it go in easier. Taylor then advised he would put on the condom, Taylor stated she does not know the number of times it has happened.

Taylor advised one time he [Cadle] tried to put it in, and it hurt Taylor stated they were at his work, and they went to go pick up pizza and she was made to sit in a chair backwards with her knees in the chair. Taylor advised he put it in her backside, and told her to just "shut up and take it " Taylor stated he was standing up and he was behind her and he tried to put it in, but she screamed because it hurt. Taylor advised it went in a tiny bit and had it covered with a condom.  Taylor stated he ejaculated and he took the condom off and threw it in the garbage. Taylor then stated nothing has happened to her butt before, first and last time.

Taylor advised on Sunday when she was dropped off for church, her dad [Cadle] brushed the back of her and her butt with his hand. Taylor stated he groped her and this is what made her upset and why she was crying when she went to church.

9

31.    On August 16, 2016, Defendant Detective Turnage conducted what she described in her police report as a "clarification interview" with Plaintiff. Defendant Detective Turnage told Plaintiff that her cell phone records showed she was texting continuously at the time she said she was sexually abused. Plaintiff responded that she used the phone as a way to avoid interacting with Defendant Cadle during the incident. In response to Defendant Detective Turnage's questioning Plaintiff as to the veracity of her story, Plaintiff responded "I am telling the truth, I cannot help it if you cannot find the evidence."

32.    On December 14, 2016, Defendant Detective Turnage conducted a recorded interview of Plaintiff, now a thirteen (13) year old girl, at Plaintiff's home. Before this interview, Plaintiff was not read her *Miranda* rights, nor was she provided an attorney or access to an attorney.

33.    During the interview, where Plaintiff provided her fourth consistent affirmation that she was sexually abused, Defendant Detective Turnage explicitly threatened Plaintiff that if she was lying her life and the lives of others would be destroyed, and accused Plaintiff of lying, to coerce her to recant and state she had made up her disclosures of sexual abuse. Defendant Detective Turnage also warned Plaintiff that if she continued to accuse Defendant Cadle, there would be consequences, angrily stating to Plaintiff in a recorded interview, "Do you want to

go back to foster care? Because more than likely, if he's arrested, they're not going to let you stay there. If its' not the truth, you're fixing to hurt a lot of people."

34.    During Defendant Detective Turnage's interrogation of Plaintiff she also stated as follows:

> What's going on, Taylor [Plaintiff]? Because you understand, if your dad [Defendant Cadle] goes to jail, he doesn't come back at all. Okay? That accusation you're making, since you are 12 years old, and this has been going on since you were nine, he goes to jail. He doesn't come back at all. So that means you, your brother, and your mom don't have him at all. If you're mad because you got your phone taken away, let's say that now and be done with it. Because I have three stories that say you like to be with your dad, you're daddy's little girl, you love to go with him because you like to get out of the house.

> But if it's not the truth, you're fixing to hurt a lot of people a lot of people. Your mom's not gonna have her car. Your dad's car is gonna get taken. Your dad's not gonna be able-the lawn business is gone. Your mom's gonna have to deal with you and your brother going to school. School starts in two weeks in Polk County–three. You're not gonna be able to have your shoes that you want for school. What are those? The Roshe- Roshe Nike shoes? You're not gonna be able to get braces. I hear you want braces or need braces. What is it Taylor?

> I mean, we had to deal with your poor mom crying out there 'cause we had to tell her that you're saying that your dad's been having sex with you since you were nine. That broke her heart. It would break her heart even more if it's not true.

35.    In response to Defendant Turnage's questioning, Plaintiff again reaffirmed the veracity of Defendant Cadle's sexual abuse, stating, "Everything I told you earlier is not a lie."

36.    Defendant Detective Turnage completely disregarded Plaintiff's exceedingly graphic and detailed and consistent descriptions of Defendant Cadle's sexual abuse, advising the Plaintiff that because the rape kit came back with no evidence of Defendant Cadle's DNA, and that if it had happened, there would have DNA found, so the case would not be charged.

37.    In fact, rape kits often do not show the evidence of an abusers' DNA, and in Plaintiff's case, a condom was used and the rape kit was performed more than 24 hours after the most recent rape, which would have served to minimize the presence of DNA. Studies have found that for rape kits that do get submitted for processing—and many often are not submitted at all—as few as 25% are returned with a sufficient quality and quantity of DNA to be tested further.

38.    Such a fundamental misunderstanding of forensic evidence by Defendant Detective Turnage can only be explained by an utter failure on the part of the PCSO to adequately train and supervise their law enforcement officers.

39.    Further, it is the law in the State of Florida that the uncorroborated testimony of a survivor sexual assault ***alone*** is sufficient to obtain a conviction. *See* Fla. Stat § 794.022. Defendant Detective Turnage either did not know, or did not care, that this is the law and instead willfully and recklessly pressured Plaintiff by suggesting to her that corroboration independent of her statements was needed.

40.     During the conversation, which was recorded, Defendant Detective Turnage said to Plaintiff, "I'm not saying you're lying . . . I just want to know why, if everything you said is true, why am I not finding anything?" To which the Plaintiff responded, "I don't know . . . I swear on my life it happened."

41.     After speaking with Plaintiff, Defendant Detective Turnage then advised Lisa Cadle that she planned to move forward with criminal charges against Plaintiff for lying to a law enforcement officer about a felony.

42.     On December 14, 2016, the conclusion section of Defendant Detective Turnage's police report stated, "Based on the facts gathered and the available evidence, there is not enough to support the elements of a criminal charge against Henry Cadle. There is however, enough probable cause to establish Taylor Cadle lied during a felony investigation. It was determined. Taylor [Plaintiff] falsified information in the initial investigation, and all lab results returned negative.

**16-34747**    Supplement No 0004

# POLK COUNTY SHERIFF'S OFFICE
**Narrative**

*12/14/16 1600 hrs.*
I responded to 556 Poyner Rd Polk City and made contact with Taylor and Lisa Cadle. I conducted a recorded clarification interview with **Taylor Cadle (W/F 13 yoa)**. Taylor advised she is not making this up and it all happened. Taylor was asked again about the incident and if there was anything she left out. Taylor stated she brought the two extra condoms which were purchased by Henry into the residence and hid them. In her original statement, Taylor advised Henry had them in the driver's door of the vehicle, but did not mention anything about them being brought into the residence. Taylor recounted where they were purchased at the Handystore and the brand was Trojan. In her original statement, she advised the brand which was purchased were Lifestyles.

Taylor also made statements about how she got into trouble with Lisa a couple of weeks prior to the incident. Taylor stated a condom wrapper was located in her dresser drawer and Lisa became upset. There was no mention about this during the original statements.

*1620 hrs.*
I conducted a recorded interview with **Lisa Cadle(W/F 52 yoa)** to clarify about the condom located in the dresser. Lisa stated there was no incident in regards to a condom. Lisa advised she would have "flipped her lid" if a condom wrapper was located in her dresser.

**CRIMINAL HISTORY:**
There is no criminal history for Henry Cadle.

**DCF:**
2015-104393 - physical injury/sexual abuse - no indicators 2016-023751-01 – sexual abuse/molestation - no indicators

**CONCLUSION:**
Based on the facts gathered and the available evidence, there is not enough to support the elements of a criminal charge against Henry Cadle. There is however, enough probable cause to establish Taylor Cadle lied during a felony investigation. It was determined Taylor falsified information in the initial investigation, and all lab results returned negative.

**INVESTIGATIVE COSTS:**
One detective for 26 hours

**CASE STATUS:**
Affidavit

| Report Officer | Printed At | |
|---|---|---|
| 6044/TURNAGE,MELISSA DEREUS | 01/03/2017 14:22 | Page 4 of 5 |

43.     Defendant Detective Turnage signed and swore and affirmed her report, which was signed off by Defendant Detective Rushing.

44.     Two days later, on December 16, 2016, Defendant Detective Turnage, submitted a signed and sworn affidavit that was co-signed by Defendant Detective Rushing, claiming that the PCSO had probable cause to charge the Plaintiff with giving false information to a law enforcement officer, a first-degree misdemeanor in the State of Florida. The affidavit of probable cause alleged that the victim of the crime was the Polk County Sheriff's Office, and specifically stated, "Due to the extent of the investigation and all investigative leads showing the victim provided false information it was determined the victim violated FSS § 837.055, giving false information to a law enforcement officer during a criminal felony investigation."

45.     Upon the inception of Plaintiff's disclosure of Defendant Cadle's abuse, the Florida Department of Children and Families opened an investigation. However, the Florida Department of Children and Families relied on Defendant Detective Turnage's findings, closing the case because Defendant Detective Turnage did not find evidence of abuse.

46.     On February 22, 2017, while unrepresented by counsel or a neutral guardian and without legal advice, Plaintiff and her adoptive mother, Lisa Cadle, signed a waiver of speedy trial with ninety days if she was referred and accepted into a diversionary program.

15

47.    On February 22, 2017, Defendant Cadle, Plaintiff's sexual molester, and Lisa Cadle, signed a Florida Department of Juvenile Justice waiver form, agreeing to waive the Plaintiff's *Miranda* Rights, and talk to a probation officer. At only thirteen-years-old, unrepresented by counsel, with her adoptive parents and guardians having interests adverse to her own, Plaintiff Cadle signed the form that stated in part, "I [Plaintiff] fully understand my rights. I fully agree to talk about my situation with my JPO [juvenile probation officer]."

48.    On May 22, 2017, Plaintiff was required to appear in court, and formally arraigned. Plaintiff's adoptive parents, Defendant Cadle (her sexual abuser) and Lisa Cadle, both of whom had interests adverse to those of Plaintiff Cadle, never sought counsel or legal advice on Plaintiff's behalf.  In fact, Lisa Cadle, advised Plaintiff to plead guilty to just get the case over with.

49.    In the absence of legal counsel, Lisa Cadle advised Plaintiff to sign a document "freely and voluntarily" waiving her right to counsel and representing herself. Whereupon, on May 27, 2017, Plaintiff pled guilty to giving false information to a law enforcement officer.

50.    On June 27, 2017, the thirteen (13) year old Plaintiff was placed on probation and continued residing with Defendant Cadle and Lisa Cadle.

51.    Plaintiff's conditions of probation included a curfew, that she perform community service, engage in anger management counseling, and write a letter of

16

apology to her Defendant Cadle, who had repeatedly sexually abused her for years, and the PCSO, who had relentlessly pressured Plaintiff to recant her truthful allegations against Defendant Cadle from the start of their "investigation."

Dear officer,

i'm sorry for my actions. I know what i did wasn't right therefore i face my consequences. This will never happen again.

Taylor Cadle,
6-29-17

52.     Defendant   Detective   Turnage's   lack   of   training   and   tainted investigation left Plaintiff at the behest of her guardian and adoptive father, Defendant Cadle, enabling Defendant Cadle to thereafter subject Plaintiff to further horrific sexual abuse.

18

53.    After Plaintiff was returned to the home of her sexual abuser, and less than one month after being forced to apologize to her abuser, Defendant Cadle continued his pattern of horrific sexual abuse against Plaintiff.

54.    On July 25, 2017, Defendant Cadle raped Plaintiff in his truck. During the incident, the Plaintiff surreptitiously took video footage and photographs of Defendant Cadle during the rape. She recorded him walking around the rear of his vehicle prior to the rape, and photographed Defendant Cadle's finger in her vagina; Defendant Cadle standing next to her with his penis exposed from the zipper of his shorts as she was lying on her back with her legs spread apart; and a picture of a box of condoms sitting on her lap. She also hid the condom box under the passenger seat of the truck.

55.    That same night, upon arriving home, the Plaintiff called 911 to report the rape. She showed the investigating officer the photographs she took of Defendant Cadle during the incident and advised him of the location where Defendant Cadle threw two used condoms and a paper towel that was in Plaintiff's underwear out the window. Officers ultimately located the condoms and the paper towel on the road where Plaintiff said the rape happened.

56.    Defendant Cadle was ultimately arrested, and during a police interview on July 26, 2017, Defendant Cadle admitted it was him in the photos that Plaintiff had taken during the rape.

57.    Defendant Cadle was charged with two counts of sexual battery by someone with familial or custodial authority upon a minor between 12-17 years of age, for not only his rape of Plaintiff on July 25, 2017, but also for the rape and sexual abuse Plaintiff reported the year prior, that resulted in her prosecution for making a false statement.

58.    On July 28, 2017, the Polk County State's Attorney's Office filed a motion to withdraw Plaintiff's guilty plea and vacate her probation. The motion stated that Plaintiff had "entered a plea of guilty without the assistance of counsel" and the "false information" had been determined to be true.

59.    On July 31, 2017, a judge vacated Plaintiff's guilty plea and terminated her probation.

60.    On September 18, 2017, the Polk County State's Attorney's Office terminated and dismissed the charges against Plaintiff, on the basis that "subsequent to the filing of the petition in this case, it was learned that [Plaintiff] was, in fact, truthful in the information she provided to law enforcement. As a result, the charge of false information to a law enforcement officer during investigation is being dismissed."

61.    On December 19, 2017, a DNA profile obtained from Plaintiff's underwear matched Defendant Henry Cadle's DNA profile.

62.    In preparing Defendant Cadle's case for trial, the State's Attorney's office submitted a notice of intent to include child hearsay evidence, which included Plaintiff's initial claims from 2016, and her forensic interviews from 2016 and 2017. A judge ruled that the evidence could be used in trial, his order stating, "this child was a victim of the failure of the criminal justice system."

63.    Defendant Cadle pled no contest to custodial sexual battery on a child 12-18 years of age and was sentenced to 17 years in prison on February 15, 2019. At the time of this pleading Defendant Cadle remains in custody and is required to register as a sex offender for the remainder of his life.

64.    Despite Defendant Detective Turnage's clear inability to treat child sexual abuse cases with the requisite care and seriousness, her coercive interrogations of Plaintiff and efforts to induce Plaintiff to make an inculpatory statement and charging Plaintiff with making a false statement without probable cause, she maintained her position as a Special Victims Unit detective. Moreover, despite the State's Attorney's Office sending a copy of the paperwork terminating and dismissing Plaintiff's conviction, stating it's finding that Plaintiff's prior report was not false, but in fact truthful, Defendant Detective Turnage was not disciplined or reprimanded in the aftermath of the incident.

65.    It was not until 2024, approximately seven years later, after Plaintiff's story received significant media attention, and a Florida State Senator contacted the

PCSO about Plaintiff's case, that the PCSO took any action to reprimand Defendant Detective Turnage. In a letter to the Senator, the PCSO claimed that Defendant Detective Turnage conducted a "thorough investigation," but admitted Defendant Detective Turnage's interviews of the Plaintiff contained "inappropriate questions and statements."

66.    On information and belief, Defendant Detective Rushing was not disciplined or reprimanded for signing the affidavit that lacked probable cause, and wrongfully criminalized Plaintiff.

67.    As a result of Plaintiff's case, the Polk County State Attorney's Office created a policy that "requires administration be consulted prior to charging a juvenile that claims to be a victim of sexual abuse." The creation of the policy reflected the recognized need for additional oversight and review of the PCSO's investigations and assertions of probable cause, particularly in cases of sexual abuse of a minor, due to the PCSO's pattern, policy, practice and custom of failing to adequately train and supervise its officers resulting in the deprivation of minors' constitutional rights.

## THE PCSO'S UNLAWFUL PRACTICES AND RATIFICATION AND ENCOURAGEMENT BY SHERIFF JUDD

68.    Plaintiff's interviews, which amounted to interrogations by a biased detective to induce the Plaintiff to recant and stated she lied about the sexual abuse; the charging of Plaintiff without probable cause; and her subsequent prosecution for

a crime she did not commit, which left Plaintiff exposed to further sexual abuse by Defendant Cadle. caused Plaintiff to suffer irreparable and lifelong damages. Plaintiff's damages were the result of the failure to train and supervise law enforcement officers, and conduct within the PCSO, which was encouraged and exacerbated by Sheriff Judd.

69.    Defendant Sheriff Judd was sworn in as the Sheriff of Polk County in January 2005.

70.    As Director of the PCSO, Defendant Sheriff Judd supervised PCSO law enforcement officers in carrying out their policing duties.

71.    In his capacity as the final policymaker for PCSO, Defendant Sheriff Judd's actions and inactions are those of Polk County.

72.    Defendant Sheriff Judd knowingly encouraged and authorized members of the PCSO to disregard and violate Constitutional and Fourth Amendment rights of victims, particularly minors with his tough on crime rhetoric, and criminalization of minors for making false statements.

73.    Polk County juveniles were charged with obstructing justice, which includes false reporting, at more than twice the State of Florida's average.

74.    In 2013, a minor was charged with aggravated assault, for allegedly cyberstalking a fellow classmate. A month after the charges were issued, the Polk

County State's Attorney's Office declined to prosecute the case due to a lack of evidence to support the charges.

75.    The same year as Plaintiff's case, the PCSO accused an 11-year-old girl of lying about an attempted abduction. She, too, was charged with filing a false police report, which the sheriff's office wrote on Facebook would "help re-enforce the lesson" after she wasted police resources.

76.    The PCSO maintained a widespread, persistent practice of coercive, accusatory interviewing of minor sexual abuse complainants without a guardian, legal counsel, or trauma-informed safeguards. The PCSO was indifferent to these practices and did not take reasonable steps to prevent them.

77.    The PCSO implicitly approved of PCSO's practices towards Plaintiff, characterizing Defendant Detective Turnage's investigation as "thorough" and imposed no discipline contemporaneously with the 2016-2017 events at issue in this case. This post-hac endorsement and failure to correct ratified the unconstitutional conduct.

78.    Further, prior to and during Plaintiff's case, the PCSO possessed actual notice of Defendant Detective Turnage's deficiencies in handling child sexual abuse investigations, including written letters of guidance and reprimand for serious case handling errors (Miranda omission leading to suppression of confession; failure to act on child disclosures; and arrest of the wrong suspect despite obvious

mismatches), yet the PCSO failed to retrain, supervise, or reassign her from her role as a Special Victims Unit detective.

79.    For example, within the year immediately preceding Defendants' violation of Plaintiff's constitutional rights, Defendant Detective Turnage committed multiple acts which evince a pattern of behavior that illustrates Defendant PCSO's deliberate indifference towards adequately training and supervising its law enforcement officers to investigate and handle child sexual abuse cases, and engage in practices that were not violative of civilians' constitutional rights. Defendant Detective Turnage was assigned to the Special Victims Unit on October 25, 2015. Less than a month into her assignment, in November 2015, in an unrelated case to Plaintiff's, during an interview with child sexual abuse suspect, Turnage failed to read the suspect the entirety of his Miranda rights, an error which resulted in the suppression of the suspect's confession.

80.    On December 29, 2015, less than a month after her prior botched child sexual abuse investigation, Defendant Turnage interviewed children who alleged their father was raping them and then left for Christmas vacation without bringing the suspect in for questioning or updating her supervisors on the status of the case. In her absence, the suspect was immediately arrested for the seriousness of the accusations made by the children. She received a letter of guidance from a Sergeant stating, "Disclosures made by children in this case must be acted upon immediately

if the investigation allows for it" and that her decision, "... to not complete this investigation or advise me of the interview results is inexcusable." However, Defendant Turnage was not disciplined in any other way or removed by PCSO from handling child sex abuse cases. Further, she was not trained or re-educated by PCSO on how to thoroughly investigate such cases.

81.    On December 16, 2016, two days after she submitted the affidavit that lacked probable cause alleging that Plaintiff had lied, Defendant Turnage received a Letter of Reprimand in reference to another serious child sexual abuse case. In that case, she arrested the wrong person. When it was evident, according to the Letter of Reprimand, that video footage of the suspect showed that he had visible tattoos, and the individual she arrested did not have any tattoos. The Letter of Reprimand stated, "[T]here was other information that you should have been considered during the investigation of this case. . . As a detective in the Bureau of Criminal Investigations you deal with cases involving the most vulnerable victims, our children and the elderly. It is imperative that you provide accurate information to your supervisors during these investigations and all leads are thoroughly followed." Upon information and belief, Defendant Turnage did not receive any additional training or reeducation on how to properly investigate child sexual abuse cases.

82.    Despite Plaintiff's wrongful adjudication being vacated in 2017, and the State's Attorney's Office later confirming Plaintiff's 2016 statements were

truthful, the PCSO instituted no meaningful corrective training or policy change; instead, the Polk County State's Attorney's Office (not the PCSO) created a policy requiring administrative consultation before charging a juvenile who claims sexual abuse—underscoring the obvious need for training and supervision that the PCSO ignored.

83.    Both prior to and at the time of the investigation into Plaintiff's complaint of sexual abuse and her prosecution, the PCSO's policies, practices, and customs served to enable the type of misconduct that resulted in the constitutional violations suffered by Plaintiff, such policies, practices and customs included:

     a.    Allowing detectives to engage in illegal and coercive tactics to secure confessions in cases;

     b.    Failing to take appropriate disciplinary or other corrective measures with respect to police officers who engaged in illegal or unconstitutional conduct;

     c.    Failure to properly train and supervise officers with respect to the constitutional limits of their investigative powers;

     d.    Ignoring with deliberate indifference systemic patterns of police misconduct and abuse of victims' rights in the course of police investigations, including coercion of statements; and

e.  Failing to properly sanction or discipline officers who were aware of violations of constitutional rights of individuals by other officers.

84.  At the time of Plaintiff's complaint of sexual abuse and her subsequent prosecution, and for many years before and thereafter the PCSO has been deliberately indifferent to the need to train, supervise, and discipline officers, failing to impose meaningful disciplinary and remedial actions in the following respects:

a.  A lack of consistent, rational, and meaningful disciplinary and remedial actions;

b.  A failure to effectively discipline officers who were found to have engaged in misconduct; and

c.  Failing to require that officers that engaged in misconduct received training to ensure that they did not repeat prior violations.

85.  On information and belief, in the wake of the overturning of Plaintiff's adjudication, Defendant Sheriff Judd made no changes to the PCSO's policies and practices, including efforts to minimize the criminalization of minors without probable cause, ensuring minors' constitutional rights were not violated, the criminalization of reporting of childhood sexual abuse, and its failure to train and supervise officers, particularly with regard to the investigation and management of

child sexual abuse cases. Defendant Sheriff Judd's continued indifference to these issues enabled and encouraged PCSO employees to disregard and violate constitutional rights both before and after Plaintiff made her 2016 report of sexual abuse.

## CAUSES OF ACTION

### COUNT I:
### 42 U.S.C. § 1983—MALICIOUS PROSECUTION—FOURTH AMENDMENT
*(Plaintiff Taylor Cadle vs. Defendant Detective Melissa Turnage - Individual Capacity)*

86.    Plaintiff hereby incorporates and realleges by reference to the allegations in Paragraphs 10-12, 18-65, 67-68, and 70-85 above.

87.    Defendant Detective Turnage's issuance of an affidavit that lacked probable cause—based on subjective disbelief rather than evidence—caused a criminal proceeding to be instituted against Plaintiff for making a false statement to a law enforcement officer.

88.    At all relevant times, Defendant Detective Turnage was acting under the color of law, and within the scope of her employment and authority as a law enforcement officer of the PCSO.

89.    An objectively reasonable law enforcement officer in Defendant Detective Turnage's position would have known that no arguable probable cause existed to charge Plaintiff with making a false statement (particularly in light of

Plaintiff's four consistent statements, her exceedingly detailed descriptions of Defendant Cadle's sexual abuse, and known forensic limitations).

90.    Defendant Detective Turnage violated Plaintiff's Fourth Amendment rights when she intentionally, with malice, and/or reckless disregard made misstatements and/or omissions in her affidavit which lacked arguable probable cause.

91.    Defendant Detective Turnage's affidavit resulted in the institution of the criminal process leading to Plaintiff's prosecution and adjudication for making a false statement.

92.    Defendant Detective Turnage was aware that the court system and State Attorney's Office would rely upon the facts set forth in her affidavit in determining whether to prosecute Plaintiff.

93.    But for the filing of the affidavit, the Plaintiff would not have been prosecuted for the criminal charge.

94.    The criminal prosecution was terminated in the Plaintiff's favor by the entry of a nolle prosequi by the State Attorney's Office on September 28, 2017.

95.    Defendant Detective Turnage's conduct caused Plaintiff's injuries, and Plaintiff would not have been injured in the absence of Defendant Detective Turnage's conduct.

96.    Plaintiff's injuries were a reasonably foreseeable consequence of Defendant Detective Turnage's conduct.

97.    As a direct and proximate result of Defendant Detective Turnage's actions, Plaintiff suffered, continues to suffer, and will suffer injuries and damages, including severe emotional distress, humiliation, reputational stigma, loss of capacity for enjoyment of life, expenses for treatment and care, and physical and psychological injury from the subsequent sexual assaults that occurred after Defendant Detective Turnage's coercive conduct left her unprotected. Said losses, injuries, and expenses are either permanent or continuing in nature and Plaintiff will continue to suffer same in the future.

98.    Punitive damages are available against Defendant Detective Turnage and are hereby sought by Plaintiff given the reprehensibility of Defendant Detective Turnage's conduct and the need to deter others from engaging in similar conduct.

99.    Plaintiff is also entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

## COUNT II:
## 42 U.S.C. § 1983—SUBSTANTIVE DUE PROCESS—FOURTEENTH AMENDMENT
*(Plaintiff Taylor Cadle vs. Defendant Detective Melissa Turnage – Individual Capacity)*

100.    Plaintiff hereby incorporates and realleges by reference the allegations in Paragraphs 10-12, 18-65, 67-68, and 70-85 above.

31

101.   Defendant Detective Turnage, acting under the color of law, subjected Plaintiff, a minor sexual abuse victim, to coercive and intimidating questioning—in the absence of the presence of an adult—threatening her with a return to foster care and family harm if she persisted in her claims of Defendant Cadle's sexual abuse, and thereafter pursued a false statement to a law enforcement officer charge without probable cause.

102.   In the alternative, and in addition, Defendant Detective Turnage, through affirmative acts and the misuse of her authority, created and substantially increased the danger to Plaintiff that Plaintiff otherwise would not have faced, including by:

a.  Discrediting Plaintiff's rape report to child protection authorities and branding her a liar, thereby undermining protective interventions;

b.  Communicating or causing to be communicated that Plaintiff made a false report, which foreseeably resulted in Plaintiff being in the custody and control of her abuser;

c.  Interfering with or discouraging protective processes that would have removed or restricted the abuser's access; and

d.  Doing so with deliberate indifference to an obvious, known, and specific risk that Plaintiff would suffer further sexual abuse.

103.   Defendant Detective Turnage's conduct shocks the conscience and violated Plaintiff's Fourteenth Amendment rights to bodily integrity, safety, and substantive due process.

104.   Defendant Detective Turnage's conduct was deliberately indifferent to Plaintiff's safety and welfare and was so egregious and arbitrary as to shock the conscience in violation of Plaintiff's Fourteenth Amendment right to bodily integrity, safety, and substantive due process.

105.   Defendant Detective Turnage's conduct ultimately resulted in Plaintiff being subjected not just to an unjust and wrongful prosecution, but to further incidents of horrific sexual abuse at the hands of Defendant Cadle.

106.   As a direct and proximate result of Defendant Detective Turnage's actions, Plaintiff suffered, continues to suffer, and will suffer injuries and damages, including severe emotional distress, humiliation, reputational stigma, loss of capacity for enjoyment of life, expenses for treatment and care, and physical and psychological injury from the subsequent sexual assaults that occurred after Defendant Detective Turnage's coercive conduct left her unprotected. Said losses, injuries, and expenses are either permanent or continuing in nature and Plaintiff will continue to suffer same in the future.

107.   Punitive damages are available against Defendant Detective Turnage and are hereby sought by Plaintiff given the reprehensibility of Defendant Detective Turnage's conduct and the need to deter others from engaging in similar conduct.

108.   Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

## COUNT III:
## 42 U.S.C. § 1983—MALICIOUS PROSECUTION—FOURTH AMENDMENT
*(Plaintiff Taylor Cadle vs. Defendant Detective William Rushing – Individual Capacity)*

109.   Plaintiff hereby incorporates and realleges by reference the allegations in Paragraphs 13-15, 18-63, 66-68, and 70-85 above.

110.   Defendant Detective Rushing's signing and affirmation of Defendant Detective Turnage's written affidavit that lacked probable cause – based on Defendant Detective Turnage's disbelief rather than evidence—caused a criminal proceeding to be instituted against Plaintiff for making a false statement to a law enforcement officer.

111.   At all relevant times, Defendant Detective Rushing was acting under color of law, and within the scope of his employment and authority as a law enforcement officer of the PCSO.

112.   An objectively reasonable law enforcement officer in Defendant Detective Rushing's position would have known that no arguable probable cause

34

existed to charge Plaintiff with making a false statement (particularly in light of Plaintiff's four consistent statements and her exceedingly detailed descriptions of Defendant Cadle's sexual abuse).

113.   Defendant Detective Rushing violated Plaintiff's Fourth Amendment rights when he intentionally and/or recklessly signed and affirmed Defendant Detective Turnage's affidavit.

114.   Defendant Detective Rushing's co-signing on an affidavit that lacked probable cause and resulted in the institution of the criminal process leading to Plaintiff's prosecution and adjudication for making a false statement.

115.   Defendant Detective Rushing was aware that the court system and State Attorney's Office would rely upon the facts set forth in Detective Turnage's affidavit in determining whether to prosecute Plaintiff.

116.   But for the filing of the affidavit, the Plaintiff would not have been prosecuted for the criminal charge.

117.   The criminal prosecution was terminated in the Plaintiff's favor by the entry of a nolle prosequi by the State Attorney's Office on September 28, 2017.

118.   Defendant Detective Rushing's conduct caused Plaintiff's injuries, and Plaintiff would not have been injured in the absence of Defendant Detective Rushing's conduct.

119.   Plaintiff's injuries were a reasonably foreseeable consequence of Defendant Detective Rushing's conduct.

120.   As a direct and proximate result of Defendant Detective Rushing's actions, Plaintiff suffered, continues to suffer, and will suffer injuries and damages, including severe emotional distress, humiliation, reputational stigma, loss of capacity for enjoyment of life, expenses for treatment and care, and physical and psychological injury from the subsequent sexual assaults that occurred after she was maliciously prosecuted. Said losses, injuries, and expenses are either permanent or continuing in nature and Plaintiff will continue to suffer same in the future.

121.   Punitive damages are available against Defendant Detective Rushing and are hereby sought by Plaintiff given the reprehensibility of Defendant Detective Rushing's conduct and the need to deter others from engaging in similar conduct.

122.   Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

## **COUNT IV:**
**42 U.S.C. § 1983—FAILURE TO TRAIN, SUPERVISE, AND DISCIPLINE**
(*Plaintiff Taylor Cadle vs. Defendant Sheriff Grady Judd – Official Capacity*)

123.   Plaintiff hereby incorporates and realleges by reference to the allegations in Paragraphs 6-9 and 18-85 above.

124.   At all relevant times, the Polk County Sheriff's Office ("PCSO")— through Sheriff Grady Judd acting in his official capacity—consciously or

deliberately failed to train, supervise, or discipline its law enforcement officers – such failures were the moving force behind the violation of Plaintiff's constitutional rights, in violation of 42 U.S.C. § 1983.

125.   As the Sheriff of the PCSO, Defendant Sheriff Judd supervised and trained the PCSO officers in carrying out their duties, including policing.

126.   The need for training and supervision was obvious given the predictable constitutional consequences of untrained/coercive interviewing and charging of minors with "false reporting" in the absence of physical evidence. Without such training, minors were subjected to further harm, as occurred in Plaintiff's case.

127.   The PCSO consciously or deliberately failed to discipline officers for coercive interviewing tactics and charging of minors without probable cause, particularly sexual abuse complainants for "false reporting" in the face of constitutional violations as described in this complaint.

128.   The need for training was obvious given the predictable constitutional consequences of untrained/coercive interviewing and the risk of charging children with "false reporting" in the absence of physical evidence.

129.   The PCSO had notice of these deficiencies both prior to and during Plaintiff's case through:

a.   Documented performance issues and written reprimands/guidance to Defendant Detective Turnage in 2015 - 2016 regarding serious lapses in SVU case handling;

b.   Practices of charging juveniles with obstruction of justice at elevated rates; and

c.   The vacatur of Plaintiff's juvenile adjudication and the State's later acknowledgement that Plaintiff's prior statements were true, demonstrating that the PCSO's approach predictably led to wrongful prosecutions and left victims at risk.

130.   Despite this notice, the PCSO failed to implement adequate training and supervision on:

a.   Child appropriate, forensic, and/or non-coercive interviewing;

b.   Proper investigation of allegations of sexual abuse, including childhood sexual abuse;

c.   Proper interviews of suspects, including those suspected of sexual abuse to include childhood sexual abuse;

d.   Probable cause standards for criminal charges related to sexual abuse including childhood sexual abuse;

e.   Probable cause standards for false reporting charges against minors; and

38

    f.    Mandatory supervisory review before recommending charges against minor complainants.

131.   In addition and in the alternative, the foregoing failures and practices affirmatively created or substantially increased a specific danger to Plaintiff by:

    a.   Discrediting her rape report and initiating a retaliatory "false-statement" prosecution that undermined her credibility with child-protective authorities;

    b.   Ensuring her continued placement in the custody and control of her known abuser by failing to pursue protective action and by communicating to other agencies that Plaintiff was not credible;

    c.   Foreseeably exposing Plaintiff to renewed and repeated sexual abuse, which did occur, as a direct result of the PCSO's actions; and

    d.   Actively interfering with protective processes that otherwise might have removed her from the abusive environment.

132.   These affirmative acts and omissions shock the conscience and violated Plaintiff's Fourteenth Amendment Rights to bodily integrity and personal security.

133.   The PCSO's deliberate indifference was the moving force behind Plaintiff being subjected to coercive interviewing techniques that deprived her of constitutional rights, malicious prosecution, her loss of personal liberty via

probation, and the foreseeable exposure to sexual assault, after the PCSO's power was used against her rather than protect her.

134.   The PCSO's acts and omissions, as described above, were the direct and proximate result of Plaintiff's injuries and damages, including severe emotional distress, humiliation, reputational stigma, loss of capacity for enjoyment of life, expenses for treatment and care, and physical and psychological injury from the subsequent sexual assaults that occurred as a result of the PCSO's failures. Said losses, injuries, and expenses are either permanent or continuing in nature and Plaintiff will continue to suffer same in the future.

135.   The PCSO knew or should have known that its conduct would result in the deprivation of Plaintiff's constitutional rights.

136.   Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

## COUNT V:
### 42 U.S.C. § 1983—FAILURE TO TRAIN, SUPERVISE, AND DISCIPLINE
(*Plaintiff Taylor Cadle vs. Defendant Sheriff Grady Judd – Individual Capacity*)

137.   Plaintiff hereby incorporates and realleges by reference to the allegations in Paragraphs 6-9 and 18-85 above.

138.   As the Sheriff of the PCSO, Defendant Sheriff Judd supervised and trained the PCSO officers in carrying out their duties, including policing.

139.    The need for training and supervision was obvious given the predictable constitutional consequences of untrained/coercive interviewing and charging of minors with "false reporting" in the absence of physical evidence. Without such training, minors were subjected to further harm, as occurred in Plaintiff's case.

140.    Defendant Sheriff Judd had notice of the deficiencies in training, supervision, and discipline both prior to and during Plaintiff's case through:

a.    Documented performance issues and written reprimands/guidance to Defendant Detective Turnage in 2015-2016 regarding serious lapses in SVU case handling;

b.    The vacatur of Plaintiff's juvenile adjudication and the State's later acknowledgement that Plaintiff's prior statements were true, demonstrating that the PCSO's approach predictably led to wrongful prosecutions and left victims at risk;

c.    Practices of charging juveniles with obstruction of justice at elevated rates; and

d.    Investigative omissions in warrant or charging submissions, and failures to assess probable cause.

141.    Despite this notice, Defendant Sheriff Judd knowingly failed to correct and ratified customs and practices that violated constitutional rights, by failing to implement adequate training and supervision on:

41

a.   Child appropriate, forensic, and/or non-coercive interviewing;

b.   Proper investigation of allegations of sexual abuse, including childhood sexual abuse;

c.   Proper interviews of suspects, including those suspected of sexual abuse to include childhood sexual abuse;

d.   Probable cause standards for criminal charges related to sexual abuse including childhood sexual abuse;

e.   Probable cause standards for false reporting charges against minors; and

f.   Mandatory supervisory review before recommending charges against minor complainants.

142.   Defendant Sheriff Judd consciously or deliberately failed to investigate, remediate, or discipline officers for coercive interviewing tactics and charging of minors without probable cause, particularly sexual abuse complainants for "false reporting" in the face of constitutional violations as described in this complaint.

143.   In addition, and in the alternative, through the above failures and customs, Defendant Sheriff Judd, affirmatively created or substantially increased a specific danger to Plaintiff by:

a. Institutionalizing a practice of discrediting child sexual-abuse complainants and pursuing "false-report" charges that undermined child-protection interventions;

b. Causing or allowing detectives, including Defendant Detective Turnage, to communicate to child-protective and allied authorities that Plaintiff was not credible, which foreseeably resulted in Plaintiff remaining in the custody and control of her abuser;

c. Discouraging or failing to require coordination with child-protection and victim-advocacy services when abuse risk was known; and

d. Doing so with deliberate indifference to an obvious, known, and specific risk that Plaintiff would suffer additional sexual abuse.

144.    These policy-driven actions and omissions shock the conscience and violated Plaintiff's Fourteenth Amendment right to bodily integrity and safety.

145.    Defendant Sheriff Judd's deliberate indifference was the moving force behind Plaintiff being subjected to coercive interviewing techniques that deprived her of constitutional rights, malicious prosecution, her loss of personal liberty via probation, and the foreseeable exposure to sexual assault, after the PCSO's power was used against her rather than protect her.

146.    Defendant Sheriff Judd's acts and omissions, as described above, were the direct and proximate result of Plaintiff's injuries and damages, including severe

emotional distress, humiliation, reputational stigma, loss of capacity for enjoyment of life, expenses for treatment and care, and physical and psychological injury from the subsequent sexual assaults that occurred as a result of Defendant Sheriff Judd's failures. Said losses, injuries, and expenses are either permanent or continuing in nature and Plaintiff will continue to suffer same in the future.

147.    Defendant Sheriff Judd knew or should have known that conduct would result in the deprivation of Plaintiff's constitutional rights.

148.    Defendant Sheriff Judd's deliberate indifference resulted in the deprivation of Plaintiff's constitutional rights.

149.    Punitive damages are available against Defendant Sheriff Judd and are hereby sought by Plaintiff given the reprehensibility of Defendant Sheriff Judd's conduct and the need to deter others from engaging in similar conduct

150.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

## COUNT VI:
## 42 U.S.C. § 1983 – POLICY, PRACTICE, CUSTOM
*(Plaintiff Taylor Cadle vs. Defendant Sheriff Grady Judd – Official Capacity)*

151.    Plaintiff hereby incorporates and realleges by reference the allegations in Paragraphs 6-9 and 18-85 above.

152.    Defendant Sheriff Judd is the final policy maker for the PCSO.

153.    The PCSO by and through Defendant Sheriff Judd had in force and effect at the time of Plaintiff's complaint of sexual abuse, a policy, practice, or custom of his deputies and other law enforcement personnel engaging in unconstitutional and coercive interviews with victims to induce them to recant and in filing charges without probable cause.

154.    The PCSO by and through Defendant Sheriff Judd had in force and effect at the time of Plaintiff's complaint of sexual abuse, a policy, practice, or custom of other improper and unconstitutional conduct by his deputies and other law enforcement personnel including but not limited to:

    a.    Failing to properly investigate allegations of sexual abuse, including childhood sexual abuse;

    b.    Failing to properly interview suspects, including those suspected of sexual abuse to include childhood sexual abuse;

    c.    Failing to meet probable cause standards for criminal charges related to sexual abuse including childhood sexual abuse;

    d.    Failing to meet probable cause standards for false reporting charges against minors; and

    e.    Failing to provide mandatory supervisory review before recommending charges against minor complainants.

155.   On information and belief, the PCSO by and through Defendant Sheriff Judd had actual or constructive notice of these practices, policies, or customs, but approved and allowed such conduct to continue.

156.   On information and belief, PCSO command staff reviewed and approved the decision to seek charges and the investigative approach used against Plaintiff including during Plaintiff's interviews.

157. In    addition,    and    in    the    alternative,    the    foregoing policies/practices/customs affirmatively created or substantially increased a specific danger to Plaintiff by:

   a.  Branding Plaintiff—a known minor sexual-abuse victim—as a liar, foreclosing or diminishing safety planning and removal options;

   b.  Communicating to allied agencies that Plaintiff's report was false, which foreseeably resulted in Plaintiff remaining in the custody and control of her abuser; and

   c.  Discouraging or failing to require coordination with child-protective/victim-advocacy services despite the obvious, known risk of further abuse.

158.   These policy driven affirmative acts and omissions shock the conscience and violated Plaintiff's Fourteenth Amendment rights to bodily integrity and personal security.

46

159.    After it was learned that Plaintiff's report of sexual abuse was in fact true and her conviction was overturned, the PCSO imposed no timely discipline or corrective action, thereby approving the decision and basis for it.

160.    The foregoing policy and decision was the moving force behind the violations of Plaintiff's Fourth and Fourteenth Amendment rights.

161.    As a direct and proximate result of the PCSO's acts and omissions, Plaintiff suffered injuries and damages, including severe emotional distress, humiliation, reputational stigma, loss of capacity for enjoyment of life, expenses for treatment and care, and physical and psychological injury from the subsequent sexual assaults that occurred because of the PCSO's failures. Said losses, injuries, and expenses are either permanent or continuing in nature and Plaintiff will continue to suffer same in the future.

162.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

## COUNT VII:
### 42 U.S.C. § 1983 – POLICY, PRACTICE, CUSTOM
*(Plaintiff Taylor Cadle vs. Defendant Sheriff Grady Judd – Individual Capacity)*

163.    Plaintiff hereby incorporates and realleges by reference the allegations in Paragraphs 6-9 and 18-85 above.

164.    Defendant Sheriff Judd is the final policy maker for the PCSO.

165.    In his individual capacity and exercising his supervisory and policy-setting authority, Defendant Sheriff Judd established, maintained and/or ratified a policy, practice, or custom of unconstitutional and coercive interviews with victims to induce them to recant and in filing charges without probable cause.

166.    At the time of Plaintiff's complaint of sexual abuse, Defendant Sheriff Judd in his personal capacity and exercising his supervisory and policy-setting authority, established, maintained or ratified one or more policies, practices, or customs that caused the constitutional violations, including:

   a.    Failing to properly investigate allegations of sexual abuse, including childhood sexual abuse;

   b.    Failing to properly interview suspects, including those suspected of sexual abuse to include childhood sexual abuse;

   c.    Failing to meet probable cause standards for criminal charges related to sexual abuse including childhood sexual abuse;

   d.    Failing to meet probable cause standards for false reporting charges against minors; and

   e.    Failing to provide mandatory supervisory review before recommending charges against minor complainants.

167.    On information and belief, Defendant Sheriff Judd had actual or constructive notice of these practices, policies, or customs, but he failed to

disapprove, curtail, or correct them, and instead permitted and ratified them, demonstrating deliberate indifference to the known or obvious risk of constitutional injury.

168.    In addition, and in the alternative, through the policies, customs, and practices he maintained/ratified, Defendant Sheriff Judd affirmatively created or substantially increased a specific danger to Plaintiff by:

    a.   Discrediting Plaintiff's rape report to allied agencies and branding her a liar, which foreseeably resulted in her remaining in the custody and control of her abuser;

    b.   Approving or failing to stop communications and filings that labeled Plaintiff a false reporter and blocked protective interventions; and

    c.   Discouraging/omitting required coordination with child-protection services in the face of a known, specific risk of further sexual abuse.

169.    These actions/omissions shock the conscience and violated Plaintiff's Fourteenth Amendment rights to bodily integrity and personal security.

170.    After it was learned that Plaintiff's report of sexual abuse was in fact true and her conviction was overturned, Defendant Sheriff Judd imposed no timely discipline or corrective action, thereby approving the decision and basis for it.

171.    Defendant Sheriff Judd's policies, practices, or customs were the moving force behind the violations of Plaintiff's Fourth and Fourteenth Amendment rights.

172.    As a direct and proximate result of the Defendant's acts and omissions, Plaintiff suffered injuries and damages, including severe emotional distress, humiliation, reputational stigma, loss of capacity for enjoyment of life, expenses for treatment and care, and physical and psychological injury from the subsequent sexual assaults that occurred because of Defendant Sheriff Judd's failures. Said losses, injuries, and expenses are either permanent or continuing in nature and Plaintiff will continue to suffer same in the future.

173.    Punitive damages are available against Defendant Sheriff Judd and are hereby sought by Plaintiff given the reprehensibility of Defendant Sheriff Judd's conduct and the need to deter others from engaging in similar conduct.

174.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

## COUNT VIII:
## SEXUAL BATTERY (RAPE)
### *(Plaintiff Taylor Cadle vs. Defendant Henry Cadle)*

175.    Plaintiff hereby incorporates and realleges by reference to the allegations in Paragraphs 16, 18-42, and 45-63 above.

176.   Between 2013 through 2017, Defendant Cadle sexually molested and raped Plaintiff.

177.   As a minor, Plaintiff was incapable of consenting to this sexual abuse.

178.   It was known to Defendant Cadle that Plaintiff, as a minor, could not consent to his sexual abuse and rapes.

179.   Defendant Cadle committed "sexual battery" as defined in § 794.011(1)(h), Fla. Stat.

180.   The sexual battery described above directly and proximately caused Plaintiff's injuries in that it directly, and in a natural and continuous sequence, produced or contributed to such injuries.

181.   As a direct and proximate result of the foregoing, Plaintiff has suffered bodily injury, severe ongoing emotional distress, mental disturbance, fright, revulsion, humiliation, emotional and psychological pain and suffering, mental anguish, inconvenience, and a loss of capacity for the enjoyment of life, along with the consequential damages as a result of the severe distress. Said losses, injuries, and expenses are either permanent or continuing in nature and Plaintiff will continue to suffer same in the future.

**COUNT IX:**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
*(Plaintiff Taylor Cadle vs. Defendant Henry Cadle)*

182.   Plaintiff hereby incorporates and realleges by reference the allegations in Paragraphs 16, 18-42, and 45-63 above.

183.   Defendant Cadle's conduct of sexually abusing and raping Plaintiff on countless occasions was intentional and reckless, and Defendant knew or should have known that emotional distress would likely result.

184.   The conduct described in the incorporated paragraphs was and is outrageous; that is, it goes beyond all bounds of decency and is and out to be regarded as odious and utterly intolerable in a civilized community.

185.   The conduct described above directly and proximately caused Plaintiff's injuries in that it directly, and in a natural and continuous sequence, produced or contributed to such injuries.

186.   As a direct and proximate result of the foregoing, Plaintiff has suffered severe ongoing emotional distress, mental disturbance, fright, revulsion, humiliation, emotional and psychological pain and suffering, mental anguish, inconvenience, and a loss of capacity for the enjoyment of life, along with the consequential damages as a result of the severe distress. Said losses, injuries, and expenses are either permanent or continuing in nature and Plaintiff will continue to suffer same in the future.

## COUNT X:
## INVASION OF PRIVACY
*(Plaintiff Taylor Cadle vs. Defendant Henry Cadle)*

187.    Plaintiff hereby incorporates and realleges by reference the allegations in Paragraphs 16, 18-42, and 45-63 above.

188.    Defendant Cadle's unwanted and offensive sexual contact with Plaintiff was an invasion of her physical solitude and privacy.

189.    The invasion of privacy described above directly and proximately caused Plaintiff's injuries in that it directly, and in a natural and continuous sequence, produced or contributed to such injuries.

**190.**    As a direct and proximate result of the foregoing, Plaintiff has suffered bodily  injury, emotional distress, mental disturbance, fright, revulsion, humiliation, emotional and  psychological pain and suffering, mental anguish, inconvenience, loss of capacity for the  enjoyment of life, lost wages, loss of the ability to earn wages, and substantial medical and other expenses for treatment and care, past, present, and future. Said losses, injuries, and expenses are either permanent or continuing in nature and Plaintiff will continue to suffer same in the future.

## <u>PRAYERS FOR RELIEF</u>

WHEREFORE, Plaintiff Taylor Cadle prays for judgment against Defendants as follows:

191.    As to Count I, a money judgment against Defendant Detective Turnage for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney's fees, as allowed by law.

192.    As to Count II, a money judgment against Defendant Detective Turnage for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney's fees, as allowed by law.

193.    As to Count III, a money judgment against Defendant Detective Rushing for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney's fees, as allowed by law.

194.    As to Count IV, a money judgment against Defendant Sheriff Judd in his official capacity for all compensatory damages and special damages, cost disbursements, pre- and post-judgment interest, and attorney fees, as allowed by law.

195.    As to Count V, a money judgment against Defendant Sheriff Judd for all compensatory damages and special damages, punitive damages, cost

disbursements, pre- and post-judgment interest, and attorney's fees, as allowed by law.

196.   As to Count VI, a money judgment against Defendant Sheriff Judd in his official capacity for all compensatory damages and special damages, cost disbursements, pre- and post-judgment interest, and attorney fees, as allowed by law.

197.   As to Count VII, a money judgment against Defendant Sheriff Judd for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney's fees, as allowed by law.

198.   As to Count VIII, a money judgment against Defendant Cadle for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney's fees, as allowed by law.

199.   As to Count IX, a money judgment against Defendant Cadle for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney's fees, as allowed by law.

200.   As to Count X, a money judgment against Defendant Cadle for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney's fees, as allowed by law.

**Date: October 24, 2025**

**/s/ Brenda Harkavy**
Brenda Harkavy, Esq. (SBN: 332405)
(*admission pro hac vice pending*)
M. Stewart Ryan, Esq. (SBN: 313516)
(*admission pro hac vice pending*)
Alexandria MacMaster, Esq.(SBN:316826)
(*admission pro hac vice pending*)
Laffey Bucci D'Andrea Reich & Ryan
1100 Ludlow Street, Suite 300
Philadelphia, PA 19107
P: 215-399-9255
bharkavy@laffeybucci.com
sryan@laffeybucci.com
amacmaster@laffeybucci.com
CVSRteam@laffeybucci.com

**/s/ Troy Rafferty**
Troy A. Rafferty, Esq. (SBN: #24120)
(*admission pro hac vice pending*)
Madeline E. Pendley, Esq. (SBN:#1019746)
Rafferty, Domnick, Cunningham & Yaffa
815 S. Palafox St., 3rd Floor
Pensacola, FL 32502
P: 850-208-0826
troy@pbglaw.com
madeline@pbglaw.com