**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

TAYLOR CADLE,

      Plaintiff,

v.

      Case No. 8:25-cv-2790-KKM-SPF

GRADY JUDD, *in his individual
capacity and official capacity*,
MELISSA TURNAGE, *in her
individual capacity*, et al.,

      Defendants.

_____

## <u>ORDER</u>

Taylor Cadle sues Polk County Sheriff Grady Judd, Detective Melissa Turnage, and Detective William Rushing under 42 U.S.C. § 1983 for allegations arising out of a child sexual abuse investigation. Am. Compl. (Doc. 14). Taylor also sues her adoptive father, Henry Cadle, for Florida common law tort claims, including rape. *Id.* Judd, Turnage, and Rushing move to dismiss Taylor's claims, arguing that they are time barred and that qualified immunity defeats the claims against Judd in his individual capacity. *See* MTD (Doc. 39). I grant the motion in part. Because Taylor's claims are timely due to tolling under Florida's statute of limitations, I deny the motion as to Turnage, Rushing, and Judd in his official capacity; however, I grant the motion as to

Judd in his individual capacity based on qualified immunity. Accordingly, I dismiss with leave to amend only the claims against Judd in his individual capacity.

## I.   BACKGROUND

This case arises out of Detective Turnage's 2016 investigation into allegations that Henry Cadle sexually abused Taylor Cadle when she was a child. I start with the investigation and then turn to Taylor's allegations related to Judd and the Polk County Sheriff's Office (PCSO).

### A. The Cadle Investigation

In 2012, Taylor was adopted by her paternal great uncle, Henry Cadle, and his wife, Lisa Cadle, after spending more than a year in foster care. Am. Compl. ¶¶ 19–20. Not long after, when Taylor was nine years old, Henry "began inappropriately touching her, with the abuse escalating to rape on countless occasions over the course of three years." *Id.* ¶ 21. "[Taylor] kept the abuse a secret for years, due to her overwhelming fear of being returned to foster care if she reported the rapes." *Id.* ¶ 23.

In July 2016, Taylor confided in her church minister's wife, whose husband called the police. *Id.* ¶ 24. PCSO deputies arrived, and Taylor gave a detailed report describing that Henry had raped her for years, often by forcing her on rides alone with him in his truck. *Id.* ¶ 24. Shortly thereafter, Special Victims Unit Detective Turnage was assigned to her case. *Id.* ¶¶ 25, 79.

During a "screening interview" conducted by Turnage, Taylor—who was twelve—repeated extensive and graphic details of abuse. *Id.* ¶ 26. According to Taylor, Turnage concluded that she was lying, told Henry of the same, and ignored suspicious and sexually suggestive remarks he made during the investigation. *Id.* ¶¶ 26–28, 30.

On August 3, 2016, Taylor gave "a third consistent statement" about the abuse, which is recorded in Turnage's police report. *Id.* ¶¶ 29–30. The account includes detailed information such as the locations of the rapes, as well as the coercive methods and language used. *Id.* ¶ 30. Turnage interviewed Taylor at least two more times. On August 16, Turnage questioned Taylor about her cell phone records, which Turnage said showed that Taylor "was texting continuously at the time she said she was sexually abused." *Id.* ¶ 31. Taylor "responded that she used the phone as a way to avoid interacting with [Henry] during the incident" and insisted she was telling the truth. *Id.* On December 14, Turnage again interviewed Taylor, who then was thirteen. *Id.* ¶ 32. Taylor alleges that the interview amounted to an "interrogation[]" intended "to induce [her] to recant and state[] she lied about the sexual abuse." *See id.* ¶ 68; *see also id.* ¶ 33. Turnage did not give a *Miranda* warning to Taylor, who was not "provided an attorney or access to an attorney." *Id.* ¶ 32. The interview was recorded. Turnage warned Taylor that her parents' lives would be ruined and that Taylor would have to go back to foster care if Henry went to jail. *Id.* ¶¶ 33–

34. Turnage urged Taylor to admit if she was lying, warning that she had "three stories that say you like to be with your dad, you're daddy's little girl, you love to go with him because you like to get out of the house." *Id.* ¶ 34. Taylor insisted that she was telling the truth. *Id.* ¶ 35.

After a rape kit test came back negative for Henry's DNA, Turnage concluded that Henry could not have raped Taylor because "if it had happened, there would have [been] DNA found." *Id.* ¶ 36. As a result, the case against Henry was not charged. *Id.* Instead, Turnage pursued "criminal charges against [Taylor] for lying to a law enforcement officer about a felony." *Id.* ¶ 41. Turnage signed an affidavit stating that there was no probable cause to charge Henry with sexual abuse, but that there was probable cause to charge Taylor with false reporting. *Id.* ¶¶ 42–43. Detective Rushing co-signed the affidavit. *Id.* ¶ 44.

As a result of Turnage's findings, the Florida Department of Children and Families, which had opened an investigation after Taylor reported the abuse, closed Taylor's case. *Id.* ¶ 45.

Meanwhile, legal proceedings against Taylor began. Henry and Lisa Cadle waived Taylor's *Miranda* rights, and she never received counsel. *Id.* ¶¶ 46–50. Still thirteen years old, Taylor signed a form stating that she "fully understood [her] rights." *Id.* ¶ 47. On the advice of Lisa Cadle, Taylor pleaded guilty to providing false information to a law enforcement officer and was put

on probation. *Id.* ¶¶ 49, 51. As part of the plea, Taylor had to write apology letters to Henry and the PCSO, undergo anger management counseling, and perform community service. *Id.* She continued to reside with Henry and her adoptive mother. *Id.* ¶ 50.

Less than a month later, Henry again raped Taylor in his truck. *Id.* ¶¶ 53–54. This time, however, Taylor filmed the abuse and called 911. *Id.* ¶¶ 54–55. Henry was arrested and charged with sexual battery, including for the specific rapes that Taylor had reported to Turnage. *Id.* ¶¶ 56–57. Henry pleaded no contest to custodial sexual battery. *Id.* ¶ 63. In 2019, he was sentenced to seventeen years in prison. *Id.*

The Polk County State's Attorney's Office moved to withdraw Taylor's guilty plea and vacate her probation. *Id.* ¶ 58. The office formally dismissed the charges against her, concluding that Taylor had been truthful all along. *Id.* ¶ 60. The State's Attorney's Office sent a letter to the PCSO reporting its decision and findings. *Id.* ¶ 64. "As a result of [Taylor's] case," the State's Attorney's Office "created a policy that 'requires administration be consulted prior to charging a juvenile that claims to be a victim of sexual abuse.' " *Id.* ¶ 67. Taylor interprets the change as evidence of "the recognized need for additional oversight and review of the PCSO's investigations and assertions of probable cause, particularly in cases of sexual abuse of a minor." *Id.*

As for the PCSO, Taylor alleges that it did not discipline or reprimand Turnage, who "maintained her position as a Special Victims Unit detective." *Id.* ¶ 64. "It was not until 2024, approximately seven years later, after [Taylor's] story received significant media attention, and a Florida State Senator contacted the PCSO about [Taylor's] case, that the PCSO took any action to reprimand [Turnage]." *Id.* ¶ 65. In response to the senator, the PCSO wrote a letter claiming that Turnage had performed a "thorough investigation," but that at times her "questions and statements" were "inappropriate." *Id.*

### B. Procedural History

Taylor filed this suit on October 10, 2025, Compl. (Doc. 1), and amended her complaint two weeks later, Am. Compl. She brings ten counts: Florida common law claims against Henry (Counts VIII–X), *id.* ¶¶ 175–90; Section 1983 claims for malicious prosecution in violation of the Fourth Amendment against Turnage and Rushing (individual capacities) (Counts I and III), *id.* ¶¶ 86–99, 109–22; a Section 1983 claim for violations of substantive due process rights to bodily safety under the Fourteenth Amendment against Turnage (individual capacity) (Count II), *id.* ¶¶ 100–08; and Section 1983 claims against Judd under theories of supervisory and municipal liability for the Fourth and Fourteenth Amendment violations (individual and official capacities) (Counts IV–VIII), *id.* ¶¶ 123–174. Turnage,

Rushing, and Judd move to dismiss all counts against them, MTD, and Taylor responds, Resp. (Doc. 43).[1]

Taylor contends that Turnage maliciously prosecuted her by pursuing charges without probable cause. Am. Compl. ¶¶ 86–99. Likewise, she alleges that Turnage violated her right to bodily safety by coercively questioning her and "branding her a liar," which, according to Taylor, foreseeably prolonged Henry's abuse. *Id.* ¶¶ 102–105. Taylor alleges that these constitutional violations were part of a pattern of misconduct enabled by the PCSO and Sheriff Grady Judd, who supervised the PCSO officers and served as the Office's "final policymaker." *Id.* ¶¶ 69–71.

Taylor alleges that Judd was on notice that Turnage would violate her constitutional rights and failed to stop her. *See id.* ¶¶ 79, 140. According to Taylor, Turnage, who joined the Special Victims Unit about nine months before Taylor reported the abuse, evidenced a pattern of misconduct and inadequacy from the start. *See id.* ¶ 79. She offers three examples.

First, in November 2015, Turnage allegedly failed to read a suspect of child sexual abuse his *Miranda* rights properly, "result[ing] in the suppression of the suspect's confession." *Id.* ¶ 79. Second, in December 2015, "Turnage

---

[1] As for Henry, he has not responded to Cadle's complaint. The clerk entered default against him on February 4, 2026, after which Taylor filed a motion for default judgment, which remains pending. *See* (Docs. 57, 61).

7

interviewed children who alleged their father was raping them and then left for Christmas vacation without bringing the suspect in for questioning or updating her supervisors on the status of the case." *Id.* ¶ 80. While Turnage was away, "the suspect was immediately arrested." *Id.* Following the incident, a sergeant sent Turnage a letter admonishing that, " '[d]isclosures made by children in this case must be acted upon immediately if the investigation allows for it' and that her decision, ' . . . to not complete this investigation or advise me of the interview results is inexcusable.' " *Id.* Taylor alleges that the PCSO did not discipline, remove, or retrain Turnage after learning of her misconduct. *Id.* Third, in another child sexual abuse case, Turnage "arrested the wrong person." *Id.* ¶ 81. A "Letter of Reprimand" again admonished Turnage for failing to consider evidence, explaining that "[a]s a detective in the Bureau of Criminal Investigations you deal with cases involving the most vulnerable victims, our children and the elderly. It is imperative that you provide accurate information to your supervisors during these investigations and all leads are thoroughly followed." *Id.* Taylor alleges upon information and belief that the PCSO did not retrain Turnage after the investigative failures. *Id.* ¶¶ 78, 80–81.

Taylor also points to Turnage's behavior during the investigation into Henry's abuse as evidence of deficient training. For example, Taylor alleges that Turnage's conclusion that Henry could not have raped Taylor based on

8

the negative rape kit demonstrated "a fundamental misunderstanding of forensic evidence." *Id.* ¶¶ 36–38. Likewise, she avers that Turnage misapplied Florida law when assessing probable cause. *See id.* ¶¶ 39–44.

Last, Taylor alleges that the malicious prosecution in her case was part of Judd's policy to "encourage[] and authorize[] members of the PCSO to disregard and violate Constitutional and Fourth Amendment rights of victims, particularly minors with his tough on crime rhetoric, and criminalization of minors for making false statements." *Id.* ¶ 72.

As evidence, Taylor offers the statistic that "Polk County juveniles were charged with obstructing justice, which includes false reporting, at more than twice the State of Florida's average." *Id.* ¶ 73. In addition to Taylor, the complaint cites one example of the PCSO charging a minor for a false statement. *See id.* ¶ 75. Specifically, "[t]he same year as [Taylor's] case," the PCSO charged an 11-year-old girl with filing a false police report related to an alleged attempted abduction. *Id.* ¶ 75. "[T]he sheriff's office wrote on Facebook" that the charges "would 'help re-enforce the lesson' " after the girl wasted police resources." *Id.* The complaint does not specify whether the charges were dropped or how the abduction case resolved. *See id.* Additionally, Taylor alleges that, "[i]n 2013, a minor was charged with aggravated assault," but the charges were later dropped due to a lack of evidence. *Id.* ¶ 74. The complaint offers no other details about that case.

## II.    Legal Standard

Rule 12(b)(6) permits dismissal when a plaintiff fails "to state a claim upon which relief can be granted." To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). A claim is plausible on its face when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. When deciding whether to grant a motion to dismiss under 12(b)(6), a court must accept the allegations in the complaint as true and construe them in the light most favorable to the nonmoving party. *Baker v. City of Atlanta*, 164 F.4th 850, 861–62 (11th Cir. 2026). This tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 679.

"A Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate 'if it is apparent from the face of the complaint that the claim is time-barred.'" *Gonsalvez v. Celebrity Cruises Inc.*, 750 F.3d 1195, 1197 (11th Cir. 2013) (quoting *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004), *abrogated on other grounds by Twombly*, 550 U.S. 544).

### III.  ANALYSIS

I begin with the statute of limitations, which all three defendants raise, and then move to qualified immunity, which was raised by Judd for the individual capacity claims. Judd did not raise a failure to state a claim for the official capacity claims.

### A. Statute of Limitations

"Section 1983 provides a federal cause of action, but in several respects relevant here federal law looks to the law of the State in which the cause of action arose." *Wallace v. Kato*, 549 U.S. 384, 387 (2007). For example, "§ 1983 cases . . . are subject to the personal-injury statute of limitations" of the forum state. *Fulton v. Fulton County Bd. of Comm'rs*, 148 F.4th 1224, 1236–37 (11th Cir. 2025). Similarly, courts "generally refer[] to state law for tolling rules." *Wallace*, 549 U.S. at 394.

The parties agree that the statute of limitations applicable to Taylor's Section 1983 claims is four years. *See* MTD at 6; Resp. at 4; *McGroarty v. Swearingen*, 977 F.3d 1302, 1307 (11th Cir. 2020) ("[A] plaintiff must commence a § 1983 claim in Florida within four years of when the cause of action accrues."). Though neither party briefs the issue, in 2023, Florida shortened the statute of limitations for general negligence actions from four to two years. § 95.11(4)(a), Fla. Stat. (2023); *see Lewis v. Waitts*, No. 24-CV-81305-RAR, 2026 WL 548058, at *10 n.7 (S.D. Fla. Feb. 27, 2026) (applying the as-

11

amended two-year statute of limitations for negligence actions to Section 1983 claims). The parties do not address whether the negligence limitations period is the proper "personal-injury statute of limitations" that applies to Section 1983 claims. *Compare Lewis*, 2026 WL 548058, at *10 n.7, *with Gant v. Sarasota Mem'l Northport*, No. 8:24-CV-2236-SDM-TGW, 2024 WL 4416800, at *1 (M.D. Fla. Oct. 4, 2024) ("In Florida, the limitation for a personal injury, and derivatively for a Section 1983 claim, is four years." (citing § 95.11(3) Fla. Stat.). Even if it were, the legislative amendment "only applies to claims accruing on or after March 24, 2023." *Horne v. Zimmer Biomet Spine, Inc.*, No. 23-CV-62102-JB, 2026 WL 872422, at *4 n.4 (S.D. Fla. Mar. 30, 2026). Taylor's claims accrued no later than 2017. *See* MTD at 8–9. Thus, the relevant statute of limitations period is four years.

The next question is when the statute of limitations began to run. No party contests that Taylor's claims qualify for tolling under § 95.051(1)(i), Florida Statutes, which "tolls the statute of limitations for a minor's tort claim when the child lacks a parent, guardian, or guardian ad litem who is not adverse to the child" with respect to the claim. *D.H. v. Adept Cmty. Servs., Inc.*, 271 So. 3d 870, 875–76 (Fla. 2018); *see* Resp. at 6.

The parties disagree, however, about how long the statute of limitations was tolled. Taylor argues that the four-year clock did not start until October 11, 2021, when she turned eighteen. Resp. at 6–7. She reasons that Henry and

12

his wife (her adoptive mother) had interests adverse to hers with respect to her claims. Resp. at 6–7. And because she lived with either or both through the age of majority, the statute of limitations did not begin to run until her eighteenth birthday. Resp. at 6–7.

The defendants do not contest that Taylor's adoptive parents had interests adverse to hers. *See* MTD at 7. Instead, they challenge that a repose provision in the statute limited tolling by requiring Taylor to file suit no later than seven years after the events that gave rise to her claims. *Id*. And because the relevant events occurred in 2016 and 2017, Taylor had to file no later than 2024. *See id.* at 8–12.

Section 95.051(1)(i), the same provision tolling the statute of limitations for minors upon which Taylor relies, bars claims that arise out of events that are more than seven years old:

> The running of the time under any statute of limitations . . . is tolled by . . . .(i) The minority . . . of the person entitled to sue during any period of time in which a parent, guardian, or guardian ad litem . . . has an interest adverse to the minor . . . . In any event, the action must be begun within 7 years after the act, event, or occurrence giving rise to the cause of action.

§ 95.051(1)(i).

Taylor counters that the state law repose provision does not apply to Section 1983 claims. Resp. at 5–6. Based on Eleventh Circuit precedent, she is correct.

13

"[W]hen borrowing the residual personal injury statute of limitations from a state, federal courts borrow no more from state law than is necessary to effect that limitations period." *Moore v. Liberty Nat. Life Ins. Co.*, 267 F.3d 1209, 1217 (11th Cir. 2001); *see also Blackmon v. Holder*, No. 5:20-CV-524-FL, 2021 WL 2877902, *4-5 (E.D.N.C. July 8, 2021) (collecting cases). *But cf. Talley v. City of LaGrange*, No. 4:23-CV-32 (CDL), 2023 WL 8114369 (M.D. Ga. Nov. 22, 2023 (applying Georgia's "survivorship law—including its statute of repose" to Section 1983 claims). In *Moore*, the Eleventh Circuit concluded that, while tolling doctrines are "intrinsic to [the] appropriate application" of a statute of limitations, a rule of repose is not. *Id.*

The court offered multiple reasons. First, a statute of limitations and a rule of repose "are distinct, both conceptually and legally." *Id.* "A statute of limitations creates a time limit for suing in a civil case, based on the date when the claim accrued." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 812 (2024) (citation modified). "A statute of repose, on the other hand, puts an outer limit on the right to bring a civil action that is measured not from the date on which the claim accrues but instead from the date of the last culpable act or omission of the defendant." *Id.* (citation modified); *see also Westpark Pres. Homeowners Ass'n, Inc. v. Pulte Home Corp.*, 365 So. 3d 391, 394 (Fla. 2d DCA 2023) ("A statute of repose eliminates the underlying legal right; it precludes a right of action after a specified time.") (citation modified).

14

The court also reasoned that the doctrines diverge in purpose. According to *Moore*, "[s]tatutes of limitations are motivated by considerations of fairness to defendants" and incentivize the "prompt resolution of claims." 267 F.3d at 1218 (quoting *First United Methodist Church of Hyattsville v. United States Gypsum Co.*, 882 F.2d 862, 865–66 (4th Cir. 1989)). In comparison, statutes of repose are animated by "the economic best interests of the public as a whole," functioning as "substantive grants of immunity" that "determin[e] a time limit beyond which liability no longer exists." *Id.* (citation modified).

To be sure, this case presents a closer question than in *Moore*, where the court considered whether to apply Alabama's common law repose period to the statutory limitations period. *Id.* at 1213. In contrast, the repose period in Florida is in the same statute—the same subsection, no less—as the provision that tolls the statute of limitations. The first clause of § 95.051(1)(i) tolls the statute of limitations and explains the relevant tolling criteria, and the second sets a seven-year period of repose from "the act, event, or occurrence giving rise to the cause of action." Clearly the legislature conceived of the two as related and likely animated by similar policy concerns of finality and fairness. The defendants do not engage at all with *Moore* or how Florida law might differ in a dispositive way from *Moore*.

15

Despite the above, *Moore*'s rationale governs. As a result, the repose clause in § 95.051(1)(i) does not apply to Cadle's Section 1983 claims.[2] That leaves Taylor with a four-year statute of limitations that began to run the day she turned eighteen, October 11, 2021. *See* Am. Compl. ¶ 18; *McGroarty*, 977 F.3d at 1307. Taylor brought this suit on October 10, 2025, less than four years later. *See* Compl. (Doc. 1). Her claims are therefore timely.[3]

### B. Qualified Immunity for Supervisory Liability of Judd

In addition to the statute of limitations, Judd argues that the doctrine of qualified immunity shields him from individual liability under Section 1983. In the light of the high bar to show supervisory liability, I agree.

"[S]ection 1983 provides a method for vindicating federal rights conferred by the Constitution and federal statutes." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 997 (11th Cir. 1990). To successfully plead a Section 1983 claim, a plaintiff must allege: "(1) that the act or omission

---

[2] Taylor filed supplemental authority, (Doc. 64) (citing *D.L. v. Cmty. Based Care of Brevard, Inc.*, Nos. 5D2024-2975, 5D2024-3492, 2026 WL 404608 (Fla. 5th DCA Feb. 13, 2026)), arguing that her claims are not time barred because of § 95.11(9), Florida Statutes (2022), which permits "an action related to" a sexual assault of a victim under sixteen to "be commenced at any time." Applying § 95.11(9) to Section 1983 claims is inconsistent with the directive to use only the general personal injury statute of limitations, not the period set for more specific torts. *See Wallace*, 549 U.S. at 387. In any event, because I conclude that Taylor's claims are not time barred, the outcome is the same.

[3] Because I conclude that Taylor's claims were timely filed, I do not address her argument that the discovery rule independently delays accrual. *See* Resp. at 7.

16

deprived plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States, and (2) that the act or omission was done by a person acting under color of law." *Id.*; *see also Knight v. Jacobson*, 300 F.3d 1272, 1276 (11th Cir. 2002) ("Section 1983 does not create a remedy for every wrong committed under the color of state law, but only for those that deprive a plaintiff of a federal right.").

Taylor alleges that Turnage and Rushing violated her Fourth Amendment rights through malicious prosecution. Am. Compl. ¶¶ 86–99, 109–122; *see generally Henley v. Payne*, 945 F.3d 1320, 1328 (11th Cir. 2019) (explaining that malicious prosecution under Section 1983 "requires a plaintiff to allege malice and favorable termination of [her] criminal proceedings"). She avers that Turnage lacked probable cause when she issued the affidavit, and thereby "caused a criminal proceeding to be instituted against [Taylor]." Am. Compl. ¶ 87. Rushing, who co-signed the affidavit, is allegedly liable for the same reasons. *Id.* ¶¶ 110, 114.

Taylor also brings a Fourteenth Amendment claim against Turnage, who Taylor alleges violated her "right to bodily integrity, safety, and substantive due process" in a manner that "shock[s] the conscience." *Id.* ¶¶ 103–104. Taylor offers two theories. Under the first, Turnage's "coercive" questioning and pursuit of charges without probable cause "resulted in [Taylor] being subjected" to "wrongful prosecution" and "further incidents of horrific sexual

17

abuse." *Id.* ¶¶ 101, 105. Under the second, Turnage foreseeably "created and substantially increased the danger to [Taylor] that [she] otherwise would not have faced" by "branding her a liar" and "[d]iscrediting" her allegations to child protection services. *Id.* ¶ 102.

Taylor contends that Judd is liable for Taylor's injuries based on his knowledge, condonation, and causation of his subordinates' unconstitutional behavior. *See id.* ¶¶ 137–150 (Count V), ¶¶ 163–174 (Count VII). Judd argues that qualified immunity forecloses Taylor's claims. *See* MTD at 13–23.

Qualified immunity shields government officials performing discretionary functions from liability under Section 1983 when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To receive qualified immunity, [a] public official 'must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. To overcome qualified immunity, the plaintiff must show "that the defendant violated a constitutional right" and

18

that the right "was clearly established." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007).

Taylor does not dispute that Judd was acting within his discretionary authority. *See* Resp. Consequently, the burden shifts to Taylor to allege violations of her clearly established constitutional rights. *See Hanson v. Fla. Dep't of Corr.*, No. 5:25-CV-21-KKM-PRL, 2025 WL 2531484, at *3 (M.D. Fla. Sept. 3, 2025).

Judd's briefing only cursorily contests that "[Taylor] has failed to allege a prima facie case of a constitutional violation," *see* MTD at 23, and instead focuses on why Taylor's claims do not otherwise meet the standards for supervisory liability. For purposes of this order, I "assume, without deciding, that the alleged conduct by" Turnage and Rushing violated Taylor's clearly established constitutional rights. *See Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (assuming without deciding when considering supervisory liability that the subordinates' actions violated clearly established rights).[4] Focusing on the more fully briefed issue, the question is whether Judd, through his own actions or a policy, also violated Taylor's constitutional rights.

---

[4] Specifically, I assume that Taylor had a clearly established right against malicious prosecution under the Fourth Amendment, and a clearly established right in preserving bodily autonomy under the Fourteenth Amendment, and that Turnage and Rushing violated her rights.

Supervisors are not liable under Section 1983 for their employee's actions. *See Ireland v. Prummell*, 53 F.4th 1274, 1289 (11th Cir. 2022) ("Liability under § 1983 cannot be based on the theory of vicarious liability." (citation modified)). Instead, to hold a supervisor liable, a plaintiff must show "that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." *Keith v. DeKalb County*, 749 F.3d 1034, 1047–48 (11th Cir. 2014). Put another way, Taylor "must plead that [Judd], through [his] own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. It bears emphasizing that—unlike state claims of vicarious liability—the standard for supervisory liability is "extremely rigorous." *Piazza v. Jefferson County*, 923 F.3d 947, 957 (11th Cir. 2019) (citation modified).

"Without personal participation in a constitutional violation, a supervisor is liable only if the plaintiff can show that the supervising official's actions caused the alleged constitutional deprivation." *Bridges v. Poe*, 155 F.4th 1302, 1314 (11th Cir. 2025). A plaintiff may establish the requisite causal connection for supervisory liability in one of three ways: (1) when the violations occur due to "a supervisor's custom or policy"; (2) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so"; and (3) "when facts support an inference that the supervisor directed the subordinates to act unlawfully or

20

knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (citation modified), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). Finally, under "a different, albeit very similar, rule . . . a supervisor can be held liable for failing to train his or her employees" in limited circumstances. *Keith*, 749 F.3d at 1052.

Taylor alleges that Judd is liable under all four theories, and I address each in turn. First, a clarification. For liability to attach, Judd's actions must have *caused* Taylor's harms. Thus, "post-event evidence can shed some light on what policies existed . . . on the date of an alleged deprivation of constitutional right." *Bridges*, 155 F.4th at 1316. To that end, failure to reprimand Turnage *afterwards*—no matter how violative the alleged misconduct was—does not create supervisory liability under Section 1983. *Cf. Bridges*, 155 F.4th at 1315 (explaining why an officer's behavior, no matter how wrong, did not implicate his supervisor absent the supervisor's prior knowledge).

### 1. Policy or Custom

Turning first to the "policy or custom" theory of liability, the standard is rigorous—Taylor must "plausibly allege[] that Sheriff [Judd] instituted a policy or custom that *caused* [Taylor] to be" harmed. *Henley*, 945 F.3d at 1331 (emphasis added). In other words, she must show that Turnage (or Rushing)

acted not merely out of their own incompetence, but "pursuant to a policy or custom of the [PCSO]." *Henley*, 945 F.3d at 1331.

Taylor argues that policies related to charging and investigations caused her injuries. *See* Resp. at 14 (arguing that the Turnage's behavior "did not occur in a vacuum," but "resulted from practices affirmatively maintained by Judd as a policymaker, including the absence of safeguards designed to prevent criminalizing victims"). She alleges that Judd promoted a custom of recommending—without probable cause—false reporting charges against minors,[5] as well as criminal charges related to reports of sexual abuse. *See* Am. Compl. ¶ 166. Further, Judd maintained customs of conducting improper investigations and interviews in sexual abuse cases. *See id.*

Absent evidence of an explicit policy, Cadle "must point to multiple incidents, . . . or multiple reports of prior misconduct by a particular employee," *Piazza*, 923 F.3d at 957, that show a certain practice is "persistent and wide-spread." *Hoffman v. Off. of State Att'y, Fourth Jud. Cir.*, 793 F. App'x 945, 953 (11th Cir. 2019) (per curiam). The complaint does not meet this high standard. Taylor does not provide any examples apart from her own of the PCSO recommending charges without probable cause. *See* Am. Compl. While she avers that Polk County charged juveniles with false reporting at a high

---

[5] Relatedly, Taylor points to Judd's "fail[ure] to mandate supervisory review before recommending charges against minor complainants." Am. Compl. ¶ 166.

rate, there is no indication of how many charges there were, whether they resolved in the defendants' favor, or what exact role Judd—as opposed to the State's Attorney's Office—had in charging. *See* Am. Compl. ¶ 73. Accusing a juvenile of false reporting is not—without more—a constitutional violation. As Judd argues, absent facts indicating malicious prosecution, the court cannot infer that malicious prosecution was "persistent and widespread." *See Hoffman*, 793 Fed. App'x at 953; MTD at 16; *see also* Am. Compl. ¶ 75 (alleging that "the PCSO accused an 11-year-old girl of lying about an attempted abduction," but not clarifying whether there was probable cause or whether the charges were dropped); Am. Compl. ¶ 67 (alleging that the State's Attorney's Office changed their charging policies because of mistrust in the PCSO, but providing no specific facts or affidavits to support the claim). Even if one could infer that the PCSO maliciously prosecuted juveniles from the statistic, there is no timeframe for the dataset, which renders it impossible to know whether a custom existed at the time of Taylor's injuries in 2016 and 2017.

Turning to Taylor's other allegations, a custom of "[f]ailing to properly investigate allegations of sexual abuse" is stated at too high a level of generality—and without enough specific evidence—to demonstrate a causal connection to Taylor's specific injuries. *See* Am. Compl. ¶ 166. Taylor does not offer another report of coercive interviewing or discrediting victims. And the

23

rest of the allegations fail to show "persistent and widespread practices" rather than "isolated" incidents. *See* Am. Compl. ¶ 79 (averring that Turnage failed to give a suspect a proper *Miranda* warning); *id.* ¶ 80 (alleging that Turnage failed to act timely on an allegation of sexual abuse). Thus, the complaint fails to establish supervisory liability based on a custom or policy.

### 2. Failure to Correct

A plaintiff may also show causation "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Cottone*, 326 F.3d at 1360 (citation modified). A claim premised on a supervisor's knowledge of prior unconstitutional deprivations requires the plaintiff to show the prior deprivations were "obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Christmas v. Harris County*, 51 F.4th 1348, 1355 (11th Cir. 2022) (citation modified). As explained above, Taylor does not make allegations that amount to widespread misconduct necessary to impose liability. *See* MTD at 15.

### 3. Failure to Prevent

In a similar vein, Taylor's allegations do not demonstrate that Judd specifically knew of Turnage's unconstitutional misconduct and failed to stop it. Although Turnage's supervisors admonished her on multiple occasions, each concerned distinct behavior. *See* Am. Compl. ¶¶ 79–81 (describing Turnage's

24

failure to give a single abuse suspect a proper *Miranda* warning and to timely investigate a single child-abuse case). Thus, as a matter of law, they do not meet the high bar of both similarity and frequency necessary to show that Judd knew Turnage would violate Taylor's constitutional rights. *See Braddy v. Fla. Dep't of Lab. & Emp. Sec.*, 133 F.3d 797, 802 (11th Cir. 1998) ("[I]solated instances of harassment will not suffice."); *cf. Bridges*, 155 F.4th at 1316 ("Failing to point to multiple incidents or multiple reports of prior misconduct by a particular employee, the plaintiffs cannot establish the required causal link between [a supervisor's] conduct and their injuries.") (citation modified). Taylor does not show that Judd was liable for failing to stop conduct he knew would happen.

### 4. Failure to Train

Taylor's alternative theory, that Judd is liable for failing to train his employees, also fails to defeat qualified immunity. "Section 1983 allows supervisors to be held liable for failure to train subordinates only where the failure to train amounts to deliberate indifference to the rights of persons with whom the officers come into contact." *Bridges*, 155 F.4th at 1317 (citation modified). Taylor must show "that [Judd] had actual or constructive notice that a particular omission in [his] training program cause[d] [his] employees to violate citizens' constitutional rights, and that armed with that knowledge [Judd] chose to retain that training program." *Keith*, 749 F.3d at 1052 (citation

modified). The bar is high—"culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Bridges*, 155 F.4th at 1317 (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)).

Taylor alleges that Judd failed to properly train detectives on topics including how to (1) investigate sexual abuse; (2) interview children in a non-coercive manner; and (3) apply the probable cause standards for sexual abuse and false reporting. *See* Am. Compl. ¶ 38 (arguing that Turnage's misinterpretation of the rape kit results showed "a fundamental misunderstanding of forensic evidence . . . [that] can only be explained by an utter failure on the part of the PCSO to adequately train and supervise their law enforcement officers); *see id.* ¶ 141. As explained above, Taylor has not shown that Judd had notice of constitutional violations by his employees. It follows that he did not know that his training program was the cause of the violations. *See Keith*, 749 F.3d at 1053 (explaining that a "pattern of similar constitutional violations by untrained employees is ordinarily necessary" to show notice) (citation modified).

Taylor counters that "a pattern of identical constitutional violations is not required where the need for training, supervision, or discipline is so obvious that failure to act is likely to result in constitutional violations." Resp. at 10. To that end, she invokes *Canton v. Harris* to argue that "[c]harging decisions involving minor sexual-abuse victims present a uniquely high-risk context"

26

because of "[t]he risk that untrained or unsupervised detectives would criminalize child victims rather than protect them." *Id.* at 10 (citing 489 U.S. 378, 390 (1989)). Judd responds that Taylor fails to show that the risk here qualifies for "*Canton*'s hypothesized single-incident liability." *See Connick*, 563 U.S. at 68; MTD at 18. Undoubtably, investigations involving minor sexual abuse victims are among the most sensitive. But without support in the case law, Taylor has not shown that *Canton* applies.

Finally, to the extent that Taylor alleges that Turnage intentionally coerced her into recanting, *see* Am. Compl. ¶ 68, "liability will not attach for failure to train" given "the obviousness of the misconduct." *Bridges*, 155 F.4th at 1317–18 (explaining that liability would not attach because "the fact that a police officer should not (and may not) sexually assault citizens in his custody is obvious to all without training or supervision") (citation modified). That a detective should not coerce a victim of sexual abuse—let alone a child—into recanting should be "obvious to all without training or supervision." *Id.* at 1317.

## IV.   CONCLUSION

The defendants move to dismiss Taylor's Section 1983 claims. Because the claims are timely, the motion to dismiss is denied as to the claims against Turnage, Rushing, and Judd in his official capacity. Because qualified immunity bars Taylor's allegations of supervisory liability, I grant the motion

27

as to Judd in his individual capacity, although I decline to dismiss the claims with prejudice.

Accordingly, the following is **ORDERED**:

1. Defendants Turnage, Rushing, and Judd's Motion to Dismiss (Doc. 39) is **GRANTED IN PART** and **DENIED IN PART**. The motion is **DENIED** as to the claims against Turnage and Rushing (Counts I–III) and Judd in his official capacity (Counts IV and VI). The motion is **GRANTED IN PART** as to the claims against Judd in his individual capacity. Counts V and VII are **DISMISSED** without prejudice.

2. Plaintiff Taylor Cadle may file an amended complaint no later than **April 28, 2026**.

3. All defendants must file a responsive pleading to the operative complaint no later than **May 12, 2026**.[6]

**ORDERED** in Tampa, Florida, April 14, 2026.

Kathryn Kimball Mizelle
United States District Judge

---

[6] Should Taylor decline to amend her complaint, then the Court will enter an order dismissing Judd, in his individual capacity, from this action.

28