**UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

| | |
|---|---|
| **TAYLOR CADLE,** | |
| **Plaintiff,** | |
| **-v-** | **Case No.: 8:25-cv-02790-KKM-SPF** |
| **GRADY JUDD (in his individual capacity and official capacity), MELISSA TURNAGE (in her individual capacity), WILLIAM RUSHING (in his individual capacity), and HENRY CADLE** | |
| **Defendants.** | |

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES the Plaintiff, Taylor Cadle, by and through her undersigned counsel, and files this Second Amended Complaint against Defendants Grady Judd, individually and in his official capacity, Melissa Turnage, individually, and William Rushing, individually, and in complaining of the Defendants, pleads and alleges as follows:

1

## JURISDICTION AND VENUE

1. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331, 1343; 42 U.S.C. §§ 1983, 1988; and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

2. Venue is proper in this Court under 28 U.S.C. § 1391(a) because all Defendants reside in the State of Florida and at least one Defendant resides in the Middle District of Florida.

3. Venue is proper in this Court under 28 U.S.C. § 1391(b) because all incidents, events, and occurrences giving rise to this action occurred in Polk County, Florida, which is in the Middle District of Florida.

## JURY DEMAND

4. Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by a twelve-person jury on all issues so triable.

## PARTIES

5. Plaintiff Taylor Cadle (hereinafter, "Plaintiff"), is a United States citizen, and now an adult female. At all times relevant to this action, she was a resident of Polk County, Florida, and a minor child.

6. At all times relevant to this action, Defendant Sheriff Grady Judd (hereinafter, "Defendant Judd") was and is the Sheriff employed by and serving as

2

the director of the Polk County Sheriff's Office (hereinafter "PCSO"). Sheriff Judd is sued in his official and individual capacities.

7. The Polk County Sheriff is an elected position.

8. At all times relevant to this action, Defendant Judd was Polk County's final policymaker and decisionmaker regarding the PCSO's policing policies and practices.

9. At all times relevant to this action, Defendant Judd was a duly appointed agent of the PCSO.

10. At all times relevant to this action, Defendant, Detective Melissa Turnage (hereinafter, "Defendant Turnage"), was a duly appointed detective of the PCSO. Defendant Turnage is sued in her individual capacity.

11. During the events described in this complaint, Defendant Turnage was acting within the scope of her employment with PCSO.

12. At all times relevant to the events described in this Complaint, the acts and omissions of the Defendant Turnage described in this Complaint were committed under the color of law and within the scope of her employment as a duly appointed PCSO employee.

13. Defendant William Rushing (hereinafter, "Defendant Rushing"), was a duly appointed detective of the PCSO. Defendant Rushing is sued in his individual capacity.

3

14. During the events described in this complaint, Defendant Rushing was acting within the scope of his employment with PCSO.

15. At all times relevant to the events described in this Complaint, the acts and omissions of the Defendant Rushing described in this Complaint were committed under the color of law and within the scope of his employment as a duly appointed PCSO employee.

16. Defendant Henry Cadle (hereinafter, "Cadle"), is the adoptive father and paternal great uncle of Plaintiff. Defendant Cadle was convicted of custodial sexual battery of a minor 12-17 years of age, and sentenced to 17 years of incarceration, for sexually abusing Plaintiff as a child.

17. All incidents complained of in this Complaint took place in and impacted or affected the Plaintiff in Polk County, Florida.

## FACTUAL ALLEGATIONS

### A. Plaintiff's Disclosure of Sexual Abuse and the PCSO Response (July 31, 2016)

18. Plaintiff was born on October 11, 2003.

19. When she was approximately seven (7) years of age, Plaintiff was removed from her mother's care and placed in the custody of the Florida Department of Children and Families, where she spent a year and a half in multiple foster homes.

4

20. On October 9, 2012, Plaintiff was formally adopted by her paternal great uncle, Defendant, Henry Cadle, and great aunt, Lisa Cadle, and moved with them into their home in Polk County, Florida.

21. When Plaintiff was approximately nine (9) years old, Defendant Cadle began inappropriately touching her, with the abuse escalating to rape on countless occasions over the course of three years. Plaintiff was sexually abused by Defendant Cadle from the ages of 9-13 from approximately 2013 to 2017.

22. The sexual abuse and rape often transpired when Defendant Cadle took Plaintiff on rides with him in his truck, where he would pull off and park on hidden roads to sexually abuse her.

23. Plaintiff kept the abuse a secret for years, due to her overwhelming fear of being returned to foster care if she reported the rapes.

24. On July 31, 2016, when Plaintiff was 12 years old, she disclosed to her church minister's wife that her adoptive father, and paternal great uncle, Defendant Cadle, had been sexually abusing her for years. The minister called the police and Hillsborough County Sheriff's Office ("HCSO") deputies initially responded (although the church is in Hillsborough County, law enforcement subsequently learned that the abuse Plaintiff disclosed had occurred in Polk County). Upon arrival, Plaintiff told the HCSO deputies that arrived on the scene that Defendant Cadle had been having her undress for him, and that the night prior, July 30, 2016, when she

was in his vehicle he attempted to penetrate her vagina with his penis and ejaculated on her. Plaintiff also disclosed that the sexual abuse occurred on the side of the road in Defendant Cadle's vehicle, where he would pull over and make her climb in the front seat and have sex with her, and that if a vehicle was coming she had to hide on the floorboard and he would act like he was peeing. Plaintiff stated that Defendant Cadle would always force her to go with him in his car when she did not want to, that she had lost count of how many times it had occurred, and the sexual abuse started when she was approximately nine (9) years old. After determining that the alleged abuse had occurred in Polk County rather than Hillsborough County, HCSO contacted the Polk County Sheriff's Office and requested that PCSO assume the investigation.

25.    Plaintiff's disclosure to the HCSO deputies included additional specific details corroborating her account. Plaintiff identified a grey 2015 Chevrolet Sonic as the vehicle in which the most recent assault had occurred; identified Rockridge Road in Polk County as the location of the pullover; disclosed that Defendant Cadle wore a condom during the assault; and identified, by writing it down because she could not say it aloud, a specific sexually explicit statement Defendant Cadle had made to her during the abuse, which the HCSO preserved as physical evidence. HCSO responded by securing Defendant Cadle's vehicle as a possible crime scene,

contacting the state abuse hotline, and summoning a Hillsborough County Child Protective Investigator.

**B. Defendant Turnage's Incompetent Investigation (July through December 2016)**

26. Defendant Turnage was assigned to investigate the case on behalf of the Polk County Sheriff's Office. Defendant Turnage subsequently arrived at the church from Polk County, was briefed by HCSO personnel on Plaintiff's detailed and corroborated disclosure and took custody of Plaintiff and the vehicle for the PCSO investigation.

27. On July 31, 2016, Defendant Turnage conducted a screening wherein the Plaintiff, at this time a twelve (12) year old child, advised that Defendant Cadle touched her in places she should not be touched, and touched her private parts with his private parts. Plaintiff told Defendant Turnage that Defendant Cadle put a condom on his private parts when he touches her private part. The Plaintiff, too ashamed to state what the Defendant Cadle would say to her when he raped her, wrote on a piece of paper for Defendant Turnage that Defendant Cadle would tell her to, "cum on my dick baby." The Plaintiff also gave Defendant Turnage a statement consistent with the statement she made to the initial deputy to arrive on scene describing how the rapes happened on the side of the road in Defendant Cadle's vehicle, and about Defendant Cadle's pretending to urinate and making her hide on the floorboard when a car passed by the vehicle. This was Plaintiff's first

consistent affirming statement to Defendant Turnage of Defendant Cadle's sexual abuse after her initial disclosure.

28.    Following her initial interview of Plaintiff, on July 31, 2016, Defendant Turnage and another PCSO officer conducted a recorded interview of Plaintiff's adoptive mother, Lisa Cadle. During that interview, Defendant Turnage articulated to Lisa Cadle the investigative premise she would apply to Plaintiff's case. Defendant Turnage told Lisa Cadle: "Right now, Taylor is making accusations that Henry has been sexually assaulting her since she was nine years old . . . . And that's why I'm trying to get a basis of how the relationship is with the family. Because sometimes when things don't go, you know, the way that they want it to, they'll start making allegations. Back when we were younger, it was, you know, we'll call DCF and say, you abused me and now it's escalated to the point of since technology is around now, it's, you know, we get sexually abused." This statement, made to the suspect's wife, before any forensic interview of Plaintiff, before any meaningful forensic investigation of Defendant Cadle, and before the collection of any corroborating evidence, reflected a presumptive declaration that Plaintiff's disclosure fell within a pattern of fabricated allegations.

29.    During the same July 31, 2016, interview, Lisa Cadle was asked a series of questions directed at identifying a source, other than Defendant Cadle's sexual abuse, from which Plaintiff might have acquired sexual knowledge. Specifically,

Lisa Cadle was asked whether Plaintiff was "sexually active" and whether she had a "boyfriend." Lisa Cadle was also asked whether Plaintiff had "ever looked at any, like pornography or anything like that." These questions reflected an investigative framework under which a 12-year-old complainant's disclosure of sexual abuse would be treated as suspect unless the complainant's reported sexual knowledge could not be attributed to an alternative source. This investigative framework is contrary to established clinical and forensic understanding of child sexual abuse disclosure, a child sexual abuse complainant's advanced sexual knowledge is itself a recognized indicator of child sexual abuse, not a basis for treating a disclosure as fabricated.

30. Defendant Turnage subsequently interviewed Defendant Cadle. Despite the evidence provided to her by Plaintiff, Defendant Turnage affirmatively solicited characterizations of Plaintiff as a serial fabricator, asking Defendant Cadle, "Has Taylor made up any kind of dramatic stories or anything like that? Like with, um, over the top stuff, like, you know, something just totally false that just doesn't [happen]?" Later in the interview Defendant Turnage then framed Plaintiff's disclosure to Defendant Cadle by saying, "Basically, Taylor [Plaintiff], I guess, has made up these allegations, okay? That you have been sexually abusing her." Thus, the assigned law enforcement officer to investigate a contemporaneous report of child sexual abuse, made clear that she already did not believe Plaintiff upon the

9

initiation of her investigation, a position that colored every subsequent dereliction of her duties throughout her work on the case; for reasons that can only be explained by the PCSO's failures to appropriately train, supervise, and discipline officers.

31.    When Defendant Turnage asked Defendant Cadle if he would be willing to take a polygraph test, Defendant Cadle said no, specifically responding, "I've had sex with a lot of people in the shower with my eyes closed, if you know what I mean. I'm a man." Rather than treating Defendant Cadle's unsolicited sexualized statement seemingly about Plaintiff as a potential admission against interest or as a significant red flag warranting follow-up, Defendant Turnage characterized it as mere "daydreaming," responding to Defendant Cadle: "Okay, but daydreaming about it and answering questions in reference to the allegations are two totally different things." When Defendant Cadle pushed back, stating "Not really. No," Defendant Turnage dropped the line of inquiry and conducted no further investigation into what Defendant Cadle meant by his statement.

32.    Later on July 31, 2016, following her interviews of Lisa Cadle, and Defendant Cadle, Defendant Turnage returned to Plaintiff for a second recorded interview. A second, male law enforcement officer was present. Before this interview, Plaintiff was not read her Miranda rights, nor was she provided an attorney or access to an attorney. No adult acted on Plaintiff's behalf during this interview.

10

33.     During the interview, where Plaintiff provided her second consistent affirmation that she was sexually abused, Defendant Turnage explicitly threatened Plaintiff that if she was lying her life and the lives of others would be destroyed, and accused Plaintiff of lying, to coerce her to recant and state she had made up her disclosures of sexual abuse. Defendant Turnage also warned Plaintiff that if she continued to accuse Defendant Cadle, there would be consequences, angrily stating to Plaintiff in a recorded interview, "Do you want to go live back in foster care? Because more than likely, if he's arrested, they're not going to let you stay there."

34.     During Defendant Turnage's interrogation of Plaintiff she also stated as follows:

What's going on, Taylor [Plaintiff]? Because you understand, if your dad [Defendant Cadle] goes to jail, he doesn't come back at all. Okay? That accusation you're making, since you are twelve years old, and this has been going on since you were nine, he goes to jail. He doesn't come back at all. So that means you, your brother, and your mom don't have him at all. If you're mad because you got your phone taken away, let's say that now and be done with it. Because I have three stories that say you like to be with your dad, you're daddy's little girl, you love to go with him because you like to get out of the house.

But if it's not the truth, you're fixing to hurt a lot of people. A lot of people. Your mom's not gonna have her car. Your dad's car is gonna get taken. Your dad's not gonna be able-the lawn business is gone. Your mom's gonna have to deal with you and your brother going to school. School starts in two weeks in Polk County–three. You're not gonna be able to have your shoes that you want for school. What are those? The Roshe- Roshe Nike shoes? You're not gonna be able to get braces. I hear you want braces or need braces. What is it Taylor?

11

I mean, we had to deal with your poor mom crying out there 'cause we had to tell her that you're saying that your dad's been having sex with you since you were nine. That broke her heart. It would break her heart even more if it's not true.

35.     During the same second interview, a second male law enforcement officer present with Defendant Turnage made a false statement to Plaintiff regarding the diagnostic significance of a sexual assault forensic examination, suggesting a forensic examination would necessarily reveal physical evidence of abuse by stating: "Since certain things happen inside your body when you have sex. Okay. And you're a very tiny person, and it's very obvious to tell. Okay. All right. That's what we're saying is if there's certain things that have never happened inside of you before, they'll be able to know." The second officer's premise, that an examiner could "tell" whether "certain things have never happened inside of [the complainant] before" because Plaintiff was "a very tiny person", has no foundation in established forensic medicine. The second officer's statement has no foundation in established forensic medicine and was factually incorrect. A sexual assault forensic examination does not reliably determine, on the basis of body size or developmental stage, whether an individual has previously had sexual contact. Established peer-reviewed standards recognize that the medical examination of children suspected of having been sexually abused will be normal in the great majority of cases, and that examination findings cannot reliably establish whether prior sexual contact has occurred based

12

on a child's body size or developmental stage.[1] The use of this medically baseless

premise as an interrogation tool against a 12-year-old child reflects a fundamental

investigative deficiency evidencing, at a minimum, lack of adequate training and

supervision. Defendant Turnage then described in graphic terms to Plaintiff, a 12-

year-old child who had that morning disclosed sexual abuse, the procedure of a

sexual assault forensic exam, using the description as a coercive threat, stating: "If

so, we'll get you transported to a hospital and they can do a gynecological exam on

you to see all, see what's been happening, see all the trauma. Is that what you want

to do?" In response to Defendant Turnage's questioning and coercive statements,

Plaintiff reaffirmed the veracity of Defendant Cadle's sexual abuse, stating,

"Everything I told you earlier is not a lie."

36.    On August 3, 2016, during a recorded forensic interview, conducted at

the Children's Home Society Advocacy Center by a trained forensic interviewer,

Plaintiff gave a fourth consistent statement about Defendant Cadle's sexual abuse.

37.    Defendant Turnage contemporaneously observed Plaintiff's recorded

forensic interview, writing a summary of Plaintiff's exceedingly detailed recitation

---

[1] *See* U.S. Dep't of Justice, Office on Violence Against Women, *A National Protocol for Sexual Abuse Medical Forensic Examinations: Pediatric* (April 2016); Adams JA, Farst KJ, Kellogg ND, *Interpretation of Medical Findings in Suspected Child Sexual Abuse: An Update for 2018*, 31 J. Pediatric & Adolescent Gynecology 225 (2018) (most sexually abused children examined non-acutely do not have diagnostic physical findings).

13

of Defendant Cadle's sexual abuse, in her police report. The summary stated as follows:

Taylor stated her dad touched her private area with his private. Taylor advised they were in the car, and were coming back from the hospital and pulled over to the side of the road. He [Cadle] then told her to get in the front seat and put something on his thing and he put it in her. Taylor stated they were coming from Trinity Hospital and he stopped at a store, they did not have what he wanted to buy and was upset.

Taylor says they stopped at a Handy Store Gas Station, and he [Cadle] bought condoms. Taylor stated she knows where the Handy Store is located, because it is across the street from where his sister lives. Taylor advised when he [Cadle] came out of the store, his pocket was bulky, and he was playing with the keys in his hand. When he got in the car, he [Cadle] pulled out a box of condoms, which had 3 located inside, Taylor stated he put them in the driver's door pocket. The condoms were grayish in color and said lifestyles. Taylor advised he opened a wrapper and threw it behind him and put it on his thingy.

Taylor advised when he [Cadle] got back in the truck, then said car, the interior light was on, and the keys were left in the car with the vehicle running the A/C. Taylor says when they were on the way home, he pulled off the side of the road, where there are no houses or traffic. Taylor advised they went passed a driveway and pulled over just passed it and there were four tires on Rockridge Road. Taylor advised he then got out of the truck and opened the back door and the front door, and threw the box, and put the rest in the car door. Taylor advised he then told her "to pull her pants down" and she said "no", and he then said "I told you to do it and do it now."

Taylor stated he [Cadle] kept his pants on. Taylor advised when he was doing the act, she saw his thingy with brownish color hair, she saw veins popping up and he said "come on my dick baby." Taylor stated he was shaking and panting and his legs were shaking and white gooey stuff came out and it got on his fingers. Taylor advised when he was done, he threw it in the grass. Taylor then climbed over the console, to the

14

back seat and he walked to the front of the car and got in and turned on
the AC.

Taylor stated the first time happened when she was sick, and she was in
the bed and her mom does not like to sleep with her because she sleeps
like an octopus and gives off heat. Taylor advised when she was asleep,
he [Cadle] came in and she felt the bed move and saw the light turn on
and then turned off. Taylor stated he put his hand on her and it freaked
her out and he put his hand over her mouth. Taylor advised during this
incident, he [Cadle] was touching the top part of it, and nothing went
inside of her thing. Taylor stated he was using his finger and rubbing it
back and forth. Taylor advised this happened when she was 9, and
everyone was in the house; mom, dad [Cadle], her, and her brother.

Taylor advised another incident was when she told him [Cadle], "she
would never touch his thing, and he could not force her to do it." Taylor
stated they were driving down the road and she was in the back seat,
and he told her to get into the front seat. Taylor advised he told her "you
need to do more, you are almost 12 year old, don't play dumb." Taylor
stated "no i don't", and he then replied "yes, you do." Taylor stated he
then un-zipped his pants and pulled his thing through his pants and told
her to "touch it." Taylor advised he said "do it", "touch it" and he called
her "a little whore." Taylor stated he has never called her names before.

Taylor stated on another incident, he [Cadle] touched her on the outside
of her shirt and was told "one day, he would have him lick her boobs
and her thing." Taylor advised he was in his room one day and he
touched her boobs, while he was sitting there making himself get hard.
Taylor stated he would hold his thing and move his hand back and forth.
Taylor advised he would put baby oil on his thingy and her thingy since
it would make it go in easier. Taylor then advised he would put on the
condom, Taylor stated she does not know the number of times it has
happened.

Taylor advised one time he [Cadle] tried to put it in, and it hurt Taylor
stated they were at his work, and they went to go pick up pizza and she
was made to sit in a chair backwards with her knees in the chair. Taylor
advised he put it in her backside, and told her to just "shut up and take
it " Taylor stated he was standing up and he was behind her and he tried
to put it in, but she screamed because it hurt. Taylor advised it went in

15

a tiny bit and had it covered with a condom. Taylor stated he ejaculated and he took the condom off and threw it in the garbage. Taylor then stated nothing has happened to her butt before, first and last time.

Taylor advised on Sunday when she was dropped off for church, her dad [Cadle] brushed the back of her and her butt with his hand. Taylor stated he groped her and this is what made her upset and why she was crying when she went to church.

38. On August 17, 2016, Defendant Turnage conducted what she described in her police report as a "clarification interview" with Plaintiff at a Travel America truck stop. Defendant Turnage told Plaintiff that her cell phone records showed she was texting continuously at the time she said she was sexually abused. Plaintiff responded that she used the phone as a barrier to avoid interacting with Defendant Cadle during the incident. When Defendant Turnage questioned Plaintiff as to the veracity of her story, Plaintiff directly responded "that is not what I said, you are making stuff up." Plaintiff continued, "I am telling the truth, I cannot help it if you cannot find the evidence." This exchange constituted Plaintiff's fifth consistent affirmation of the truth of her disclosure of sexual abuse. Nonetheless, on this same date, Defendant Turnage wrote in her investigative file that "[b]ased on the facts gathered and the available evidence, there is not enough to support the elements of a criminal offense."

39. On August 19, 2016, Defendant Turnage signed her initial investigative conclusion, stating that she "cannot substantiate sufficient probable cause to determine a criminal offense occurred." Defendant Turnage reached this conclusion

before any forensic evidence was available. The Florida Department of Law Enforcement Laboratory Report (FDLE Number 20160308885) was not issued until October 26, 2016, more than two months after Defendant Turnage's conclusion. The subsequent laboratory findings did not drive Defendant Turnage's conclusion; they served to speciously rationalize a conclusion Defendant Turnage had already reached based on her presumptive-fabrication framework.

40.    The October 26, 2016, FDLE Laboratory Report in Plaintiff's case (FDLE Number 20160308885) was addressed directly to "Sheriff Grady C. Judd, Jr." at the Polk County Sheriff's Office, 1891 Jim Keene Blvd., Winter Haven, Florida. The report set forth findings on evidence collected from Plaintiff and Defendant Cadle. The FDLE laboratory found that "no semen was identified on the panties," and that on the vaginal and cervical swabs "quantitation failed to demonstrate a sufficient amount of male DNA for STR DNA analysis." In other words, the quantity of male DNA present was insufficient to permit DNA profile development, *not that no male DNA was present*. The FDLE laboratory entered Defendant Cadle's DNA profile, developed from his buccal swabs, into the Combined DNA Index System (CODIS). PCSO had also previously executed a search warrant on the vehicle in which Plaintiff disclosed she had been raped, and PCSO's search of the vehicle interior for bodily fluids returned negative results. Each of these forensic findings: insufficient male DNA quantity on the vaginal and

cervical swabs, no semen on the "panties", and no bodily fluids in the vehicle interior, was independently consistent with Plaintiff's consistent disclosure that Defendant Cadle had used a condom during the assault. None of these findings excluded the occurrence of sexual contact. Despite the fact that Plaintiff had reported condom use by Defendant Cadle from her first disclosure, and despite the fact that every forensic finding was consistent with that disclosure, Defendant Turnage treated each finding as additional proof that Plaintiff had fabricated her account, and did not further investigate or attempt to explain (outside of Plaintiff's consistent, detailed disclosures of sexual abuse) why a twelve-year-old child would have male DNA present on her vaginal and cervical swabs.

41.    Notwithstanding the FDLE laboratory's actual finding, Defendant Turnage represented the result to Plaintiff and documented the result in her own investigative narrative as a categorical exclusion of male DNA. In her December 14, 2016 PCSO Investigative Supplement, Defendant Turnage formally documented that "all lab results returned negative." During Defendant Turnage's December 14, 2016, interrogation of Plaintiff, Defendant Turnage told Plaintiff that "everything has come back negative." Both characterizations were materially inconsistent with the FDLE laboratory's actual finding, which had identified the presence of male DNA in a quantity insufficient for profile development, not the absence of male DNA. Defendant Turnage's categorical-exclusion characterization of male DNA in

18

her narrative report, and her statement to Plaintiff during her interrogation that "everything has come back negative," were therefore knowing or reckless misrepresentations of the FDLE laboratory's actual finding. Defendant Turnage did *nothing* to further investigate or try to explain the presence of male DNA.

42.    Defendant Turnage's investigative narrative concluded that "[Plaintiff] falsified information in the initial investigation, and all lab results returned negative," and that there was probable cause to charge Plaintiff with false reporting under Florida law. In reaching her investigative conclusion, Defendant Turnage disregarded forensic information she herself documented in her investigative narrative.

43.    On July 31, 2016, Defendant Turnage retrieved surveillance video from the Handy store in Zephyrhills covering only the time window from 20:30 to 22:00 hours on July 30, 2016. Plaintiff had reported, and Defendant Turnage had documented, that Defendant Cadle entered the Handy store at approximately 19:45 hours, forty-five minutes earlier than the time window of the video Defendant Turnage retrieved. The retrieved video did not cover the time window in which Plaintiff had reported Defendant Cadle was at the store. Defendant Turnage nonetheless cited the absence of Defendant Cadle from the retained video as supporting her conclusion that Plaintiff had fabricated.

44.    On December 14, 2016, Defendant Turnage conducted a recorded interview of Plaintiff, now a thirteen (13) year old girl, at Plaintiff's home. Before this interview, Plaintiff was not read her *Miranda* warnings, nor was she provided an attorney or access to an attorney. Defendant Turnage began the interview by telling Plaintiff: "I'm here to talk to you today because everything has come back, okay? Everything has come back negative." Defendant Turnage then told Plaintiff: "If it happened, there would be . . . DNA found. We didn't find anything." This representation misstated the actual findings of the October 26, 2016, FDLE Laboratory Report, which found the presence of male DNA, albeit an insufficient amount to develop a full profile of that DNA. Notwithstanding Defendant Turnage's unsupported representation, Plaintiff provided her sixth consistent affirmation that she was sexually abused by Defendant Cadle, telling Defendant Turnage she was "not making this up and it all happened." When asked if there was anything she had left out, Plaintiff provided additional corroborating detail, including that she had brought two extra condoms purchased by Defendant Cadle into the residence and hidden them there.

45.    Defendant Turnage completely disregarded Plaintiff's exceedingly graphic, detailed, and consistent descriptions of Defendant Cadle's sexual abuse, advising the Plaintiff that because the rape kit came back with no evidence of

Defendant Cadle's DNA, and that if it had happened, there would have DNA found, so the case would not be charged.

46.    In fact, rape kits often do not show the evidence of an abuser's DNA[2] even if the abuse is corroborated by other means, and in Plaintiff's case, a condom was used,[3] and the rape kit was performed more than 24 hours after the most recent rape, which would have served to minimize the presence of DNA.[4] Studies have found that for rape kits that do get submitted for processing—and many often are not submitted at all[5]—as few as 25% are returned with a sufficient quality and quantity of DNA to be tested further.[6]

---

[2] National Institute of Justice, *Sexual Assault Cases: Exploring the Importance of Non-DNA Forensic Evidence* (Nov. 9, 2017); Emily J. Hanson, Cong. Rsch. Serv., R44237, *Sexual Assault Kits (SAKs) and the Backlog of Untested Sexual Assault Evidence: In Brief* 1 (2022).

[3] National Institute of Justice, *Sexual Assault Cases: Exploring the Importance of Non-DNA Forensic Evidence* (Nov. 9, 2017); U.S. Dep't of Justice, Office on Violence Against Women, *A National Protocol for Sexual Assault Medical Forensic Examinations: Adults/Adolescents* 97 n.226 (3d ed. 2024).

[4] U.S. Dep't of Justice, Office on Violence Against Women, *A National Protocol for Sexual Assault Medical Forensic Examinations: Adults/Adolescents* 75 (3d ed. 2024).

[5] Hanson, *supra* note 1, at 6 (citing Kevin Strom et al., *How Much Justice Is Denied? An Estimate of Unsubmitted Sexual Assault Kits in the United States*, 73 J. Crim. Just. (2021), and estimating 300,000–400,000 unsubmitted SAKs in the United States between 2014 and 2018)

[6] Hanson, *supra* note 1, at 1.

47.    Such a fundamental misunderstanding of forensic evidence by Defendant Turnage can only be explained by an utter failure on the part of the PCSO and Defendant Judd to adequately train and supervise their law enforcement officers.

48.    Further, it is the law in the State of Florida that the uncorroborated testimony of a survivor sexual assault *alone* is sufficient to obtain a conviction. *See* Fla. Stat § 794.022. Defendant Turnage either did not know due to lack of training by PCSO and Defendant Judd, or did not care, that this is the law and instead willfully and recklessly pressured Plaintiff by suggesting to her that corroboration independent of her statements was needed.

49.    During the interrogation, which was recorded, Defendant Turnage said to Plaintiff, "I'm not saying you're lying . . . I just want to know why, if everything you said is true, why am I not finding anything?" To which the Plaintiff responded, "I don't know . . . I swear on my life it happened."

**C. The False and Malicious Prosecution of Plaintiff**

50.    After speaking with Plaintiff, Defendant Turnage then advised Lisa Cadle that she planned to move forward with criminal charges against Plaintiff for lying to a law enforcement officer about a felony.

51.    On December 14, 2016, the conclusion section of Defendant Turnage's police report stated, "Based on the facts gathered and the available evidence, there is not enough to support the elements of a criminal charge against Henry Cadle.

22

There is however, enough probable cause to establish Taylor Cadle lied during a felony investigation. It was determined Taylor [Plaintiff] falsified information in the initial investigation, and all lab results returned negative."



16-34747    C004

## POLK COUNTY SHERIFF'S OFFICE
### Narrative

12/14/16 1600 hrs.
I responded to 556 Poyner Rd Polk City and made contact with Taylor and Lisa Cadle. I conducted a recorded clarification interview with Taylor Cadle (W/F 13 yoa). Taylor advised she is not making this up and it all happened. Taylor was asked again about the incident and if there was anything she left out. Taylor stated she brought the two extra condoms which were purchased by Henry into the residence and hid them. In her original statement, Taylor advised Henry had them in the driver's door of the vehicle, but did not mention anything about them being brought into the residence. Taylor recounted where they were purchased at the Handystore and the brand was Trojan. In her original statement, she advised the brand which was purchased were Lifestyles.

Taylor also made statements about how she got into trouble with Lisa a couple of weeks prior to the incident. Taylor stated a condom wrapper was located in her dresser drawer and Lisa became upset. There was no mention about this during the original statements.

1620 hrs.
I conducted a recorded interview with Lisa Cadle(W/F 52 yoa) to clarify about the condom located in the dresser. Lisa stated there was no incident in regards to a condom. Lisa advised she would have "flipped her lid" if a condom wrapper was located in her dresser.

CRIMINAL HISTORY:
There is no criminal history for Henry Cadle.

DCF:
2015-104393 - physical injury/sexual abuse - no indicators 2016-023751-01 - sexual abuse/molestation - no indicators

CONCLUSION:
Based on the facts gathered and the available evidence, there is not enough to support the elements of a criminal charge against Henry Cadle. There is however, enough probable cause to establish Taylor Cadle lied during a felony investigation. It was determined Taylor falsified information in the initial investigation, and all lab results returned negative.

INVESTIGATIVE COSTS:
One detective for 20 hours

CASE STATUS:
Affidavit

6044/TURNAGE, MELISSA DENEUS    01/03/2017 14:22    Page 4 of 5

52.    Defendant Turnage signed and swore and affirmed her report, which was signed off by Defendant Rushing.

53.     Two days later, on December 16, 2016, Defendant Turnage, submitted a signed and sworn affidavit that was co-signed by Defendant Rushing, claiming that the PCSO had probable cause to charge the Plaintiff with giving false information to a law enforcement officer, a first-degree misdemeanor in the State of Florida. The affidavit of probable cause alleged that the victim of the crime was the Polk County Sheriff's Office, and specifically stated, "Due to the extent of the investigation and all investigative leads showing the victim provided false information it was determined the victim violated FSS § 837.055, giving false information to a law enforcement officer during a criminal felony investigation."

54.     The December 16, 2016, charging affidavit signed by Defendant Turnage and notarized by Defendant Rushing omitted material exculpatory information available to the officers at the time of signing. The affidavit made no reference to Plaintiff's consistent, detailed, and independently corroborated disclosure to HCSO on July 31, 2016, or to the physical evidence HCSO had preserved. The affidavit made no reference to the six consistent affirmations Plaintiff had provided across the July 31, 2016, first interview with HCSO; the July 31, 2016, screening; the July 31, 2016, second (and recorded) interview with a male detective present; the August 3, 2016 CAC forensic interview; the August 17, 2016, "clarification interview;" and the December 14, 2016, home interview. The affidavit made no reference to Defendant Cadle's refusal to take a polygraph examination or

25

to his unsolicited sexualized statement during his interview. The affidavit's reference to the FDLE laboratory findings omitted the forensic realities that (1) condom use — which Plaintiff had consistently reported — materially reduces DNA transferability, (2) that insufficient DNA for STR analysis does not establish that no sexual contact occurred, and (3) that there was in fact the (as of yet unexplained by law enforcement) presence of male DNA on Plaintiff's vaginal and cervical swabs.

55.    Upon the inception of Plaintiff's disclosure of Defendant Cadle's abuse, the Florida Department of Children and Families opened an investigation. However, the Florida Department of Children and Families relied on Defendant Turnage's findings, closing the case because Defendant Turnage did not find evidence of abuse.

**D. Plaintiff's Unlawful, Unconstitutional and False Adjudication**

56.    On February 22, 2017, while unrepresented by counsel or a neutral guardian and without legal advice, Plaintiff and her adoptive mother, Lisa Cadle, signed a waiver of speedy trial with ninety days if she was referred and accepted into a diversionary program.

57.    On February 22, 2017, Defendant Cadle, Plaintiff's sexual abuser, and Lisa Cadle, signed a Florida Department of Juvenile Justice waiver form, agreeing to waive the Plaintiff's *Miranda* Rights, and talk to a probation officer. At only thirteen-years-old, unrepresented by counsel, with her adoptive parents and guardians having interests adverse to her own, Plaintiff signed the form that stated

26

in part, "I [Plaintiff] fully understand my rights. I fully agree to talk about my situation with my JPO [juvenile probation officer]."

58.     On May 22, 2017, Plaintiff was required to appear in court, and formally arraigned. Plaintiff's adoptive parents, Defendant Cadle (her sexual abuser) and Lisa Cadle, both of whom had interests adverse to those of Plaintiff Cadle, never sought counsel or legal advice on Plaintiff's behalf. In fact, Lisa Cadle advised Plaintiff to plead guilty to just get the case over with.

59.     In the absence of legal counsel, Lisa Cadle advised Plaintiff to sign a document "freely and voluntarily" waiving her right to counsel and representing herself. Whereupon, on May 27, 2017, Plaintiff pled guilty to giving false information to a law enforcement officer.

60.     On June 27, 2017, the thirteen (13) year old Plaintiff was placed on probation and continued residing with Defendant Cadle and Lisa Cadle.

61.     Plaintiff's conditions of probation included a curfew, that she perform community service, engage in anger management counseling, and write a letter of apology to Defendant Cadle, who had repeatedly sexually abused her for years, and the PCSO, who had relentlessly pressured Plaintiff to recant her truthful allegations against Defendant Cadle from the start of their "investigation."

Dear dad,

im Sorry for what i did, I didn't Stop and think of my Consequences of these actions. This will not happen again & im Sorry.

Taylor Cadle
6-29-17



Dear officer,

I'm Sorry for my actions. I know what I did wasn't right therefore I face my consequences. This will never happen again.

Taylor Cadle,
6-29-17

62.      Defendant Turnage's lack of training by PCSO and Defendant Judd and tainted investigation left Plaintiff at the behest of her guardian and adoptive father, Defendant Cadle, enabling Defendant Cadle to thereafter subject Plaintiff to further horrific sexual abuse.

**E.  Plaintiff's Return To Her Abuser, Subsequent Rape and Vacatur**

29

63.    After Plaintiff was returned to the home of her sexual abuser, and less than one month after being forced to apologize to her abuser, Defendant Cadle continued his pattern of horrific sexual abuse against Plaintiff.

64.    On July 25, 2017, Defendant Cadle raped Plaintiff in his truck. During the incident, the Plaintiff surreptitiously took video footage and photographs of Defendant Cadle during the rape. She recorded him walking around the rear of his vehicle prior to the rape, and photographed Defendant Cadle's finger in her vagina; Defendant Cadle standing next to her with his penis exposed from the zipper of his shorts as she was lying on her back with her legs spread apart; and a picture of a box of condoms sitting on her lap. She also hid the condom box under the passenger seat of the truck.

65.    That same night, upon arriving home, the Plaintiff called 911 to report the rape. She showed the investigating officer the photographs she took of Defendant Cadle during the incident and advised him of the location where Defendant Cadle threw two used condoms and a paper towel that was in Plaintiff's underwear out the window. Officers ultimately located the condoms and the paper towel on the road where Plaintiff said the rape happened.

66.    Defendant Cadle was ultimately arrested, and during a police interview on July 26, 2017, Defendant Cadle admitted it was him in the photos that Plaintiff had taken during the rape.

30

67.    Defendant Cadle was charged with two counts of sexual battery by someone with familial or custodial authority upon a minor between 12-17 years of age, for not only his rape of Plaintiff on July 25, 2017, but also for the rape and sexual abuse Plaintiff reported the year prior, that resulted in her prosecution for making a false statement.

68.    On July 28, 2017, the Polk County State's Attorney's Office filed a motion to withdraw Plaintiff's guilty plea and vacate her probation. The motion stated that Plaintiff had "entered a plea of guilty without the assistance of counsel" and the "false information" had been determined to be true.

69.    On July 31, 2017, a judge vacated Plaintiff's guilty plea and terminated her probation.

70.    On September 18, 2017, the Polk County State's Attorney's Office terminated and dismissed the charges against Plaintiff, on the basis that "subsequent to the filing of the petition in this case, it was learned that [Plaintiff] was, in fact, truthful in the information she provided to law enforcement. As a result, the charge of false information to a law enforcement officer during investigation is being dismissed."

71.    On December 19, 2017, a DNA profile obtained from Plaintiff's underwear recovered from the July 25, 2017, rape matched Defendant Henry Cadle's DNA profile.

72.    In preparing Defendant Cadle's case for trial, the State's Attorney's office submitted a notice of intent to include child hearsay evidence, which included Plaintiff's initial claims from 2016, and her forensic interviews from 2016 and 2017. A judge ruled that the evidence could be used in trial, his order stating, "this child was a victim of the failure of the criminal justice system."

73.    Defendant Cadle pled no contest to custodial sexual battery on a child 12-18 years of age and was sentenced to 17 years in prison on February 15, 2019. At the time of this pleading Defendant Cadle remains in custody and is required to register as a sex offender for the remainder of his life.

74.    Despite Defendant Turnage's clear inability to treat child sexual abuse cases with the requisite care and seriousness, her coercive interrogations of Plaintiff and efforts to induce Plaintiff to make an inculpatory statement and charging Plaintiff with making a false statement without probable cause, she maintained her position as a Special Victims Unit detective under Defendant Judd's leadership and with his full knowledge. Moreover, despite the State's Attorney's Office sending a copy of the paperwork terminating and dismissing Plaintiff's conviction, stating it's finding that Plaintiff's prior report was not false, but in fact truthful, Defendant Turnage was not disciplined or reprimanded in the aftermath of the incident by Defendant Judd or any of his subordinates.

75.    It was not until 2024, approximately eight years later, after Plaintiff's story received significant media attention, and a Florida State Senator contacted the PCSO about Plaintiff's case, that the PCSO took any action to reprimand Defendant Turnage. In an October 22, 2024, a written letter on letterhead that in large bold font at the top of each page as being from "**Sheriff Grady Judd, Polk County**" to Senator Book, PCSO Captain Dina Russell, captain of the Bureau of Criminal Investigations under Defendant Judd, (which includes the Special Victims Section), simultaneously defended Defendant Turnage's investigation as "thorough" while admitting that her "approach during the interview did not align with the high standards expected of the Polk County Sheriff's Office, particularly in the sensitive context of the Special Victims Section," and that Defendant Turnage had "asked/made inappropriate questions and statements." The letter further confirmed that Defendant Turnage was, as of that date, "no longer assigned to the Special Victims Section." The disciplinary action finally taken in October 2024 consisted of a single Letter of Retraining and a requirement that Defendant Turnage complete an online interview-and-interrogation course through the Police One Academy. Defendant Turnage's removal from the Special Victims Section in 2024, after eight years of continued SVS assignment following Plaintiff's case, and the PCSO's simultaneous defense of her investigation as "thorough," reflect PCSO's institutional practice of declining to take meaningful remedial action and of publicly defending

the conduct at issue even while acknowledging its deficiencies. The PCSO and Defendant Judd ratified the conduct at issue by imposing no discipline contemporaneously with the 2016-2017 events at issue, by maintaining Defendant Turnage in the PCSO's Special Victims Unit for approximately eight years after her handling of Plaintiff, and by defending Defendant Turnage's investigation as "thorough."

76.    As a direct result of PCSO's investigation and prosecution of Plaintiff, the Polk County State Attorney's Office created a charging policy that, as publicly reported, "requires administration [be] consulted prior to charging a juvenile that claims to be a victim of sexual abuse." The Polk County State Attorney's Office's decision to create the policy was specifically and publicly attributed to Plaintiff's case. The policy applies specifically to the charging of juvenile complainants of sexual abuse — the same category of complainant PCSO had charged in Plaintiff's case — and requires an administrative-level consultation that had not been required before Plaintiff's case. The Polk County State Attorney's Office's creation of the policy reflects the State Attorney's Office's institutional determination that PCSO's charging practices in cases involving juvenile complainants of sexual abuse could not be relied upon to produce probable-cause-supported charging decisions without additional oversight external to PCSO. On information and belief, no comparable administrative-consultation policy was in place prior to PCSO's prosecution of

Plaintiff, and the policy was created specifically in response to the PCSO charging failures in Plaintiff's case.

## THE PCSO'S UNLAWFUL AND/OR UNCONSTITUIONAL PRACTICES AND THE RATIFICATION AND ENCOURAGEMENT OF SAME BY DEFENDANT JUDD

77.     Plaintiff's interviews, which amounted to interrogations by a biased detective to trying to induce the Plaintiff to recant and state that she lied about the sexual abuse; the charging of Plaintiff without probable cause; and her subsequent prosecution for a crime she did not commit, which left Plaintiff exposed to further sexual abuse by Defendant Cadle, caused Plaintiff to suffer irreparable and lifelong damages. Plaintiff's damages resulted from the PCSO's failure to train and supervise its law enforcement officers, and from conduct the PCSO encouraged and that was exacerbated by Defendant Judd.

78.     Defendant Judd was sworn in as the Sheriff of Polk County in January 2005.

79.     As Director of the PCSO, Defendant Judd supervised PCSO law enforcement officers in carrying out their policing duties, including Defendants Turnage and Rushing.

80.     In his capacity as the final policymaker for PCSO, Defendant Judd's actions and inactions are those of Polk County.

81.     Defendant Judd knowingly encouraged and authorized members of the PCSO to disregard and violate Constitutional and Fourth Amendment rights of victims, particularly minors, with his tough on crime rhetoric and criminalization of minors for making false statements.

## A. The Pattern of Unlawful and/or Unconstitutional Investigative Incompetency during Investigations by Polk County Sheriff's Office Under Defendant Judd's Supervision

82.     Five years before Plaintiff's disclosure of sexual abuse, in April 2011, a PCSO detective investigated a reported sexual assault of a 17-year-old girl. The victim reported that she had been raped by a 15-year-old boy while she was unconscious, and the PCSO incident report documented physical injuries to the victim consistent with her account, including scratches on her shoulder and hands, bruises on her wrist and forearm, a broken fingernail from fighting off the suspect, and a swollen upper lip. Before any controlled phone call to the suspect was made, the PCSO detective advised the 17-year-old victim that she could be charged with lewd battery on the basis that the 15-year-old boy had been underage when she had prior consensual sexual contact with him. In direct response to the PCSO detective's charging advisement, the 17-year-old victim stated she wished to drop the charges and signed a PCSO waiver of prosecution (Form No. 9009). The suspect was never interviewed. The victim's rape kit was never tested. The suspect, who was at the time under court supervision for a prior juvenile delinquency matter, was not charged with

36

violating his probation by attending the party while he was on home confinement. Nor was he threatened with prosecution for violations of his probation (whereas the 17-year-old victim of assault was threatened with prosecution). The April 2011 PCSO handling of the 17-year-old sexual assault complainant reflected the same PCSO institutional practice that Defendant Turnage applied to Plaintiff five years later: the use of PCSO's charging authority against a complainant of sexual violence to deter the complainant from pursuing their allegations, notwithstanding PCSO's own documented evidence of the complainant's victimization.

83.     Just as in the Cadle matter, the suspect originally accused of sexual assault by the minor female victim in 2011, went on to be charged for battery for another subsequent incident he was able to commit due to PCSO and Defendant Judd's unlawful intimidation tactics on minor females coming forward regarding sexual assault.

84.     On information and belief, in May 2022, the Polk County Sheriff's Office Special Victims Unit, acting through Detective Rachel Simmons (badge #8645) of the SVU East office, closed without referral for prosecution a sexual abuse complaint involving a fifteen-year-old minor complainant who had disclosed sexual abuse occurring four years earlier, when the minor complainant had been eleven years old. The minor complainant disclosed that during a summer she and her siblings stayed at the home of an adult relative for whom she was a goddaughter; the

37

adult relative had digitally penetrated her vagina on multiple occasions while his wife was absent from the home. The minor complainant further disclosed contemporaneously observing the adult relative engaging in similar inappropriate touching of her younger brother. Four years later, after the minor complainant disclosed the abuse to her father, the minor complainant's brother also disclosed having been similarly abused by the same adult relative during the same summer. The PCSO Special Victims Unit conducted a forensic interview of the minor complainant and attempted a controlled telephone call between the complainant and the suspect; the suspect's wife answered the telephone and prevented the suspect from speaking. The suspect retained counsel and declined to be interviewed by PCSO. On the same day on which the controlled-call attempt occurred, Detective Simmons advised the complainant's family that the PCSO Special Victims Unit was closing the investigation because the suspect had not confessed and the matter would proceed as the complainant's word against the suspect's word. The PCSO Special Victims Unit closed the investigation. The complaint was never referred to the Polk County State Attorney's Office for charging review.

85.    The PCSO's Special Victims Unit stated rationale for closing the May 2022 investigation, that the absence of the suspect's confession rendered the complainant's account insufficient to proceed, directly contradicts Florida law. Florida Statute § 794.022(1) provides, "The testimony of the victim need not be

38

corroborated in a prosecution under s. 787.06, s. 794.011, or s. 800.04." The corroboration rule in § 794.022(1) means that the uncorroborated testimony of a sexual assault complainant is, as a matter of Florida law, alone sufficient to support a sexual battery conviction. The PCSO Special Victims Unit's application of an extra-statutory corroboration requirement in May 2022, that the complainant's forensic interview, three corroborating sibling witnesses, and a controlled-call attempt were together insufficient absent a suspect confession, reflects the same misapplication of Florida sexual assault law that Defendant Turnage applied to Plaintiff in 2016, when Defendant Turnage disregarded the Plaintiff's six consistent and detailed disclosures of sexual abuse statements. The PCSO Special Victims Unit's continued misapplication of Florida sexual assault law on the same statutory issue, six years after Plaintiff's injuries, in the same investigative unit, is post-event evidence shedding light on the institutional supervisory and training deficiencies that existed within PCSO at the time of Plaintiff's injury.

**B. The Unlawful and/or Unconstitutional Practices of Charging Complainants Under Florida False-Reporting Statutes by Polk County Sheriff's Office under Defendant Judd's Supervision**

86. In March 2016, four months before Defendant Turnage was assigned to investigate Plaintiff's disclosure of sexual abuse, the PCSO Special Victims Unit charged an 11-year-old girl with giving false information to a law enforcement officer under Fla. Stat. § 837.05(1) in connection with a reported attempted

abduction near her bus stop in Davenport, Florida. The 11-year-old child initially reported to responding deputies, and again to PCSO Special Victims Unit Detective Wetherington, that while walking home from her bus stop on March 8, 2016, an unknown male passenger in a white vehicle had said to her, "Your mom is in the hospital and they sent us to get you." The child ran home and reported the incident.

87.     On March 10, 2016, after the child's mother brought her in for a third interview, the child stated that a white vehicle had pulled up next to her and a white male occupant had said "wrong person" and had driven off, but that she had elaborated beyond those facts because she did not want to walk home from the bus stop. The child did not recant the underlying encounter; she stated that the white vehicle approach and the white male's statement had occurred. The 11-year-old was arrested the following day, March 11, 2016, and transported to the Juvenile Assessment Center on a charge of giving false information to law enforcement under Fla. Stat. § 837.05(1). Defendant Judd personally appeared at the March 10, 2016 PCSO press conference at which the charging decision was announced, where Defendant Judd publicly framed the PCSO charging decision in punitive terms: "At the very least, we are dealing with a child who lied to us and wasted our resources …" Defendant Judd's public framing of an 11-year-old child complainant as having "wasted our resources" is direct evidence of his personal articulation of PCSO's

40

institutional charging posture toward complainants whose accounts PCSO subjectively assessed as not credible.

88.    The March 2016 matter reflects the same PCSO institutional charging practice that Defendant Turnage applied to Plaintiff four months later: the practice, operating through the PCSO Special Victims Unit, of deploying PCSO's charging authority against complainants whose reports PCSO Special Victims Unit personnel subjectively assessed as non-credible, rather than exercising PCSO's discretion not to charge. The PCSO's election to arrest an 11-year-old child and transport her to the Juvenile Assessment Center, rather than to close the investigation without arrest, reflects the institutional charging posture Defendant Judd publicly articulated at the time of the charging decision and that Defendant Turnage applied in her investigation of Plaintiff's disclosure of sexual abuse.

89.    Two days before Plaintiff's July 31, 2016 disclosure, on July 29, 2016, the Polk County Sheriff's Office charged Brianna Lang, an adult domestic violence victim, with giving false information to a law enforcement officer in violation of Fla. Stat. § 837.055 after she claimed it was a stranger who strangled her when it was actually her husband that had done so after being approached by PCSO, the same statute under which Defendant Turnage charged Plaintiff approximately five months later. The Lang charging decision reflects PCSO's institutional charging framework under § 837.055 in operation in the immediate temporal proximity to Plaintiff's

disclosure: PCSO's election to deploy § 837.055 against a complainant whose account PCSO investigators subjectively assessed as needing to be criminally charged without fully appreciating the impact of trauma, rather than to close the investigation without charging.

90.    The Brianna Lang case reflects the same PCSO institutional charging framework overseen by Defendant Judd operating against a complainant of intrafamilial abuse two days before Plaintiff's disclosure. PCSO deployed Fla. Stat. § 837.055 against an adult domestic violence victim on July 29, 2016, and PCSO deployed Fla. Stat. § 837.055 against Plaintiff, a minor child sexual abuse complainant, who had provided six consistent disclosures of sustained sexual abuse. The deployment of false-reporting charges in both cases, reflects PCSO's institutional charging posture: deploying in Special Victims Unit cases its charging authority against complainants whose accounts PCSO investigators subjectively assess without fully appreciating the nuance of intrafamilial abuse and harm such charges can bring to survivors of abuse.

## C. Defendant Turnage's Unlawful and/or Unconstitutional Investigative Incompetency and Documented Misconduct Known, Tolerated and Ratified by Polk County Sheriff's Office and Defendant Judd

91.    Both prior to and during PCSO's investigation of Plaintiff's disclosure of sexual abuse, the PCSO under the purview of Defendant Judd possessed actual and documented notice that Defendant Turnage lacked the investigative competence,

42

judgment, and procedural discipline required for assignment to the Special Victims Unit. In the nine months preceding Defendant Turnage's assignment to Plaintiff's case, the PCSO under Defendant Judd's leadership issued Defendant Turnage two separate formal disciplinary actions, each arising from a child sexual abuse investigation within the PCSO's Special Victims Unit. A third written disciplinary action, also arising from Defendant Turnage's handling of a child sexual abuse investigation issued on December 16, 2016, the same day Defendant Turnage signed the charging affidavit against Plaintiff. Notwithstanding this documented pattern of Special Victims Unit - specific deficiencies, the PCSO retained Defendant Turnage in her Special Victims Unit assignment, assigned her to investigate Plaintiff's disclosure of sexual abuse in July 2016, and permitted her to remain responsible for the investigation of Plaintiff's case through the December 16, 2016 charging affidavit.

92.    In November 2015, less than a month after Defendant Turnage's October 25, 2015 assignment to the Special Victims Unit, Defendant Turnage conducted a custodial interrogation of a suspect in a child sexual abuse investigation in which Defendant Turnage failed to provide complete *Miranda* warnings. A Florida court subsequently granted the suspect's motion to suppress his confession based on the inadequate *Miranda* warnings. Defendant Turnage's deficient investigative practices in that November 2015 case impacted the case's outcome and

43

the prosecution of a sexual abuser. PCSO issued Defendant Turnage an 8-hour suspension without pay for the November 2015 *Miranda* failure. The November 2015 *Miranda* violation, the suppression of the suspect's confession, and the 8-hour suspension reflected PCSO's documented notice that, within the first month of her Special Victims Unit assignment, Defendant Turnage lacked familiarity with the procedural requirements governing custodial interrogation in child sexual abuse investigations. Nine months later, in her interrogation of Plaintiff in connection with Plaintiff's disclosure of sexual abuse, Defendant Turnage applied the same disregard for procedural protections, questioning Plaintiff in a coercive manner that included threats and graphic descriptions of forensic examination procedures, without the procedural safeguards that the circumstances and Plaintiff's age as a 12-year-old child required. Defendant Turnage's deficient investigative practices in Plaintiff's case impacted the outcome of that case as well: Defendant Henry Cadle was permitted to remain free, absolved of any charging for his sexual abuse of Plaintiff, thus enabling his July 2017 rape of Plaintiff.

93.    In December 2015, approximately one month after her prior botched child sexual abuse investigation, Defendant Turnage interviewed children who disclosed that their father was sexually abusing them. Notwithstanding these disclosures, Defendant Turnage left for vacation without bringing the suspect in for questioning and updating her supervisors on the status of the investigation. In her

absence, other PCSO personnel arrested the suspect because of the seriousness of the children's disclosures. On December 29, 2015, PCSO issued Defendant Turnage a Letter of Guidance stating, "Disclosures made by children in this case must be acted upon immediately if the investigation allows for it" and that her decision, "... to not complete this investigation or advise me of the interview results is inexcusable." The incident reflected PCSO and Defendant Judd's documented notice that Defendant Turnage lacked the institutional judgment required to appreciate the need to take seriously child disclosures of ongoing child sexual abuse and appropriately act on them that was at a minimum available to Defendant Judd in Detective Turnage's personnel file. Further, Defendant Turnage was not disciplined or removed from the Special Victims Unit, nor was she trained or re-educated by PCSO on how to handle such cases.

94.    On December 16, 2016, the same day Defendant Turnage signed the charging affidavit that lacked probable cause against Plaintiff, the PCSO issued Defendant Turnage a Letter of Reprimand in reference to another serious child sexual abuse case. In that case, she arrested the wrong person. Defendant Turnage had arrested a suspect notwithstanding clear physical mismatches between the suspect and the perpetrator description provided by a child complainant. Specifically, the video footage of the actual suspect showed that he had visible tattoos, and the individual she arrested did not have any tattoos. The Letter of

45

Reprimand stated, "[T]here was other information that you should have been considered during the investigation of this case. . . As a detective in the Bureau of Criminal Investigations you deal with cases involving the most vulnerable victims, our children and the elderly. It is imperative that you provide accurate information to your supervisors during these investigations and all leads are thoroughly followed." That Letter of Reprimand that was accessible to Defendant Judd in his employee's personnel file reflected the PCSO and Defendant Judd's documented notice that Defendant Turnage lacked the investigative care required to ensure the arrests in child sexual abuse investigations were supported by the facts, even as Defendant Turnage, on that same day, was obtaining the signature and notarization necessary to initiate the wrongful charging of Plaintiff. Upon information and belief, Defendant Turnage did not receive any additional training or reeducation on how to properly investigate child sexual abuse cases in response to this Letter of Reprimand.

95.     The PCSO's assignment of Defendant Turnage to Plaintiff's case in July 2016, and its retention of Defendant Turnage in the Special Victims Unit in the face of the multiple documented disciplinary incidents detailed above, evince PCSO and Defendant Judd's deliberate indifference to the adequate training and supervision of its law enforcement officers responsible for the investigation and handling of child sexual abuse cases. PCSO's assignment of Defendant Turnage to Plaintiff's case in July 2016, notwithstanding two prior documented disciplinary incidents arising from

46

her handling of child sexual abuse investigations within the preceding nine months, and PCSO's retention of Defendant Turnage as the responsible detective on Plaintiff's case through the December 16, 2016, charging affidavit, notwithstanding the same-day issuance of a third written disciplinary action arising from her handling of a separate child sexual abuse investigation, reflect a PCSO institutional practice, established, maintained, and ratified by Defendant Judd, of continuing the Special Victims Unit assignment of detectives whose performance within that specialized unit had been documented as deficient. That PCSO institutional practice caused Defendant Turnage, despite her demonstrated and documented SVU unfitness, to be assigned to Plaintiff's case in July 2016 and to remain responsible for Plaintiff's case through the December 16, 2016, charging affidavit, at which point she committed the constitutional violations alleged herein.

## D. Defendant Judd's Personal Public Statements Reflecting his Deliberate Indifference, Approval and Institutional Posture Pertaining to Incompetent SVU Investigations by Polk County Sheriff's Office under Defendant Judd's Supervision

96.     In the year leading up to PCSO's investigation of Plaintiff's disclosure of sexual abuse, Defendant Judd publicly articulated an institutional posture and lack of comprehension or understanding towards complainants of sexual assault and intrafamilial abuse, as a threshold investigative posture in disregard of the corroboration rule established by Fla. Stat. §794.022(1). On June 21, 2015, in published on-the-record statements to The Ledger, Polk County's daily newspaper,

47

Defendant Judd stated, "When it comes to sex-crime investigations we find those who initially claimed to be victims lie to you as quickly and as badly as the suspects on many occasions."

97.    When presented with published research from the National Center for the Prosecution of Violence Against Women estimating the rate of false sexual assault reports in the range of 2 percent to 8 percent, Defendant Judd dismissed those figures as "much too low." Defendant Judd further characterized sexual assault reports as presumptively suspect, stating in a companion June 21, 2015, Ledger article that "some of these getting reported are absolutely fiction — and to think we would test those kits when clearly there is not a sexual battery makes no sense." To illustrate his premise, Defendant Judd volunteered to The Ledger the example of a rape complainant with mental illness, stating: "Just the other day, we had a mentally ill lady who said a man broke into her house and viciously raped her. She had this big elaborate story. We did a rape kit, did an investigation and there was no event, and now we have a rape kit." Defendant Judd's public description of a rape complainant as a "mentally ill lady" with a "big elaborate story" whose report he deemed "no event" — notwithstanding PCSO's own collection of a rape kit in the case — reflected the institutional approach Defendant Judd established at PCSO for sexual assault complainants whom PCSO personnel subjectively assessed as non-credible without processing a rape kit before making the determination in credibility.

48

98.     Contemporaneously with Defendant Judd's June 2015 public statements, The Ledger reported that during Defendant Judd's tenure the PCSO had collected 990 sexual assault evidence kits and had failed to submit 524 of them, approximately 53 percent, to the Florida Department of Law Enforcement for testing. When asked about the PCSO's untested kit rate, Defendant Judd personally defended the PCSO's practice, stating, "You would not put a rape kit in the system on a case that didn't occur."

99.     Defendant Judd's public statements in 2015, made in his capacity as the PCSO's final policymaker and as the supervisor of the Special Victims Unit, communicated to PCSO law enforcement personnel, including SVU detectives, three institutional principles: that complainants of sexual assault and intrafamilial abuse were to be subjected to credibility assessments as a threshold investigative posture, rather than taking the investigative steps required by Florida sexual assault law and recognized investigative protocols; that the principle risk in sex crime investigations was being deceived by a complainant, rather than failing to develop the investigative leads on which Fla. Statue §794.022(1) permits prosecution; and the empirically grounded research concerning the rarity of false sexual assault reports was to be disregarded in favor of Defendant Judd's focus on complainant credibility. These statements were not confidential supervisory communications;

49

they were made publicly through newspapers of record and reflected that institutional policy for the agency that Defendant Judd directed.

100. By the time of PCSO's investigation of Plaintiff's disclosure in July through December 2016, the United States Department of Justice had published formal guidance on the law enforcement response to sexual assault, including the Department's December 15, 2015, guidance titled "Identifying and Preventing Gender Bias in Law Enforcement Response to Sexual Assault and Domestic Violence," which addressed (a) the institutional risk of premature credibility assessments by law enforcement of complainants of sexual assault and domestic violence, (b) the recognized investigative response to disclosure dynamics that commonly produce partial, inconsistent, or evolving complainant accounts, and (c) directed law enforcement agencies to implement investigative practices recognizing these dynamics. The International Association of Chiefs of Police had likewise published the "Sexual Assault Incident Reports: Investigative Strategies" training guide, addressing similar institutional risks. Peer-reviewed research on the rarity of false sexual assault reports, including the research Defendant Judd had publicly dismissed as "much too low," was publicly available to Defendant Judd and to the agency he directed. Defendant Judd's public statements, and the institutional posture he set for PCSO, were therefore made in disregard of the federal and professional investigative standards then in force, showing Defendant Judd's deliberate

50

indifference and explicit approval of Defendant Turnage's and the PCSO's incompetent investigative techniques in cases involving Special Victim crimes.

101. Despite Plaintiff's wrongful adjudication being vacated in 2017, and the State's Attorney's Office later confirming Plaintiff's 2016 statements were truthful, the Defendant Judd and PCSO instituted no meaningful corrective training or policy change; instead, the Polk County State's Attorney's Office (not the PCSO) created a policy requiring administrative consultation before charging a juvenile who claims sexual abuse—underscoring the obvious need for training and supervision that the PCSO ignored.

102. Both prior to and at the time of the investigation into Plaintiff's complaint of sexual abuse and her prosecution, the Defendant Judd and the PCSO's policies, practices, and customs served to enable the type of misconduct that resulted in the constitutional violations suffered by Plaintiff, such policies, practices and customs included:

a. Allowing detectives to engage in illegal and coercive tactics to secure confessions in cases;

b. Failing to take appropriate disciplinary or other corrective measures with respect to police officers who engaged in illegal or unconstitutional conduct;

c.  Failure to properly train and supervise officers with respect to the constitutional limits of their investigative powers;

d.  Ignoring with deliberate indifference systemic patterns of police misconduct and abuse of victims' rights in the course of police investigations, including coercion of statements;

e.  Failing to properly sanction or discipline officers who were aware of violations of constitutional rights of individuals by other officers.

103.  At the time of Plaintiff's complaint of sexual abuse and her subsequent prosecution, and for many years before and thereafter Defendant Judd and the PCSO have been deliberately indifferent to the need to train, supervise, and discipline officers, failing to impose meaningful disciplinary and remedial actions in the following respects:

a.  A lack of consistent, rational, and meaningful disciplinary and remedial actions;

b.  A failure to effectively discipline officers who were found to have engaged in misconduct; and

c.  Failing to require that officers who engaged in misconduct received training to ensure that they did not repeat prior violations.

52

104. On information and belief, in the wake of the overturning of Plaintiff's adjudication, Defendant Judd made no changes to the PCSO's policies and practices, including efforts to minimize the criminalization of minors without probable cause, ensuring minors' constitutional rights were not violated, the criminalization of reporting of childhood sexual abuse, and its failure to train and supervise officers, particularly with regard to the investigation and management of child sexual abuse cases. Defendant Judd's continued indifference to these issues enabled and encouraged PCSO employees to disregard and violate constitutional rights both before and after Plaintiff made her 2016 report of sexual abuse.

### E. The Continued Pattern of Special Victims Unit Detectives' Unlawful and/or Unconstitutional Misconduct by the Polk County Sheriff's Office under Defendant Judd's Supervision

105. Defendant Judd and the PCSO's failure to implement meaningful supervision and training within its investigative ranks continued in the years after Plaintiff's case. PCSO detective Dennis Jones, Jr. had been hired as a PCSO deputy in July 2013 — three years before Defendant Turnage was assigned to investigate Plaintiff's disclosure of sexual abuse — and was promoted to PCSO detective in October 2017. In September 2019, approximately two years after the vacatur of Plaintiff's adjudication, Detective Jones was arrested and criminally charged with two counts of falsifying official records, one count of forgery, and one count of uttering a false instrument. PCSO's own investigation established that Detective

53

Jones had falsified two waivers of prosecution, reporting that he had personally met with the parents of juveniles to obtain their signed waivers when, in fact, doorbell camera footage and relocation records confirmed that Detective Jones had never visited the parents' homes and that the waivers were fabricated. PCSO's investigation further established that Detective Jones had fabricated records of interviews with a daycare director, a teacher's assistant, and students in a separate case, when surveillance video and cellphone records confirmed those interviews never occurred. Detective Jones resigned upon his arrest. Detective Jones's misconduct occurred within the same PCSO investigative institution, under the same supervisory authority of Defendant Judd, that had produced Defendant Turnage's investigation of Plaintiff three years earlier.

106.   PCSO Detective Gregory David Streeter was hired by the Polk County Sheriff's Office in 2018 and worked his way up through PCSO's South County Jail food service division and uniform patrol division before being assigned as a detective in the PCSO Special Victims Unit in May 2024, where he served until June 2025 and worked approximately ninety cases. According to PCSO's own personnel records, Detective Streeter received "very good" annual performance reviews from PCSO supervisory personnel through June 2025. PCSO did not initiate any audit of Detective Streeter's investigative work during the period in which his Special Victims Unit caseload was open. The audit that ultimately occurred was not triggered

54

by any routine PCSO supervisory review in place by Defendant Judd; it was triggered only by Detective Streeter's August 13, 2025, resignation. The PCSO audit, conducted between August 14 and October 2025, established that Detective Streeter's PCSO Special Victims Unit investigations contained, in PCSO's own words, "inconsistencies with either evidence being made up or not being placed into evidence, or facts denoted in his reports that were not true."

107.    The charging affidavit identifies the specific Streeter Special Victims Unit cases in which the agency's audit identified evidence tampering or fabrication. They include: (a) the investigation of an infant skull fracture case in which Detective Streeter documented submitting an evidentiary compact disc containing a recorded interview with the infant's mother — when collected from the PCSO property and evidence section, the disc was blank; in which Detective Streeter documented traveling to the mother's address — when no records support that travel; in which Detective Streeter documented uploading evidentiary photographs — when no photographs were uploaded to the PCSO photo lab; and in which Detective Streeter documented a follow-up phone call to the infant's mother — when AT&T records do not support that the call occurred and the mother confirmed she had never met with, been interviewed by, or lived at the address documented by Detective Streeter; (b) a lewd-conduct investigation involving an 11-year-old girl and a 16-year-old girl, in which Detective Streeter seized two cell phones and a laptop computer for forensic

55

examination, and in which the seized cell phones, laptop, and forensic-download flash drive were never submitted to the PCSO property and evidence section and were never located by the audit; (c) a reported sexual assault of a 12-year-old female who was forced to perform oral sex on another juvenile, which was closed as an "uncooperative victim" case; and (d) a reported sexual abuse of a 6-year-old by her father, which was closed as an "uncooperative victim" case before being reopened and reassigned to another detective. All of this occurred under Defendant Judd's office leadership.

108.    Detective Streeter was charged on October 21, 2025, with six counts of tampering with or fabricating evidence in child and sex abuse investigations. The charges reflect that Detective Streeter's misconduct in his PCSO Special Victims Unit caseload took two principle forms: documentation of investigative steps Detective Streeter had not in fact taken — including documented interviews, travel, photographs, and submitted recordings that did not exist — and failure to submit, or concealment of, items of physical evidence Detective Streeter had collected during PCSO Special Victims Unit investigations. The substantive consequence of Detective Streeter's misconduct, occurring within his PCSO Special Victims Unit caseload, was that PCSO's Special Victims Unit case dispositions in those investigations were based on PCSO records that misrepresented the actual

investigative work performed and the actual evidence developed in the affected cases.

109.   The Jones and Streeter cases, together with Defendant Judd's eight-year delay in taking any disciplinary action against Defendant Turnage until Defendant Turnage and Judd were facing public scrutiny and Defendant Judd and the PCSO's failure to implement any meaningful policy or training change in response to Plaintiff's case, reflect a persistent institutional absence of meaningful supervisory oversight within PCSO's investigative ranks overseen by Defendant Judd, including within its Special Victims Unit.

## CAUSES OF ACTION

### COUNT I:
### 42 U.S.C. § 1983—MALICIOUS PROSECUTION—FOURTH AMENDMENT
*(Plaintiff Taylor Cadle vs. Defendant Melissa Turnage – Individual Capacity)*

110.   Plaintiff hereby incorporates and realleges by reference to the allegations in Paragraphs 10-12 and 18-109 above.

111.   Defendant Turnage's issuance of an affidavit that lacked probable cause—based on subjective disbelief rather than evidence—caused a criminal proceeding to be instituted against Plaintiff for making a false statement to a law enforcement officer.

112. At all relevant times, Defendant Turnage was acting under the color of law, and within the scope of her employment and authority as a law enforcement officer of the PCSO.

113. An objectively reasonable law enforcement officer in Defendant Turnage's position would have known that no arguable probable cause existed to charge Plaintiff with making a false statement (particularly in light of Plaintiff's four consistent statements, her exceedingly detailed descriptions of Defendant Cadle's sexual abuse, and known forensic limitations).

114. Defendant Turnage violated Plaintiff's Fourth Amendment rights when she intentionally, with malice, and/or reckless disregard made misstatements and/or omissions in her affidavit which lacked arguable probable cause.

115. Defendant Turnage's affidavit resulted in the institution of the criminal process leading to Plaintiff's prosecution and adjudication for making a false statement.

116. Defendant Turnage was aware that the court system and State Attorney's Office would rely upon the facts set forth in her affidavit in determining whether to prosecute Plaintiff.

117. But for the filing of the affidavit, the Plaintiff would not have been prosecuted for the criminal charge.

118.   The criminal prosecution was terminated in the Plaintiff's favor by the entry of a nolle prosequi by the State Attorney's Office on September 28, 2017.

119.   Defendant Turnage's conduct caused Plaintiff's injuries, and Plaintiff would not have been injured in the absence of Defendant Turnage's conduct.

120.   Plaintiff's injuries were a reasonably foreseeable consequence of Defendant Turnage's conduct.

121.   As a direct and proximate result of Defendant Turnage's actions, Plaintiff suffered, continues to suffer, and will suffer injuries and damages, including severe emotional distress, humiliation, reputational stigma, loss of capacity for enjoyment of life, expenses for treatment and care, and physical and psychological injury from the subsequent sexual assaults that occurred after Defendant Turnage's coercive conduct left her unprotected. Said losses, injuries, and expenses are either permanent or continuing in nature and Plaintiff will continue to suffer same in the future.

122.   Punitive damages are available against Defendant Turnage and are hereby sought by Plaintiff given the reprehensibility of Defendant Turnage's conduct and the need to deter others from engaging in similar conduct.

123.   Plaintiff is also entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

**COUNT II:**
**42 U.S.C. § 1983—SUBSTANTIVE DUE PROCESS—FOURTEENTH AMENDMENT**
(*Plaintiff Taylor Cadle vs. Defendant Melissa Turnage – Individual Capacity*)

124.    Plaintiff hereby incorporates and realleges by reference the allegations in Paragraphs 10-12 and 18 to 109 above.

125.    Defendant Turnage, acting under the color of law, subjected Plaintiff, a minor sexual abuse victim, to coercive and intimidating questioning—in the absence of the presence of an adult—threatening her with a return to foster care and family harm if she persisted in her claims of Defendant Cadle's sexual abuse, and thereafter pursued a false statement to a law enforcement officer charge without probable cause.

126.    In the alternative, and in addition, Defendant Turnage, through affirmative acts and the misuse of her authority, created and substantially increased the danger to Plaintiff that Plaintiff otherwise would not have faced, including by:

    a. Discrediting Plaintiff's rape report to child protection authorities and branding her a liar, thereby undermining protective interventions;

    b. Communicating or causing to be communicated that Plaintiff made a false report, which foreseeably resulted in Plaintiff being in the custody and control of her abuser;

    c. Interfering with or discouraging protective processes that would have removed or restricted the abuser's access; and

60

d. Doing so with deliberate indifference to an obvious, known, and specific risk that Plaintiff would suffer further sexual abuse.

127. Defendant Turnage's conduct shocks the conscience and violated Plaintiff's Fourteenth Amendment rights to bodily integrity, safety, and substantive due process.

128. Defendant Turnage's conduct was deliberately indifferent to Plaintiff's safety and welfare and was so egregious and arbitrary as to shock the conscience in violation of Plaintiff's Fourteenth Amendment right to bodily integrity, safety, and substantive due process.

129. Defendant Turnage's conduct ultimately resulted in Plaintiff being subjected not just to an unjust and wrongful prosecution, but to further incidents of horrific sexual abuse at the hands of Defendant Cadle.

130. As a direct and proximate result of Defendant Turnage's actions, Plaintiff suffered, continues to suffer, and will suffer injuries and damages, including severe emotional distress, humiliation, reputational stigma, loss of capacity for enjoyment of life, expenses for treatment and care, and physical and psychological injury from the subsequent sexual assaults that occurred after Defendant Turnage's coercive conduct left her unprotected. Said losses, injuries, and expenses are either permanent or continuing in nature and Plaintiff will continue to suffer same in the future.

131.   Punitive damages are available against Defendant Turnage and are hereby sought by Plaintiff given the reprehensibility of Defendant Turnage's conduct and the need to deter others from engaging in similar conduct.

132.   Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

### COUNT III:
### 42 U.S.C. § 1983—MALICIOUS PROSECUTION—FOURTH AMENDMENT
*(Plaintiff Taylor Cadle vs. Defendant William Rushing – Individual Capacity)*

133.   Plaintiff hereby incorporates and realleges by reference the allegations in Paragraphs 13-15 and 18-109 above.

134.   Defendant Rushing's signing and affirmation of Defendant Turnage's written affidavit that lacked probable cause – based on Defendant Turnage's disbelief rather than evidence—caused a criminal proceeding to be instituted against Plaintiff for making a false statement to a law enforcement officer.

135.   At all relevant times, Defendant Rushing was acting under color of law, and within the scope of his employment and authority as a law enforcement officer of the PCSO.

136.   An objectively reasonable law enforcement officer in Defendant Rushing's position would have known that no arguable probable cause existed to charge Plaintiff with making a false statement (particularly in light of Plaintiff's four

62

consistent statements and her exceedingly detailed descriptions of Defendant Cadle's sexual abuse).

137. Defendant Rushing violated Plaintiff's Fourth Amendment rights when he intentionally and/or recklessly signed and affirmed Defendant Turnage's affidavit.

138. Defendant Rushing's co-signing on an affidavit that lacked probable cause and resulted in the institution of the criminal process leading to Plaintiff's prosecution and adjudication for making a false statement.

139. Defendant Rushing was aware that the court system and State Attorney's Office would rely upon the facts set forth in Detective Turnage's affidavit in determining whether to prosecute Plaintiff.

140. But for the filing of the affidavit, the Plaintiff would not have been prosecuted for the criminal charge.

141. The criminal prosecution was terminated in the Plaintiff's favor by the entry of a nolle prosequi by the State Attorney's Office on September 28, 2017.

142. Defendant Rushing's conduct caused Plaintiff's injuries, and Plaintiff would not have been injured in the absence of Defendant Rushing's conduct.

143. Plaintiff's injuries were a reasonably foreseeable consequence of Defendant Rushing's conduct.

144. As a direct and proximate result of Defendant Rushing's actions, Plaintiff suffered, continues to suffer, and will suffer injuries and damages, including severe emotional distress, humiliation, reputational stigma, loss of capacity for enjoyment of life, expenses for treatment and care, and physical and psychological injury from the subsequent sexual assaults that occurred after she was maliciously prosecuted. Said losses, injuries, and expenses are either permanent or continuing in nature and Plaintiff will continue to suffer same in the future.

145. Punitive damages are available against Defendant Rushing and are hereby sought by Plaintiff given the reprehensibility of Defendant Rushing's conduct and the need to deter others from engaging in similar conduct.

146. Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

## COUNT IV:
### 42 U.S.C. § 1983—FAILURE TO TRAIN, SUPERVISE, AND DISCIPLINE
(*Plaintiff Taylor Cadle vs. Defendant Sheriff Grady Judd – Official Capacity*)

147. Plaintiff hereby incorporates and realleges by reference to the allegations in Paragraphs 6-9 and 18-109 above.

148. At all relevant times, the Polk County Sheriff's Office ("PCSO")— through Sheriff Grady Judd acting in his official capacity—consciously or deliberately failed to train, supervise, or discipline its law enforcement officers –

64

such failures were the moving force behind the violation of Plaintiff's constitutional rights, in violation of 42 U.S.C. § 1983.

149.   As the Sheriff of the PCSO, Defendant Judd supervised and trained the PCSO officers in carrying out their duties, including policing.

150.   The need for training and supervision was obvious given the predictable constitutional consequences of untrained/coercive interviewing and charging of minors with "false reporting" in the absence of physical evidence. Without such training, minors were subjected to further harm, as occurred in Plaintiff's case.

151.   The PCSO consciously or deliberately failed to discipline officers for coercive interviewing tactics and charging of minors without probable cause, particularly sexual abuse complainants for "false reporting" in the face of constitutional violations as described in this complaint.

152.   The need for training was obvious given the predictable constitutional consequences of untrained/coercive interviewing and the risk of charging children with "false reporting" in the absence of physical evidence.

153.   The PCSO had notice of these deficiencies both prior to and during Plaintiff's case through:

   a.   Documented performance issues and written reprimands/guidance to Defendant Turnage in 2015 -2016 regarding serious lapses in SVU case handling;

65

b.  Practices of charging juveniles with obstruction of justice at elevated rates;

c.  The vacatur of Plaintiff's juvenile adjudication and the State's later acknowledgement that Plaintiff's prior statements were true, demonstrating that the PCSO's approach predictably led to wrongful prosecutions and left victims at risk.

154.  Despite this notice, the PCSO failed to implement adequate training and supervision on:

a.  Child appropriate, forensic, and/or non-coercive interviewing;

b.  Proper investigation of allegations of sexual abuse, including childhood sexual abuse;

c.  Proper interviews of suspects, including those suspected of sexual abuse to include childhood sexual abuse;

d.  Probable cause standards for criminal charges related to sexual abuse including childhood sexual abuse;

e.  Probable cause standards for false reporting charges against minors;

f.  Mandatory supervisory review before recommending charges against minor complainants.

155. In addition and in the alternative, the foregoing failures and practices affirmatively created or substantially increased a specific danger to Plaintiff by:

   a. Discrediting her rape report and initiating a retaliatory "false-statement" prosecution that undermined her credibility with child-protective authorities;

   b. Ensuring her continued placement in the custody and control of her known abuser by failing to pursue protective action and by communicating to other agencies that Plaintiff was not credible;

   c. Foreseeably exposing Plaintiff to renewed and repeated sexual abuse, which did occur, as a direct result of the PCSO's actions; and

   d. Actively interfering with protective processes that otherwise might have removed her from the abusive environment.

156. These affirmative acts and omissions shock the conscience and violated Plaintiff's Fourteenth Amendment Rights to bodily integrity and personal security.

157. The PCSO's deliberate indifference was the moving force behind Plaintiff being subjected to coercive interviewing techniques that deprived her of constitutional rights, malicious prosecution, her loss of personal liberty via probation, and the foreseeable exposure to sexual assault, after the PCSO's power was used against her rather than protect her.

158. The PCSO's acts and omissions, as described above, were the direct and proximate result of Plaintiff's injuries and damages, including severe emotional distress, humiliation, reputational stigma, loss of capacity for enjoyment of life, expenses for treatment and care, and physical and psychological injury from the subsequent sexual assaults that occurred as a result of the PCSO's failures. Said losses, injuries, and expenses are either permanent or continuing in nature and Plaintiff will continue to suffer same in the future.

159. The PCSO knew or should have known that its conduct would result in the deprivation of Plaintiff's constitutional rights.

160. Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

**COUNT V:**
**42 U.S.C. § 1983—FAILURE TO TRAIN, SUPERVISE, AND DISCIPLINE**
(*Plaintiff Taylor Cadle vs. Defendant Sheriff Grady Judd – Individual Capacity*)

161. Plaintiff hereby incorporates and realleges by reference to the allegations in Paragraphs 6-9 and 18-109 above.

162. At all times relevant to this action, Defendant Judd was the Sheriff of Polk County, Florida, the final policymaker for the Polk County Sheriff's Office, and the official with responsibility for the training, supervision, discipline, and assignment of PCSO personnel, including the detectives assigned to the PCSO Special Victims Unit who investigated Plaintiff's disclosure of sexual abuse. In that

capacity, Defendant Judd directed PCSO's operations, established PCSO's institutional posture toward complainants of sexual violence and intrafamilial abuse, and exercised final authority over PCSO investigative, charging, and personnel practices.

163. Defendant Judd personally established, maintained, and endorsed a PCSO institutional practice towards complainants of sexual violence and intrafamilial abuse under which such complainants were subject to a flawed credibility assessment as a threshold investigative posture, in disregard of the corroboration rule established by Florida Statute § 794.022(1) and of the procedural limits on the deployment of Florida's false-reporting statutes (Fla. Stat. §§ 837.05(1), 837.055) against complainants of sexual violence and intrafamilial abuse as reflected in his approved office practices and public statements. Defendant Judd's establishment of this practice is reflected in his own on-the-record June 21, 2015 public statements to The Ledger, in which he articulated that

   a. Sex-crime complainants "lie to you as quickly and as badly as the suspects on many occasions";

   b. Peer-reviewed research estimating false-report rates at 2 percent to 8 percent was "much too low";

   c. some sexual assault reports are "absolutely fiction" such that testing rape kits in those cases "makes no sense"; and

d. an adult rape complainant whose account PCSO investigators subjectively rejected was a "mentally ill lady" with a "big elaborate story" whose report reflected "no event," notwithstanding PCSO's own collection of a rape kit in that case.

164. These statements, made in Defendant Judd's capacity as PCSO's final policymaker and published in Polk County's newspaper of record, communicated to PCSO personnel, including Special Victims Unit detectives, the institutional posture Defendant Judd set for PCSO's handling of complainants of sexual violence and intrafamilial abuse.

165. The institutional posture Defendant Judd established and maintained was reflected in PCSO's investigative and charging conduct toward complainants of sexual violence and intrafamilial abuse during the period that included Plaintiff's case and that has continued into Defendant Judd's current tenure, as evidenced by:

a. The April 2011 PCSO investigation in which a PCSO detective used a charging threat against a 17-year-old sexual assault complainant before completing the investigation of her sexual assault report where the suspect was subsequently charged with battery for an incident that occurred after the botched 2011 investigation;

b. The March 2016 Special Victims Unit charging of an 11-year-old girl reporter under Fla. Stat. § 837.05(1), in connection with which

70

Defendant Judd personally appeared at a PCSO press conference announcing the charging decision and name of 11-year-old girl;

c. The July 2016 PCSO charging of an adult domestic violence strangulation victim, under Fla. Stat. § 837.055, two days before Plaintiff's disclosure of sexual abuse and under the same statute Defendant Turnage charged Plaintiff;

d. The PCSO investigative and charging conduct in Plaintiff's case from July through December 2016, culminating in Defendant Turnage's December 16, 2016 charging affidavit against Plaintiff under Fla. Stat. § 837.055;

e. The May 2022 PCSO Special Victims Unit closure of a sexual abuse complaint involving a fifteen-year-old minor complainant, on a stated rationale that directly contradicts Fla. Stat. § 794.022(1); and

f. Throughout the relevant period the PCSO under Defendant Judd's leadership collected 990 sexual assault evidence kits and declined to submit 524 of those kits (approximately 53%) to the FDLE for forensic analysis. Defendant Judd personally defended the PCSO practice of not submitting sexual assault evidence kits for testing in June 2015, on the record, on the explicit ground that the PCSO would not submit kits in cases PCSO investigators had determined did not occur, stating, "You

71

would not put a rape kit in the system on a case that didn't occur." Defendant Judd's own articulated rationale, that the agency he directed would not submit kits in cases PCSO investigators had prematurely and subjectively determined were non-occurrences, established the credibility-based screening principle Defendant Judd set for the agency's sexual assault evidence kit submissions to FDLE during his tenure.

166. Defendant Judd had actual or constructive notice of the institutional posture and the pattern identified above, and of the need for training to address the constitutional risks created by that posture. Defendant Judd's notice is established as follows.

    a. On the record where Defendant Judd is himself the source of the underlying statement or institutional decision:

        i. Defendant Judd's own June 21, 2015 public statements establishing the flawed credibility-based screening principle for sexual assault investigations and rape kit submissions;

        ii. Defendant Judd's June 20, 2015 personal call for a PCSO hand audit of all rape kits;

iii. Defendant Judd's July 10, 2015 personal public statements disregarding FDLE kit-acceptance policies, publicly contested by the Commissioner of FDLE on July 16, 2015;

iv. Defendant Judd's personal appearance at the March 10, 2016 PCSO press conference at which the charging decision involving the 11-year-old child reporter was announced and Defendant Judd publicly framed the charging decision in punitive terms for young minors;

v. Defendant Judd's continued public statements throughout the period of The Ledger's multi-year coverage of PCSO's untested-rape-kit practice;

b. On the record where Defendant Judd is the named addressee of correspondence concerning Plaintiff's case: the October 26, 2016 FDLE Laboratory Report addressed to "Sheriff Grady C. Judd, Jr." at the PCSO address, reflecting that the FDLE laboratory's findings in Plaintiff's case were directed to Defendant Judd personally as the addressee of record;

c. On information and belief, Defendant Judd had actual or constructive knowledge of Defendant Turnage's three documented disciplinary incidents, the November 2015 Miranda violation and 8-hour

73

suspension, the December 2015 Letter of Guidance, and the December 16, 2016 Letter of Reprimand through the operation of PCSO's institutional disciplinary reporting practices, under which formal disciplinary actions involving Special Victims Unit detectives in child sexual abuse investigations are reportable through the PCSO command structure to the Sheriff's office. Defendant Judd, as Sheriff and final policymaker for the agency under Fla. Const. art. VIII, § 1(d), held both supervisory authority over and individual responsibility for the assignment, retention, and discipline of PCSO detectives in the Special Victims Unit. Notwithstanding the documented disciplinary record, Defendant Judd retained Defendant Turnage in her Special Victims Unit assignment for approximately eight years following Plaintiff's case; and

d. Defendant Judd's knowledge and approval of defending Defendant Turnage's investigation in the Cadle matter as "thorough" in a letter addressing Plaintiff's matter in 2024 in a letter written on letterhead that in bold large font on each page starts with "**Sheriff Grady Judd",** and;

e. Post-event evidence shedding light on PCSO institutional practice during Defendant Judd's tenure includes:

74

i.  The September 2019 arrest and criminal charges against PCSO Detective Dennis Jones, Jr. for repeatedly being able to falsify official records;

ii.  The May 2022 PCSO Special Victims Unit closure of the credible and corroborated sexual abuse complaint made by minors against an adult family member; and

iii.  The October 2025 charges against PCSO Special Victims Unit Detective Gregory Streeter for tampering with or fabricating evidence in child and sex abuse investigations.

167.  The majority of these post-event matters received local news coverage and PCSO institutional response, of which Defendant Judd, as the Sheriff who made public statements concerning each, had actual knowledge.

168.  Defendant Turnage's three documented disciplinary incidents known, should have been known or at a minimum accessible to Defendant Judd during her full tenure in the PCSO Special Victims Unit within a nine-month time frame reflected a connected pattern of failure to apply the substantive and procedural legal standards governing PCSO Special Victims Unit investigations of child sexual abuse, the same legal standards that Defendant Turnage subsequently failed to apply in her investigation of Plaintiff's disclosure:

a. The November 2015 Miranda violation, which resulted in suppression of a confession in a child sexual abuse investigation negatively impacting the prosecution and case outcome, reflected Defendant Turnage's failure to apply the procedural requirements governing custodial interrogation of suspects in PCSO Special Victims Unit investigations. PCSO issued Defendant Turnage an 8-hour suspension;

b. The December 2015 Letter of Guidance, issued for Defendant Turnage's failure to act on disclosures of ongoing sexual abuse made by child complainants in an active PCSO Special Victims Unit investigation, reflected Defendant Turnage's failure to apply the substantive standards governing PCSO Special Victims Unit response to disclosed child sexual abuse — specifically, the institutional obligation to act timely and substantively on disclosures of ongoing child sexual abuse. PCSO did not remove Defendant Turnage from the Special Victims Unit and did not require remedial training following the December 2015 Letter of Guidance;

c. The December 16, 2016 Letter of Reprimand, issued the same day Defendant Turnage signed the December 16, 2016 charging affidavit against Plaintiff, was issued for Defendant Turnage's arrest of the wrong suspect in a separate child sexual abuse investigation, notwithstanding

76

clear physical mismatches between the suspect and the perpetrator description provided by the child complainant. The Letter of Reprimand reflected Defendant Turnage's failure to apply the probable-cause standards governing arrest determinations in PCSO Special Victims Unit child sexual abuse investigations; and

d. Defendant Turnage's misapplication of Fla. Stat. § 794.022(1) corroboration law in Plaintiff's case, advising Plaintiff that the absence of corroborating DNA evidence was dispositive of her allegations of sexual abuse, reflected the same category of legal-standards-application failure documented in the prior three disciplinary incidents: a failure to apply the substantive and procedural legal standards governing PCSO Special Victims Unit investigations of child sexual abuse.

169. The four incidents above are connected by a common unifying practice: Defendant Turnage's repeated failure, over a fourteen-month period in the PCSO Special Victims Unit, to apply the substantive and procedural legal standards governing the investigation of child sexual abuse. PCSO's retention of Defendant Turnage in the Special Victims Unit notwithstanding three documented incidents of legal-standards-application failure, and Defendant Judd and PCSO's failure to require remedial training in the legal-standards-application areas the disciplinary

77

incidents had identified, exposed Plaintiff to the constitutional violations and injuries Defendant Turnage subsequently produced.

170.   Defendant Judd failed to train PCSO personnel, including Defendant Turnage and Defendant Rushing, in the following specific subjects, the training of which is non-obvious to law enforcement personnel without specific instruction:

a. The substantive Florida law set forth in Fla. Stat. § 794.022, which provides that the uncorroborated testimony of a victim of sexual assault is alone sufficient to obtain a conviction;

b. The probable-cause standard for charging a complainant of sexual violence and intrafamilial abuse under Fla. Stat. § 837.055 or Fla. Stat. § 837.05, including the constitutional and statutory limits on such charging decisions;

c. The correct interpretation of forensic laboratory findings in sexual violence investigations, including the limitations of DNA analysis where condoms are used, and the limitations of medical forensic examinations in assessing whether sexual contact has occurred, and the recognized indicators of child sexual abuse identifiable through forensic medical examination; and

d. Investigative protocols for the response to disclosures of sexual violence and intrafamilial abuse, including (i) the recognition that

78

complainants of sustained intrafamilial abuse commonly present with partial, delayed, or evolving accounts, (ii) the procedural requirements for the conduct of forensic interviews of minor sexual abuse complainants, and (iii) the procedural requirements governing custodial interrogation of minor complainants of sexual abuse, including the circumstances under which parental, guardian, or counsel presence is required.

171. These trainable subjects identified in ¶ 170 above, are not obvious to law enforcement personnel without training. Florida sexual assault corroboration law (Fla. Stat. § 794.022(1)) is a statutory rule of evidence that is not self-evident; it requires affirmative instruction. Probable cause analysis for false-reporting charges against complainants of sexual violence and intrafamilial abuse requires understanding of both the elements of the false-reporting statutes and the constitutional limits on charging discretion in this specific factual context. Forensic evidence interpretation in child sexual abuse cases, including the meaning of negative DNA results in cases involving condom use, the meaning of negative medical forensic examination findings in cases involving delayed disclosure, and the recognized clinical indicators of child sexual abuse, requires specific scientific and clinical instruction. Investigative protocols for disclosures of sustained intrafamilial abuse, including the recognition of disclosure dynamics, require training in the

recognized professional standards of the discipline. None of these subjects are obvious without training or supervision.

172. Defendant Judd's failure to train PCSO personnel in the trainable subjects identified in ¶ 170 above, notwithstanding his actual or constructive notice of the need for such training as established in ¶¶ 165-169 above, constituted deliberate indifference to the constitutional rights of persons in Plaintiff's position. The pattern of similar constitutional violations identified in ¶ 165 above provided Defendant Judd with actual or constructive notice that the absence of training in the subjects identified in ¶ 170 above was causing PCSO Special Victims Unit personnel to violate the constitutional rights of complainants of sexual violence and intrafamilial abuse, and Defendant Judd, armed with that knowledge, chose to retain the inadequate training program.

173. Defendant Judd's deliberate indifference to the need for training is further demonstrated by:

    a. His own on-the-record public endorsement in June 2015 of the institutional posture that gave rise to the constitutional risks the absent training would have addressed;

    b. His failure, notwithstanding receipt of the October 26, 2016, FDLE Laboratory Report addressed to him personally, to intervene in

Plaintiff's investigation or to re-examine PCSO's investigative practices;

c. His failure, notwithstanding the 2017 vacatur of Plaintiff's adjudication and the State Attorney's 2017 confirmation that Plaintiff's allegations had been truthful, to institute any corrective training or policy change within PCSO; and

d. The continued operation, six years after Plaintiff's injuries, of the same § 794.022(1) misapplication that produced Plaintiff's injuries, as evidenced by the May 2022 PCSO Special Victims Unit case closure described at ¶¶ 84-85 above.

174. Defendant Judd's supervisory conduct identified above was the moving force behind the following constitutional injuries suffered by Plaintiff:

a. Defendant Turnage's presumptive-fabrication framing of Plaintiff's disclosure on July 31, 2016;

b. Defendant Turnage's coercive interrogation of Plaintiff later that same day;

c. Defendant Turnage's pre-DNA investigative conclusion of August 17, 2016, and formal conclusion of August 19, 2016;

d.  Defendant Turnage's lack of understanding and misrepresentation of the October 26, 2016, FDLE Laboratory Report to Plaintiff on December 14, 2016;

e.  Defendant Turnage's December 14, 2016, investigative conclusion that Plaintiff had fabricated her disclosure despite the Laboratory Report corroborating Plaintiff; and

f.  Defendant Turnage's December 16, 2016, charging affidavit against Plaintiff.

175.  Each action reflected the direct application of the institutional practice Defendant Judd had established and maintained, Defendant Judd's failure to train PCSO personnel identified above in ¶ 170 and Defendant Judd's retention of Defendant Turnage in the Special Victims Unit notwithstanding her documented SVU-specific unfitness.

176.  Defendant Rushing's December 16, 2016, notarization of the charging affidavit, without independent review of the evidence or correction of the affidavit's material omissions, likewise reflected the institutional practice Defendant Judd had established and also Defendant Judd's failure to train PCSO personnel in the trainable subjects identified above in ¶ 170.

177.  As a direct and proximate result of Defendant Judd's conduct identified in ¶¶ 162-176 above the following occurred:

a. As a 12-year-old sexual abuse complainant, Plaintiff was subjected to coercive and accusatory interrogation by Defendant Turnage;

b. Plaintiff was subjected to threats by Defendant Turnage that her father would be incarcerated and her family would suffer material losses if she persisted in affirming the veracity of her disclosures of sexual abuse;

c. Plaintiff was subjected to threats by Defendant Turnage that she herself would be returned to foster care if she persisted in affirming the veracity of her disclosures of sexual abuse;

d. Plaintiff was subjected to graphic and intimidating descriptions by Defendant Turnage and another PCSO officer of the procedures of a sexual assault forensic examination, used as a coercive threat to induce Plaintiff to recant her disclosures;

e. Plaintiff was wrongfully charged with giving false information to a law enforcement officer in violation of Fla. Stat. § 837.055;

f. Plaintiff was wrongfully adjudicated of giving false information to a law enforcement officer in violation of Fla. Stat. § 837.055;

g. Plaintiff was ordered to perform community service;

h. Plaintiff was ordered to write letters of apology to her abuser Defendant Cadle and to the PCSO that had wrongfully charged her;

i. Plaintiff was placed on probation;

83

j. Plaintiff was removed from Florida Department of Children and Families protective supervision;

k. Plaintiff was returned to the custody and control of Defendant Cadle, a sexual predator who had repeatedly sexually abused her over the span of approximately 5 years; and

l. Plaintiff was raped again by Defendant Cadle on July 25, 2017.

178. Defendant Judd's acts and omissions, as described above, were the direct and proximate result of Plaintiff's injuries and damages, including severe emotional distress, humiliation, reputational stigma, loss of capacity for enjoyment of life, expenses for treatment and care, and physical and psychological injury from the subsequent sexual assaults that occurred as a result of Defendant Judd's failures. Said losses, injuries, and expenses are either permanent or continuing in nature and Plaintiff will continue to suffer same in the future.

179. Defendant Judd knew or should have known that conduct would result in the deprivation of Plaintiff's constitutional rights.

180. Defendant Judd's deliberate indifference resulted in the deprivation of Plaintiff's constitutional rights.

181. Punitive damages are available against Defendant Judd and are hereby sought by Plaintiff given the reprehensibility of Defendant Judd's conduct and the need to deter others from engaging in similar conduct

182.    Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

## COUNT VI:
## 42 U.S.C. § 1983 – POLICY, PRACTICE, CUSTOM
*(Plaintiff Taylor Cadle vs. Defendant Sheriff Grady Judd – Official Capacity)*

183.    Plaintiff hereby incorporates and realleges by reference the allegations in Paragraphs 6-9 and 18-109 above.

184.    Defendant Judd is the final policy maker for the PCSO.

185.    The PCSO by and through Defendant Judd had in force and effect at the time of Plaintiff's complaint of sexual abuse, a policy, practice, or custom of his deputies and other law enforcement personnel engaging in unconstitutional and coercive interviews with victims to induce them to recant and in filing charges without probable cause.

186.    The PCSO by and through Defendant Judd had in force and effect at the time of Plaintiff's complaint of sexual abuse, a policy, practice, or custom of other improper and unconstitutional conduct by his deputies and other law enforcement personnel including but not limited to:

      a.    Failing to properly investigate allegations of sexual abuse, including childhood sexual abuse;

      b.    Failing to properly interview suspects, including those suspected of sexual abuse to include childhood sexual abuse;

c.    Failing to meet probable cause standards for criminal charges related to sexual abuse including childhood sexual abuse;

d.    Failing to meet probable cause standards for false reporting charges against minors;

e.    Failing to provide mandatory supervisory review before recommending charges against minor complainants.

187.   On information and belief, the PCSO by and through Defendant Judd had actual or constructive notice of these practices, policies, or customs, but approved and allowed such conduct to continue.

188.   On information and belief, PCSO command staff reviewed and approved the decision to seek charges and the investigative approach used against Plaintiff including during Plaintiff's interviews.

189.   In addition, and in the alternative, the foregoing policies/practices/customs affirmatively created or substantially increased a specific danger to Plaintiff by:

a.  Branding Plaintiff—a known minor sexual-abuse victim—as a liar, foreclosing or diminishing safety planning and removal options;

b.  Communicating to allied agencies that Plaintiff's report was false, which foreseeably resulted in Plaintiff remaining in the custody and control of her abuser; and

   c. Discouraging or failing to require coordination with child-protective/victim-advocacy services despite the obvious, known risk of further abuse.

190. These policy driven affirmative acts and omissions shock the conscience and violated Plaintiff's Fourteenth Amendment rights to bodily integrity and personal security.

191. After it was learned that Plaintiff's report of sexual abuse was in fact true and her conviction was overturned, the PCSO imposed no timely discipline or corrective action, thereby approving the decision and basis for it.

192. The foregoing policy and decision was the moving force behind the violations of Plaintiff's Fourth and Fourteenth Amendment rights.

193. As a direct and proximate result of the PCSO's acts and omissions, Plaintiff suffered injuries and damages, including severe emotional distress, humiliation, reputational stigma, loss of capacity for enjoyment of life, expenses for treatment and care, and physical and psychological injury from the subsequent sexual assaults that occurred because of the PCSO's failures. Said losses, injuries, and expenses are either permanent or continuing in nature and Plaintiff will continue to suffer same in the future.

194. Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

## COUNT VII:
### 42 U.S.C. § 1983 – POLICY, PRACTICE, CUSTOM
*(Plaintiff Taylor Cadle vs. Defendant Sheriff Grady Judd – Individual Capacity)*

195. Plaintiff hereby incorporates and realleges by reference the allegations in Paragraphs 6-9 and 18-109 above.

196. Defendant Judd is the final policy maker for the PCSO.

197. In his individual capacity and exercising his supervisory and policy-setting authority, Defendant Judd personally established, maintained, and ratified PCSO institutional policies, practices, and customs imposing a flawed credibility-based screening posture toward complainants of sexual violence and intrafamilial abuse, applied as a threshold investigative posture in disregard of the corroboration rule established by Fla. Stat. § 794.022(1) and of the procedural limits on the deployment of Florida's false-reporting statutes (Fla. Stat. §§ 837.05(1), 837.055) against complainants of sexual violence and intrafamilial abuse. Defendant Judd's personal establishment of these policies, practices, and customs is reflected in his on-the-record June 21, 2015, public statements to The Ledger, in which Defendant Judd stated:

    a. Sex-crime complainants "lie to you as quickly and as badly as the suspects on many occasions;"

    b. Peer-reviewed research estimating false-report rates at 2 percent to 8 percent was "much too low;"

c. Some sexual assault reports are "absolutely fiction" such that testing rape kits in those cases "makes no sense;"

d. An adult rape complainant whose account PCSO investigators subjectively rejected was a "mentally ill lady" with a "big elaborate story" whose report reflected "no event," notwithstanding PCSO's own collection of a rape kit in that case; and

e. Defendant Judd's own approval and defense of PCSO's practice of declining to submit 524 of 990 sexual assault evidence kits to the Florida Department of Law Enforcement for forensic analysis was justified, in Defendant Judd's words: "You would not put a rape kit in the system on a case that didn't occur." Defendant Judd's own articulated rationale, that the agency he directed would not submit kits in cases PCSO investigators had subjectively and prematurely determined were non-occurrences — established the flawed credibility-based screening principle Defendant Judd set for the agency's sexual assault evidence kit submissions to FDLE during his tenure.

f. These statements, made in Defendant Judd's capacity as PCSO's final policymaker and published in a newspaper of record, communicated to PCSO law enforcement personnel, including Special Victims Unit detectives, the institutional policies, practices, and customs Defendant

89

Judd established for PCSO's handling of complainants of sexual violence and intrafamilial abuse.

198.   The PCSO institutional policies, practices, and customs Defendant Judd personally established were persistent and widespread within PCSO's jurisdiction. The pattern includes:

a.   the April 2011 PCSO investigation in which a PCSO detective deployed charging-threat against a 17-year-old sexual assault complainant before completing the investigation of her sexual assault report where the suspect was later charged with battery for a subsequent incident;

b.   the March 2016 PCSO Special Victims Unit charging of an 11-year-old child reporter under Fla. Stat. § 837.05(1), in connection with which Defendant Judd personally appeared at the PCSO press conference announcing the charging decision;

c.   the July 2016 PCSO charging of an adult domestic violence strangulation victim under Fla. Stat. § 837.055, two days before Plaintiff's disclosure of sexual abuse and under the same statute Defendant Turnage charged Plaintiff approximately five months later;

d.   the July through December 2016 PCSO handling of Plaintiff's case, a 12-year-old complainant of childhood sexual abuse by her adoptive father, charged under Fla. Stat. § 837.055;

90

e. the May 2022 PCSO Special Victims Unit closure of a sexual abuse complaint involving a fifteen-year-old minor complainant corroborated by another family member who also reported sexual abuse, on a stated rationale that directly contradicts Fla. Stat. § 794.022(1); and

f. PCSO and Defendant Judd's practice throughout the relevant period of declining to submit 524 of 990 collected sexual assault evidence kits to FDLE for forensic analysis. Each of these incidents reflected the same PCSO institutional policies, practices, and customs Defendant Judd had personally established and maintained.

199. On information and belief, Defendant Judd had actual or constructive notice of these policies, practices, and customs but failed to disapprove, curtail, or correct them, and instead permitted and ratified them, demonstrating deliberate indifference to the known or obvious risk of constitutional injury.

200. The PCSO institutional policies, practices, and customs Defendant Judd personally established, maintained, and ratified included, without limitation, the following specific customs and practices:

a. Reaching investigative conclusions regarding complainants of sexual violence before the receipt of forensic laboratory findings, based on PCSO investigators' subjective credibility assessments;

91

b. Treating the absence of corroborating forensic evidence as dispositive of non-occurrence, notwithstanding the documented limitations of forensic evidence in sexual abuse investigations including the effect of condom use on DNA recovery;

c. Charging complainants of sexual violence and intrafamilial abuse, including minors, under Fla. Stat. § 837.055 and Fla. Stat. § 837.05 as a mechanism to deter complainants from pursuing their allegations or to penalize complainants whose accounts PCSO investigators subjectively rejected;

d. Using charging threats against complainants of sexual violence to cause complainants to abandon their reports and sign waivers of prosecution;

e. Conducting custodial interrogation of minor complainants of sexual abuse without the presence of a parent, guardian, or counsel independent of the suspect;

f. Declining to submit sexual assault evidence kits to FDLE for testing based on the flawed credibility-based screening principle Defendant Judd publicly articulated; and

g. Retaining in the PCSO Special Victims Unit detectives whose documented disciplinary incidents in child sexual abuse investigations had established their unfitness for that assignment

92

201. Defendant Judd had actual or constructive notice of the policies, practices, and customs identified above, established by his own June 2015 public statements articulating them; by the PCSO investigative and charging records in the April 2011, March 2016, and July 2016 incidents identified in ¶ 198 above; by Defendant Judd's personal appearance at the March 10, 2016 PCSO press conference at which the charging decision involving the 11-year-old child reporter was announced; by Defendant Judd's personal receipt of the October 26, 2016 FDLE Laboratory Report in Plaintiff's case, addressed directly to "Sheriff Grady C. Judd, Jr." at the PCSO address; and on information and belief, by the operation of PCSO's institutional disciplinary reporting practices, under which formal disciplinary actions involving Special Victims Unit detectives in child sexual abuse investigations are reportable through the PCSO command structure to the Sheriff. Notwithstanding this notice, Defendant Judd ratified the policies, practices, and customs by failing to disapprove, curtail, or correct them; by retaining Defendant Turnage in the PCSO Special Victims Unit for approximately eight years following Plaintiff's case notwithstanding her three documented disciplinary incidents; and by failing to institute any corrective measures within PCSO that would have disrupted the policies, practices, and customs.

202. The continued operation of these policies, practices, and customs in the years after Plaintiff's case, as evidenced by the September 2019 criminal prosecution

of PCSO detective Dennis Jones, Jr. for falsifying official records and waivers of prosecution in juvenile matters, and the October 2025 criminal prosecution of former PCSO Special Victims Unit Detective Gregory Streeter for tampering with and fabricating evidence in six child and sex abuse investigations, further reflects the continued operation of the policies, practices, and customs Defendant Judd had personally established.

203.   The continuing operation of the same policies, practices, and customs in PCSO's investigative and charging conduct after Plaintiff's case — including the May 2022 PCSO Special Victims Unit case closure described in ¶¶ 84-85 above and the post-event matters described in ¶¶ 105-108 above, is post-event evidence under *Bridges v. Poe*, 155 F.4th 1302, 1316 (11th Cir. 2025), shedding light on the policies, practices, and customs Defendant Judd had personally established and that were operative at the time of Plaintiff's 2016 injuries.

204.   The PCSO's policies, practices, and customs that Defendant Judd personally established, maintained, and ratified were the moving force behind Plaintiff's constitutional injuries. Defendant Turnage's handling of Plaintiff's case, including:

   a.   her presumptive-fabrication framing of Plaintiff's disclosure to Lisa Cadle on July 31, 2016;

   b.   her coercive interrogation of Plaintiff later that same day, July 31, 2016;

c.  pre-DNA investigative conclusions of August 17 and August 19, 2016;

d.  her December 14, 2016 misrepresentation of the FDLE Laboratory Report; and

e.  her December 16, 2016 charging affidavit against Plaintiff, directly reflected the application of policies, practices, and customs Defendant Judd had established.

205.  Defendant Rushing's notarization of the December 16, 2016 charging affidavit, without independent review of the evidence or correction of its material omissions, likewise reflected the direct application of these policies, practices, and customs.

206.  As a direct and proximate result of the policies, practices, and customs set forth in ¶¶ 197 – 205 above, the following occurred:

a.  As a 12-year-old sexual abuse complainant, Plaintiff was subjected to coercive and accusatory interrogation by the PCSO;

b.  Plaintiff was subjected to threats by the PCSO that her father would be incarcerated and her family would suffer material losses if she persisted in affirming the veracity of her disclosures of sexual abuse;

c.  Plaintiff was subjected to threats by the PCSO that she herself would be returned to foster care if she persisted in affirming the veracity of her disclosures of sexual abuse;

d.  Plaintiff was subjected to graphic and intimidating descriptions by the PCSO of the procedures of a sexual assault forensic examination, used as a coercive threat to induce Plaintiff to recant her disclosures;

e.  Plaintiff was wrongfully charged with giving false information to a law enforcement officer in violation of Fla. Stat. § 837.055;

f.  Plaintiff was wrongfully adjudicated of giving false information to a law enforcement officer in violation of Fla. Stat. § 837.055;

g.  Plaintiff was ordered to perform community service;

h.  Plaintiff was ordered to write letters of apology to her abuser Defendant Cadle and to the PCSO that had wrongfully charged her;

i.  Plaintiff was placed on probation;

j.  Plaintiff was removed from Florida Department of Children and Families protective supervision;

k.  Plaintiff was returned to the custody and control of Defendant Cadle, a sexual predator who had repeatedly sexually abused her over the span of approximately 5 years; and

l.  Plaintiff was raped again by Defendant Cadle on July 25, 2017.

207.  As a direct and proximate result of the Defendant Judd's acts and omissions, Plaintiff suffered injuries and damages, including severe emotional distress, humiliation, reputational stigma, loss of capacity for enjoyment of life,

expenses for treatment and care, and physical and psychological injury from the subsequent sexual assaults that occurred because of Defendant Judd's failures. Said losses, injuries, and expenses are either permanent or continuing in nature and Plaintiff will continue to suffer same in the future.

208. Punitive damages are available against Defendant Judd and are hereby sought by Plaintiff given the reprehensibility of Defendant Judd's conduct and the need to deter others from engaging in similar conduct.

209. Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988 and other applicable laws.

## COUNT VIII:
## SEXUAL BATTERY (RAPE)
*(Plaintiff Taylor Cadle vs. Defendant Henry Cadle)*

210. Plaintiff hereby incorporates and realleges by reference to the allegations in Paragraphs 16 and 18-109 above.

211. Between 2013 through 2017, Defendant Cadle sexually molested and raped Plaintiff.

212. As a minor, Plaintiff was incapable of consenting to this sexual abuse.

213. It was known to Defendant Cadle that Plaintiff, as a minor, could not consent to his sexual abuse and rapes.

214. Defendant Cadle committed "sexual battery" as defined in § 794.011(1)(h), Fla. Stat.

97

215. The sexual battery described above directly and proximately caused Plaintiff's injuries in that it directly, and in a natural and continuous sequence, produced or contributed to such injuries.

216. As a direct and proximate result of the foregoing, Plaintiff has suffered bodily injury, severe ongoing emotional distress, mental disturbance, fright, revulsion, humiliation, emotional and psychological pain and suffering, mental anguish, inconvenience, and a loss of capacity for the enjoyment of life, along with the consequential damages as a result of the severe distress. Said losses, injuries, and expenses are either permanent or continuing in nature and Plaintiff will continue to suffer same in the future.

## COUNT IX:
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
*(Plaintiff Taylor Cadle vs. Defendant Henry Cadle)*

217. Plaintiff hereby incorporates and realleges by reference the allegations in Paragraphs 16 and 18-109 above

218. Defendant Cadle's conduct of sexually abusing and raping Plaintiff on countless occasions was intentional and reckless, and Defendant knew or should have known that emotional distress would likely result.

219. The conduct described in the incorporated paragraphs was and is outrageous; that is, it goes beyond all bounds of decency and is and out to be regarded as odious and utterly intolerable in a civilized community.

220.   The conduct described above directly and proximately caused Plaintiff's injuries in that it directly, and in a natural and continuous sequence, produced or contributed to such injuries.

221.   As a direct and proximate result of the foregoing, Plaintiff has suffered severe ongoing emotional distress, mental disturbance, fright, revulsion, humiliation, emotional and psychological pain and suffering, mental anguish, inconvenience, and a loss of capacity for the enjoyment of life, along with the consequential damages as a result of the severe distress. Said losses, injuries, and expenses are either permanent or continuing in nature and Plaintiff will continue to suffer same in the future.

## COUNT X:
### INVASION OF PRIVACY
*(Plaintiff Taylor Cadle vs. Defendant Henry Cadle)*

222.   Plaintiff hereby incorporates and realleges by reference the allegations in Paragraphs 16 and 18-109 above.

223.   Defendant Cadle's unwanted and offensive sexual contact with Plaintiff was an invasion of her physical solitude and privacy.

224.   The invasion of privacy described above directly and proximately caused Plaintiff's injuries in that it directly, and in a natural and continuous sequence, produced or contributed to such injuries.

225.   As a direct and proximate result of the foregoing, Plaintiff has suffered bodily injury, emotional distress, mental disturbance, fright, revulsion, humiliation, emotional and  psychological pain and suffering, mental anguish, inconvenience, loss of capacity for the  enjoyment of life, lost wages, loss of the ability to earn wages, and substantial medical and other expenses for treatment and care, past, present, and future. Said losses, injuries, and expenses are either permanent or continuing in nature and Plaintiff will continue to suffer same in the future.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff Taylor Cadle prays for judgment against Defendants as follows:

226.   As to Count I, a money judgment against Defendant Turnage for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney's fees, as allowed by law.

227.   As to Count II, a money judgment against Defendant Turnage for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney's fees, as allowed by law.

228.   As to Count III, a money judgment against Defendant Rushing for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney's fees, as allowed by law.

229. As to Count IV, a money judgment against Defendant Judd in his official capacity for all compensatory damages and special damages, cost disbursements, pre- and post-judgment interest, and attorney fees, as allowed by law.

230. As to Count V, a money judgment against Defendant Judd for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney's fees, as allowed by law.

231. As to Count VI, a money judgment against Defendant Judd in his official capacity for all compensatory damages and special damages, cost disbursements, pre- and post-judgment interest, and attorney fees, as allowed by law.

232. As to Count VII, a money judgment against Defendant Judd for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney's fees, as allowed by law.

233. As to Count VIII, a money judgment against Defendant Cadle for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney's fees, as allowed by law.

234. As to Count IX, a money judgment against Defendant Cadle for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney's fees, as allowed by law.

235.   As to Count X, a money judgment against Defendant Cadle for all compensatory damages and special damages, punitive damages, cost disbursements, pre- and post-judgment interest, and attorney's fees, as allowed by law.

**Date:** April 28, 2026

**/s/ Brenda Harkavy**
Brenda Harkavy, Esq. (SBN: 332405)
*Admitted pro hac vice*
M. Stewart Ryan, Esq. (SBN: 313516)
*Admitted pro hac vice*
Alexandria MacMaster, Esq. (SBN: 316826)
*Admitted pro hac vice*
Laffey Bucci D'Andrea Reich & Ryan
1100 Ludlow Street, Suite 300
Philadelphia, PA 19107
P: 215-399-9255
bharkavy@laffeybucci.com
sryan@laffeybucci.com
amacmaster@laffeybucci.com
CVSRteam@laffeybucci.com

**/s/ Troy Rafferty**
Troy A. Rafferty, Esq. (SBN: 24120)
Madeline E. Pendley, Esq. (SBN: 1019746)
Rafferty, Domnick, Cunningham & Yaffa
815 S. Palafox St., 3rd Floor
Pensacola, FL 32502
P: 850-208-0826
troy@pbglaw.com
madeline@pbglaw.com

## CERTIFICATE OF SERVICE

I hereby certify that notice of this filing was served via the Court's CM/ECF

system on all counsel of record registered to receive electronic notifications.

**Dated**: April 28, 2026                    Respectfully submitted,

                                             **/s/ Brenda Harkavy**
                                             Brenda Harkavy, Esq.